UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DICHELLO DISTRIBUTORS, INC.      )
                                 )
                                 )     CASE NO. 3:20-cv-01003-VLB
                     Plaintiff,  )
                                 )
     v.                          )
                                 )
ANHEUSER-BUSCH, LLC              )
                                 )
                     Defendant.  )     AUGUST 14, 2020

## AMENDED COMPLAINT

## THE PARTIES

1.      The Plaintiff, Dichello Distributors, Inc. ("Dichello"), is a family owned Connecticut corporation located at 55 Marsh Hill Road, Orange, Connecticut.

2.      Dichello is a wholesale distributor of numerous beer brands, including beer brands manufactured by the Defendant, Anheuser-Busch, LLC ("AB") and has been the exclusive distributor of AB beer brands in New Haven, Fairfield and Middlesex counties for many decades.

3.      AB is a Missouri limited liability company with a principal place of business located at One Busch Place, St. Louis, Missouri.  AB was formerly known as Anheuser-Busch, Incorporated, until it was converted under the laws of Missouri to Anheuser-Busch, LLC on or about October 1, 2011. AB is registered to do business in the State of Connecticut.

4.      AB is a beer manufacturer that, upon information and belief, owns and operates 19 breweries in the United States and owns more than 40 major beer

1

brands, including Bud Light, Budweiser, Busch, Michelob, Rolling Rock, Natural Light, Stella Artois, LandShark, Shock Top, Goose Island, Blue Point, and Beck's.

## GENERAL NATURE OF THE ACTION

5.      Dichello's claims against AB arise under the Sherman Antitrust Act, 15 U.S.C. § 1 et. seq.; the Connecticut Antitrust Act, C.G.S. § 35-24 et. seq.; the Connecticut Unfair Trade Practices Act, C.G.S. § 42-11a et. seq.; and the common law of the State of Connecticut.

6.      Dichello seeks, *inter alia,* declaratory judgment relief, injunctive relief, and money damages, including an award of treble damages, punitive damages, interest, costs and reasonable attorneys' fees.

## THE UNITED STATES BEER MARKET

### Historical Basis of State Regulation

7.      Before Prohibition and passage of the 18th Amendment, brewers and producers of alcoholic beverages sold their products directly to retailers and often owned and controlled bars and taverns (commonly known as "tied houses"). Manufacturer control over tied houses led to anti-competitive business practices and unscrupulous marketing tactics designed to induce excessive consumption.

8.      With the passage of the 21st Amendment and the end of Prohibition, the States were granted the primary authority to regulate the distribution of alcoholic beverages, including beer, with the objective of allowing consumption but eliminating the evils that led to Prohibition.

9.     Connecticut, in response, enacted the Liquor Control Act, C.G.S. § 30-1 *et seq.*, with the objective of preventing manufacturers from engaging in anti-competitive practices and unscrupulous marketing tactics, and reducing excessive consumption.

**State Regulation**

10.     The beer industry in Connecticut, and in most other states, is divided into three tiers—commonly referred to as a "Three Tier System."

11.     The "Three Tier System" consists of a rigid set of laws and regulations that dictate how alcohol is distributed from manufacturers to consumers.

12.     The three tiers are (i) manufacturers; (ii) wholesalers; and (iii) retailers.  Each tier within the "Three Tier System" is regulated by state law and any company operating within a given tier must secure a state permit to do so.

13.     Manufacturers in the first tier are generally prohibited from selling directly to retailers, and instead, must sell to wholesalers—who in turn sell to retailers, who then ultimately sell the beer products to the consumer.

14.     Additionally, any given brand of beer can only be distributed by a single wholesaler within a defined territory.

15.     The "Three Tier System" also prohibits any company operating in any one tier from owning, operating or controlling a company operating in different tier.

16.     Connecticut's Liquor Control Act is intentionally and comprehensively structured to prevent any one tier of the beer industry from

3

controlling or influencing another. For example, Connecticut strictly mandates that: "No person, corporation or group of persons or corporations who, through stock ownership or otherwise, control or have the power to control a permit business of one class shall control or have the power to control a permit business of another class of permit, except as permitted by the Connecticut General Statutes." Regs. Conn. State Agencies § 30-6-A4(b).

17.    Connecticut law also specifically protects wholesalers, who have distributed a beer product for more than six months, from termination by a manufacturer "except for just and sufficient cause" found by the Department of Consumer Protection, Liquor Control Division, after notice and hearing. Conn. Gen. Stat. § 30-17.

18.    Importantly, Connecticut's Liquor Control Act, C.G.S. § 30-1 *et. seq.*, is designed to (i) prevent anti-competitive practices, (ii) provide for an orderly marketplace, (iii) eliminate unscrupulous marketing tactics, (iv) generate revenues for the state, (v) facilitate local control over alcoholic beverages, and (vi) encourage temperance.

19.    The independence of licensed wholesalers protected under the Liquor Control Act and its Three Tier System serves as an important check on the market power of large manufacturers and the pernicious economic and social effects associated with pre-Prohibition tied houses.

20.    The independence of wholesalers also facilitates the entry into that market of competing brands of beer, including local "craft" beers, all of which inures to the benefit of consumers and the public. Specifically, independent

wholesalers can invest resources in relationships with brewers of all sizes to provide them with the opportunity to compete, prosper and grow in the beer marketplace.

21.     The independence of wholesale distribution mandated by the Liquor Control Act and embodied in the Three Tier System is critical for the marketplace to remain free from the controls and influence of any one brewer in order to meet consumer demand with respect to choice, variety, access and price.

22.     AB, however, has illegally circumvented and undermined Connecticut's Liquor Control Act and the Three Tier System, as detailed herein.

<u>The Market Segments for Beer</u>

23.     Beers sold in the United States are generally segmented, based on price and quality, into three categories: (1) sub-premium, (2) premium, and (3) high-end.

24.     High-end beers account for a small portion of the beer sold by AB in the United States when compared to sub-premium and premium beers.

25.     AB seeks to maintain "price gaps" between each beer segment to minimize competition across segments.

26.     As the price of beer in one segment approaches the price of beer in another segment, consumers are increasingly willing to "trade up" from one category of brands to another.

27.     As a result, competition in the high-end beer segment serves as an important constraint on the ability of AB to raise beer prices in the premium and sub-premium segments.

**Beer Distribution in the United States**

28.    Consistent with the "Three Tier System," AB uses wholesalers to merchandise, sell, and deliver its beer brands to retailers in Connecticut.  The retailers include package stores, grocery stores, restaurants and bars.

29.    While in a limited number of states AB is permitted to distribute beer directly to retailers as it prefers to do, independent wholesalers distribute the largest volume of AB beer in the United States and AB's beer brands account for a large percentage of the overall business of these independent wholesalers.

30.    Nevertheless, independent wholesalers – such as Dichello – also distribute beers that compete with AB, including high-end beers that constrain AB's ability to raise prices on its premium and sub-premium brands.

**The Relevant Market**

31.    Beer is usually made from a malted cereal grain, flavored with hops, and brewed via a fermentation process.

32.    Beer's taste, alcohol content, image, price, and other factors make it substantially different from other alcoholic beverages.

33.    Other alcoholic beverages, such as wine and distilled spirits, are not sufficiently substitutable to beer from the consumers' perspective, and as a result, relatively few consumers would substantially reduce their beer purchases in the event of a small but significant and non-transitory increase in the price of beer.

34.     Competition exists among beer manufacturers on a national level, and decisions about beer brewing, marketing and branding typically take place on a national level.

35.     Connecticut law, however, regulates competition of beer products in terms of pricing and distribution.

36.     The relevant market for antitrust purposes is, therefore, beer sold within the State of Connecticut and the United States.

**AB's Market Power within the Relevant Market**

37.     AB is the largest beer brewing company both in the United States and the world.

38.     Millions of Americans spend nearly $120 Billion each year on beer, and AB accounts for approximately 40% of all beer sales in the United States.

39.     In addition, AB makes and sells a vast number of beer brands and those brands account for a large percentage of independent wholesaler's revenues.

40.     AB, thus, has significant power in the relevant market, and that power has allowed AB to attempt to illegally control independent wholesalers, including Dichello.

**AB's Anticompetitive Activity**

41.     AB has used its market power in the relevant market to disadvantage rivals, restrict supply, and reduce price competition.

42.     AB, in particular, has used a variety of practices and contractual provisions that limit, impede and restrain the free and independent promotion

and distribution of competing beers, generally, and high-end beers, more specifically.

43.     For example, AB has forced upon its independent wholesalers contractual terms that (i) limit the wholesaler's ability to promote, supply and sell beers that compete with AB's beer brands, and (ii) place control of the wholesaler, its operations, and its business, in the hands of AB.

44.     Specifically, while Dichello had already secured the exclusive right to distribute numerous AB products in its territory many decades ago (rights protected by Connecticut law), AB forced Dichello to enter an Amended and Restated Wholesaler Equity Agreement ("Equity Agreement") on or around August 25, 2006.  The Equity Agreement mandates:

    a.     Dichello will "devote greater effort" to AB products "than it devotes to any other products;"

    b.     The "efforts and resources" devoted by Dichello to AB products "will have priority over all other products and services sold or distributed by Dichello;"

    c.     AB must approve the individual employed by Dichello to manage Dichello's entire business (the "Equity Manager");

    d.     Only the AB-approved Equity Manager can control the day-to-day operations of Dichello's entire business;

    e.     Dichello must convey to the AB-approved Equity Manager an ownership interest of at least 25% in Dichello;

f.   AB can control Dichello's Equity Manager by withdrawing its approval of the Equity Manager for alleged good cause;

g.   Dichello must have a Successor-Manager available to replace the Equity Manager;

h.   AB must approve the Successor-Manager and can withdraw its approval of the Successor-Manager;

i.   Dichello must adhere to certain operating, sales and merchandising standards, which AB can apply and has applied in a manner that controls Dichello's business and restricts competition;

j.   AB must approve any sale, transfer or other disposition of any interest in Dichello, and may attempt to dictate and impose restrictions on trusts and estate planning instruments executed in connection with family ownership transfers;

k.   Dichello is prohibited from transferring or selling any ownership interest to a third party if, as a result, Dichello becomes owned, in whole or in part, directly or indirectly by the public; and

l.   AB can terminate Dichello's distributorship rights in circumstances and in a manner inconsistent with Connecticut law.

9

45.     AB, upon information and belief, forced all of its independent wholesalers to sign identical or nearly identical agreements.

46.     Utilizing the provisions of the Equity Agreement and its market power, AB has attempted to wrongfully exert control over its independent wholesalers including Dichello in numerous ways.

47.     In particular, AB has historically sought to conscript its independent wholesalers into the work of ensuring AB's market dominance to the disadvantage of its competitors by:

a.     Withholding incentives for wholesalers whose brand portfolios are not adequately "aligned" with AB's brands;

b.     Pressuring wholesalers to dispense with non-aligned brands in exchange for aligned brands newly acquired by AB;

c.     Requiring wholesalers to use best efforts to achieve and maintain the highest practicable sales volume and retail placement of AB products to the detriment of competing brands in a geographic area;

d.     Conditioning wholesaler incentives on sales volume for AB products, the retail placement of AB products and/or on AB's percentage of beer sales in a geographic area, thereby disincentivizing a wholesaler from promoting competing brands so as to ensure AB's market share;

e.     Requiring wholesalers to allocate marketing spending for AB products in proportion to revenues generated by the

wholesaler on AB products in the prior year; thereby depriving the wholesaler of or limiting the marketing spending necessary for new products entering the marketplace from competing manufacturers;

f.    Forbidding wholesalers from requesting that a retailer replace AB taps or shelf space with taps or products from competing brands;

g.    Requiring wholesalers to report to AB sales of all AB products and competitor products on a regular basis; and

h.    Prohibiting wholesalers from compensating its salespeople for the sale of competing brands unless it provides the same incentive for the sale of (typically less profitable) AB products.

48.    The anticompetitive effects of the Equity Agreement and AB's conduct thereunder are intended to harm small and local brewers and consumers of high-end beers, which—as noted—constitute an important constraint on AB's ability to raise prices of premium and sub-premium beers.  The anticompetitive effects of the Equity Agreement and the control exerted by AB thereunder fall especially hard on wholesalers of AB's brands which are deterred or prevented from selling more profitable competing brands, and which are compelled to spend more on the promotion and distribution of less profitable AB brands than they otherwise would.

11

49.     AB, in particular, wrongfully controls independent wholesalers and ensures that the wholesaler acts only in the best interests of AB and to the disadvantage of competitive beer brands and the wholesaler itself.

50.     Moreover, the anticompetitive effects of the Equity Agreement and AB's conduct thereunder pose more acute harm to competition in states, such as Connecticut, where AB's competitors distribute a beer brand through one wholesaler in a given territory and that one wholesaler is illegally controlled by AB and its Equity Agreements.

51.     Because of AB's substantial market share, the United States Department of Justice ("DOJ") filed a complaint in the United States District Court for the District of Columbia to enjoin AB's parent company from acquiring SABMiller plc. In 2018, AB's parent company, on behalf of itself, its subsidiaries, and affiliates, agreed to a Modified Final Judgment that curtailed AB's ability to engage in some of the foregoing anticompetitive and unlawful practices under the Equity Agreement. However, as the DOJ acknowledged in response to public comment on a proposed Final Judgment, not all of the foregoing practices were within the scope of its complaint.

52.     A critical and pernicious provision of the Equity Agreement not within the scope of the Modified Final Judgment is the requirement that a wholesaler provide the Equity Manager  an ownership share, which gives AB the ability to influence and control the individual at the wholesaler who has day-to-day control over the sale of AB's brands <u>as well as the brands of its competitors</u>.

53.     AB effectively assumes control over its wholesalers using the Equity Manager requirements by simultaneously exercising veto power over the ability of the Equity Manager to earn a living and threatening its wholesalers with termination should they not cede control over the entirety of their business to the Equity Manager.

54.     The core qualifications employed by AB in approving an Equity Manager are loyalty to AB and an unwavering allegiance to the promotion of AB's interests alone. The consequences of AB's Equity Manager program are inevitable and illegal conflicts of interest as well as detriment to the overall business of the wholesaler and the competing brands that it sells.

55.     By way of example, in 2013, AB orchestrated and approved the hiring of Sal DiBetta as Dichello's Equity Manager. At that time, DiBetta had no experience in running a beer wholesale operation. DiBetta however had worked as a salesman for AB for 31 years.

56.     After Dichello's hiring of AB's "company man," AB systematically conspired with DiBetta to control Dichello for the benefit of AB's financial interests, all to the great detriment of Dichello.  For example, under the direction of AB, DiBetta changed Dichello's sales force incentives structure, which had provided higher commissions on Dichello's more profitable competing brands, to a structure that prohibited paying higher commissions on any products competing with AB brands.

57.     During his employment with Dichello, DiBetta regularly reported confidential information of Dichello to AB employees, including AB's Vice

President of Business and Wholesaler Development, Bob Tallett, who DiBetta referred to as his "Chief."

58.     DiBetta and AB regularly communicated about and undertook steps to undermine Dichello's stated intentions to manage the entirety of its business independent of AB's control and in the manner most beneficial to all of its beer brands.  For example, AB communicated with DiBetta to address the "problem" he secretly reported to AB when Dichello informed him that it intended to reserve more of its trucks for decaling by competing brands.

59.     Ultimately, using company insights and confidential information of Dichello provided to it by DiBetta, AB undertook a course of action intended to pressure Dichello's ownership to sell the business to new owners whose interests would be more aligned with those of AB.

## COUNT ONE (CUTPA)

60.     Paragraphs 1 through 59 are hereby incorporated in Count One as if fully stated herein.

61.     Connecticut law prohibits AB from "control" and "the power to control" Dichello's business and the business of any wholesaler in Connecticut.

62.     Connecticut and federal law prohibit contracts, combinations, and/or conspiracies in restraint of trade or commerce as set forth in Section 35-26 of the Connecticut Antitrust Act and 15 U.S.C. § 1 of the Sherman Act.

63.     Connecticut and federal law also prohibit contracts, combinations, and/or conspiracies that (i) limit the supply of any part of trade or commerce, and/or (ii) coerce, persuade and induce others to refuse to deal with another as

14

set forth in Section 35-28 of the Connecticut Antitrust Act and 15 U.S.C. § 1 of the Sherman Act.

64.     Connecticut and federal law also prohibit contracts, combinations and/or conspiracies that monopolize or attempt to monopolize a part of trade or commerce as set forth in Section 35-27 of the Connecticut Antitrust Act and 15 U.S.C. § 2 of the Sherman Act.

65.     AB has engaged in unfair and deceptive trade practices by violating Connecticut law by asserting control and the power to control Dichello's business, and that of other wholesalers in Connecticut, and further by engaging in acts that control Dichello's business.

66.     AB's actions, alone or in combination, constitute unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42-110b.

67.     AB has engaged in actions specifically designed to circumvent and undermine Connecticut's Liquor Control Act, the "Three Tier System", state and federal antitrust statutes and the associated laudable policies and objectives of preventing anti-competitive practices, unscrupulous marketing tactics and excessive alcohol consumption, and maintaining an orderly and locally controlled marketplace for alcoholic beverages.

68.     As a result of AB's conduct, Dichello has suffered an ascertainable loss, will continue to suffer substantial harm and, as a result, is entitled to the

recovery of money damages, punitive damages, attorneys' fees, interest and costs.

69.     AB's CUTPA violations have caused harm to Dichello by, *inter alia*, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

70.     AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

<u>COUNT TWO (Connecticut Antitrust Act)</u>

71.     Paragraphs 1 through 70 are hereby incorporated in Count Two as if fully stated herein.

72.     AB's Equity Agreement forced upon Dichello and all other independent wholesalers, and each of AB's actions thereunder, constitute a contract, combination and/or conspiracy in restraint of trade or commerce in violation of Section 35-26 of the Connecticut Antitrust Act.

73.     AB's Equity Agreements with Dichello and others were entered into in whole or in part in this state and have been effectuated in whole or in part in this state.

74.     AB's anticompetitive actions have caused injury to Dichello by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands,

reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

75.    Dichello is accordingly entitled to the recovery of damages, including treble damages together with a reasonable attorney's fee and costs.

76.    AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

**COUNT THREE (Connecticut Antitrust Act)**

77.    Paragraphs 1 through 76 are hereby incorporated in Count Three as if fully stated herein.

78.    AB's Equity Agreement forced upon Dichello, and other independent wholesalers, and each of AB's actions thereunder, constitute a contract, combination and/or conspiracy to monopolize or attempt to monopolize a part of trade or commerce, in violation of Section 35-27 of the Connecticut Antitrust Act.

79.    AB's Equity Agreements with Dichello and others were entered into in whole or in part in this state and have been effectuated in whole or in part in this state.

80.    AB's anticompetitive actions have caused injury to Dichello by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

81.     Dichello is accordingly entitled to the recovery of damages, including treble damages together with a reasonable attorney's fee and costs.

82.     AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

**COUNT FOUR (Connecticut Antitrust Act)**

83.     Paragraphs 1 through 82 are hereby incorporated in Count Four as if fully stated herein.

84.     AB's Equity Agreement forced upon Dichello and other independent wholesalers, and each of AB's actions thereunder, constitute a contract, combination and/or conspiracy to (i) limit the supply of any part of trade or commerce, and/or (ii) coerce, persuade and induce others to refuse to deal with another, all in violation of Section 35-28 of the Connecticut Antitrust Act.

85.     AB's Equity Agreements with Dichello and others were entered into in whole or in part in this state and have been effectuated in whole or in part in this state.

86.     AB's anticompetitive acts have caused injury to Dichello by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

87.     Dichello is accordingly entitled to the recovery of damages, including treble damages together with a reasonable attorney's fee and costs.

88.     AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

**COUNT FIVE (Connecticut Antitrust Act)**

89.     Paragraphs 1 through 88 are hereby incorporated in Count Five as if fully stated herein.

90.     AB's Equity Agreement forced upon Dichello, and others, and each of AB's actions thereunder, constitute the sale of commodities with the effect of substantially lessening competition and/or tending to create a monopoly, in violation of Section 35-29 of the Connecticut Antitrust Act.

91.     AB's anticompetitive conduct has caused injury to Dichello by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

92.     Dichello is accordingly entitled to the recovery of damages, including treble damages together with a reasonable attorney's fee and costs.

93.     AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

**COUNT SIX (Sherman Act, Section 1)**

94.     Paragraphs 1 through 93 are hereby incorporated in Count Six as if fully stated herein.

95.     AB's Equity Agreement forced upon Dichello, and others in the United States, and AB's actions thereunder, constitute a contract, combination and/or conspiracy in restraint of trade or commerce among the several States, in violation of 15 U.S.C. § 1.

96.     AB possesses market power in the relevant markets throughout the United States and has used that power to control supply and limit competition in the affected markets, including the market serviced by Dichello, as detailed herein.

97.     AB's anticompetitive conduct has caused injury to Dichello by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business.

98.     Dichello is accordingly entitled to the recovery of damages, including money damages, treble damages, attorneys' fees, interest and costs.

99.     AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

<u>COUNT SEVEN (Sherman Act, Section 2)</u>

100.    Paragraphs 1 through 99 are hereby incorporated in Count Seven as if fully stated herein.

101.    AB possesses market power in the relevant markets and has used that power to control supply and limit competition in the affected markets, as detailed above.

102.    AB's market share, in a highly concentrated market, with high barriers to entry, create a dangerous probability that AB's exclusionary and anticompetitive conduct will lead to monopoly power for AB in the relevant market.

103.    AB's conduct therefore constitutes monopolization and/or an attempt at monopolization of the relevant markets in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

104.    AB's anticompetitive conduct, as alleged, has caused injury to Dichello in the market it services by, for example, impeding its ability to sell more profitable high-end beers, compelling it to spend more on the promotion and distribution of less profitable AB brands, reducing the overall profitability of its past operations, impairing the value of its on-going operations, and substantially diminishing the fair market value of Dichello's business

105.    Dichello is accordingly entitled to the recovery of damages including money damages, treble damages, attorneys' fees, interest and costs.

106.    AB will continue to engage in these unlawful activities unless enjoined, and Dichello has no adequate remedy at law.

## COUNT EIGHT (Tortious Interference)

107.    Paragraphs 1 through 106 are hereby incorporated in Count Eight as if fully stated herein.

21

108.   At all relevant times herein including through the present, Dichello has enjoyed a contractual and beneficial relationship with the manager of its business who owes duties to Dichello as his employer, including the duty of loyalty.

109.   AB has had full knowledge of this contractual and beneficial relationship.

110.   By and through its wrongful and unlawful conduct described herein, including its insistence upon compliance with the terms of the Equity Agreement and through its direct dealings with Dichello's manager, AB has intentionally interfered with this relationship to advance its own economic interests to the detriment of Dichello.

111.   Dichello has suffered damages as a result of AB's tortious conduct.

## COUNT NINE (Declaratory Relief)

112.   Paragraphs 1 through 111 are hereby incorporated in Count Nine as if fully stated herein.

113.   An actual controversy exists between the parties as it relates to the legality, validity and/or enforceability of the Equity Agreement and each provision of the Equity Agreement identified in Paragraph 44, above.

114.   Dichello contends, and upon information and belief, AB denies, that the provisions of the AB Equity Agreement violate Connecticut's Liquor Control Act, the Connecticut Antitrust Act, and/or the Sherman Act.

115.   Dichello further contends, and upon information and belief, AB denies, that the AB Equity Agreement is illegal, invalid, and unenforceable

because it (i) violates Connecticut law, (ii) is contrary to Connecticut public policy and (iii) lacks consideration.

116.    Dichello, accordingly, seeks a declaration that the AB Equity Agreement and/or its provisions are illegal, invalid and/or unenforceable for the reasons identified herein.

## PRAYER FOR RELIEF

WHEREFORE, Dichello requests that this Court:

1.    Award money damages, interest, punitive damages, attorneys' fees and costs in accordance with Connecticut General Statutes § 42-110(g).

2.    Enjoin AB, in accordance with Connecticut General Statutes § 42-110(g), from using the Equity Agreement with Dichello and others to control, or to retain the power to control, wholesalers in violation of the Connecticut Liquor Control Act and Connecticut's Three Tier System.

3.    Award money damages and treble damages, together with a reasonable attorney's fee and costs in accordance with Section 35-35 of the Connecticut Antitrust Act.

4.    Enjoin AB, in accordance with Section 35-34 of the Connecticut Antitrust Act, from using the Equity Agreement with Dichello and others to (i) restrain trade, (ii) monopolize trade, (iii) attempt to monopolize trade, (iv) limit the supply of any part of trade or commerce, and/or (v) coerce, persuade or induce others to refuse to deal with another.

5.      Award money damages, prejudgment interest, threefold damages and the costs of suit, including a reasonable attorney's fee in accordance with 15 U.S.C. § 15.

6.      Enjoin AB, in accordance with 15 U.S.C. § 26, from using the Equity Agreement with Dichello and others to (i) restrain trade, (ii) monopolize trade, and/or (iii) attempt to monopolize trade or commerce.

7.      Award money damages, punitive damages, interest and costs due to AB's tortious conduct.

8.      Enter a declaratory judgment that the Equity Agreement's provisions, and AB's actions thereunder, violate Connecticut's Liquor Control Act, the Connecticut Antitrust Act, and/or the Sherman Act, and are thereby illegal, invalid and unenforceable.

9.      Enter a declaratory judgment that the Equity Agreement is illegal, invalid and unenforceable because it (i) violates Connecticut law, (ii) is contrary to Connecticut public policy and (iii) lacks consideration.

10.      Award such other and further relief to Dichello as justice and equity requires.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury in this action.

PLAINTIFF,
DICHELLO DISTRIBUTORS, INC.

 /s/ John R. Horvack, Jr.
John R. Horvack, Jr. (Federal Bar No. 12926)
David S. Hardy (Federal Bar No. 20904)
Damian K. Gunningsmith (Federal Bar No. 29430)
Carmody Torrance Sandak & Hennessey LLP
195 Church Street, 18th Floor
New Haven, CT 06509
Tel.: (203) 777-5501
Fax.: (203) 784-3199
jhorvackjr@carmodylaw.com
dhardy@carmodylaw.com
dgunningsmith@carmodylaw.com

Leonard C. Reizfeld (Federal Bar No. ct01933)
10 Marietta Street
Hamden, CT  06514
Tel.: (203) 288-5599
Fax:  (203) 281-7766
reizfeld@gmail.com

## CERTIFICATION OF SERVICE

I hereby certify that on August 14, 2020, a copy of the foregoing Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 /s/ John R. Horvack, Jr.
John R. Horvack, Jr.