## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DICHELLO DISTRIBUTORS, INC.,

      Plaintiff,

v.

ANHEUSER-BUSCH, LLC

      Defendant

No. 3:20-cv-01003 (MPS)

## RULING ON MOTION TO DISMISS

Plaintiff, Dichello Distributors, Inc. ("Dichello"), is a family-owned wholesale distributor of beer, including the beer brands manufactured by the Defendant, Anheuser-Busch, LLC ("AB"), a company that owns more than forty major brands and operates nineteen breweries within the United States.  Dichello has been the exclusive distributor of AB's beer brands in New Haven, Fairfield, and Middlesex counties for many decades.  Dichello has brought this action alleging that certain features of its distributor agreement with AB violate federal and state antitrust law and Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq*., and that AB is tortiously interfering with Dichello's contract with the employee charged with managing its business.  Dichello also seeks a declaration that its distributor agreement with AB is illegal and unenforceable.  AB seeks to dismiss Dichello's complaint in its entirety.  For the following reasons, I grant in part and deny in part AB's motion to dismiss.

## I.  FACTUAL BACKGROUND

The following facts are drawn from Dichello's Amended Complaint, ECF No. 17, and are accepted as true for the purposes of this ruling.  I also consider the Equity Agreement and the Modified Final Judgment in *United States v. Anheuser-Busch InBev SA/NV*, No. 16-1483, 2018

1

WL 6684721 (D.D.C. Oct. 22, 2018), on which the Amended Complaint relies. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (On a Rule 12(b)(6) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks and citations omitted)). I may also take judicial notice of the Modified Final Judgment. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (On Rule 12(b)(6) motion, "the court may also consider matters of which judicial notice may be taken" (internal quotation marks omitted)); *DiBa Fam. Ltd. P'ship v. Ross*, No. 13-06384, 2014 WL 5438068, at *2 (S.D.N.Y. Oct. 27, 2014) ("Courts may also take judicial notice of matters of public record, including court rulings, when considering motions to dismiss.").

## A. State Regulation of the Beer Industry

Connecticut's Liquor Control Act "dictate[s] how alcohol is distributed from manufacturers to consumers." (ECF No. 17 ¶ 11). "The beer industry [in Connecticut] … is divided into three tiers[:]" "(i) manufacturers; (ii) wholesalers; and (iii) retailers." (*Id.* ¶ 10, 12). "Each tier within the 'Three Tier System' is regulated by state law and any company operating within a given tier must secure a state permit to do so." (*Id*. ¶ 12). "Manufacturers in the first tier are generally prohibited from selling directly to retailers, and instead, must sell to wholesalers—who in turn sell to retailers, who then ultimately sell the beer products to the consumer." (*Id.* ¶ 13). "[A]ny given brand of beer can only be distributed by a single wholesaler within a defined territory." (*Id.* ¶ 14).

Companies operating within a tier are prohibited "from owning, operating[,] or controlling a company in a different tier." (*Id.* ¶ 15). Thus, wholesalers are protected and remain independent, which "serves as an important check on the market power of large manufacturers…." (*Id.* ¶ 19). Wholesaler independence "also facilitates the entry into that market of competing brands of beer, including local 'craft' beers, all of which inures to the benefit of consumers and the public." (*Id.* ¶ 20). Specifically, independent wholesalers are "critical for the marketplace" because they "can invest in relationships with brewers of all sizes to provide them with the opportunity to compete, prosper[,] and grow in the beer marketplace[,]" and, consequently, can meet consumer demand for "choice, variety, access[,] and price." (*Id.* ¶¶ 20–21).

### B. The Parties

AB is a beer manufacturer that "owns and operates 19 breweries in the United States and owns more than 40 major beer brands, including Bud Light, Budweiser, Busch, Michelob, Rolling Rock, Natural Light, Stella Artois, LandShark, Shock Top, Goose Island, Blue Point, and Beck's." (*Id.* ¶ 4). AB "uses wholesalers to merchandise, sell[,] and deliver its beer brands to retailers in Connecticut. The retailers include package stores, grocery stores, restaurants[,] and bars." (*Id.* ¶ 28). "[I]ndependent wholesalers distribute the largest volume of AB beer in the United States and AB's beer brands account for a large percentage of the overall business of these independent wholesalers." (*Id.* ¶ 29).

Dichello is one such wholesaler. Dichello is a family-owned Connecticut corporation that distributes "numerous beer brands, including beer brands manufactured by [AB], [to retailers] and has been the exclusive distributor of AB beer brands in New Haven, Fairfield and Middlesex counties for many decades." (*Id.* ¶¶ 1–2). In addition to distributing AB's brands,

Dichello also distributes brands that compete with AB, "including high-end beers that constrain AB's ability to raise prices on its premium and sub-premium brands." (*Id.* ¶ 30). The categories of beer brands are explained below.

### C. The Beer Market

Beer, typically "made from a malted cereal grain, flavored with hops, and brewed via a fermentation process[,]" has a "taste, alcohol content, image, price, [among other] factors, [that] make it substantially different from other alcoholic beverages." (*Id.* ¶¶ 31, 32). As a result, "[o]ther alcoholic beverages, such as wine and distilled spirits, are not sufficiently substitutable to beer from the consumers' perspective, and … relatively few consumers would substantially reduce their beer purchases in the event of a small but significant and non-transitory increase in the price of beer." (*Id.* ¶ 33).

"Americans spend nearly $120 [b]illion each year on beer, and [AB, the largest beer brewing company both in the United States and in the world,] accounts for approximately 40% of all beer sales in the U.S." (*Id.* ¶¶ 37, 38). In addition, AB sells a "vast number of brands and those brands account for a large percentage of [each] independent wholesaler's revenues." (*Id.* ¶ 39). "[T]hus, AB has significant power in the relevant market…." (*Id.* ¶ 40). The relevant market is "beer sold within the State of Connecticut and the United States[]" because, although competition between beer manufacturers exists on a national level, and decisions about brewing, marketing, and branding take place on a national level, competition is regulated by the state via the Connecticut Liquor Control Act. (*Id.* ¶¶ 34–36).

The beer market is also "segmented, based on price and quality, into three categories: (1) sub-premium, (2) premium, and (3) high-end." (*Id.* ¶ 23). Only a small portion of the beer sold by AB comes from the high-end category. (*Id.* ¶ 24). Therefore, AB seeks to maintain a "price

gap" between each category so that consumers are less willing to trade up from one category to the next.  (*Id.* ¶¶ 25–26).  The price gaps "minimize competition across segments."  (*Id.* ¶ 25).

### D.  Anheuser-Busch's Anticompetitive Conduct

Dichello alleges that "AB has used its market power in the relevant market to disadvantage rivals, restrict supply, and reduce competition."  (*Id.* ¶ 41).  Specifically, Dichello asserts that "AB … has used a variety of practices and contractual provisions that impede and restrain the free and independent promotion and distribution of competing beers, generally, and high-end beers, more specifically."  (*Id.* ¶ 42).  Dichello alleges that AB "forced" it to enter into the Amended and Restated Wholesaler Equity Agreement ("Equity Agreement") on August 25, 2006.  (*Id.* ¶¶ 43–44).  These contractual terms "(i) limit the wholesaler's ability to promote, supply[,] and sell beers that compete with AB's beer brands, and (ii) place control of the wholesaler, its operations, and its business, in the hands of AB."  (*Id.* ¶ 43).  Dichello alleges that AB has "forced all of its independent wholesalers to sign identical or nearly identical agreements."  (*Id.* ¶ 45).

The Equity Agreement requires Dichello to "devote greater effort" to AB products than other products and give priority "over all other products" to the efforts and resources devoted to AB products.  (*Id.* ¶ 44(a), (b)).  Further, "AB must approve the individual employed by Dichello to manage Dichello's entire business (the 'Equity Manager')" and the successor to the Equity Manager ("Successor Manager").  (*Id.* ¶ 44(c), (h)).  The AB-approved Equity Manager has sole control of Dichello's day-to-day operations and Dichello must convey to the Equity Manager an ownership interest of at least twenty-five percent.  (*Id.* ¶ 44(d), (e)).  AB can withdraw its approval of the Equity Manager for good cause.  (*Id.* ¶ 44(f) –(h)).  Dichello alleges that the ownership interest for the Equity Manager "gives AB the ability to influence and control the

5

individual at the wholesaler who has day-to-day control over the sale of AB's brands[,] as well as the brands of its competitors." (*Id.* ¶ 52 (emphasis omitted)). Thus, Dichello asserts that AB "effectively assumes control over its wholesalers" through its power over the Equity Manager and ability to terminate its relationship with the wholesaler if the wholesaler does not give the Equity Manager control over "the entirety of [the wholesaler's] business." (*Id.* ¶ 53). Dichello alleges that AB's "core qualifications" for approving an Equity Manager "are loyalty to AB and unwavering allegiance to the promotion of AB's interests alone." (*Id.* ¶ 54).

To support its claim that AB holds inappropriate control over the Equity Manager position, Dichello cites one example. In 2013, Dichello alleges that "AB orchestrated and approved the hiring of Sal DiBetta as [the] Equity Manager." (*Id.* ¶ 55). Mr. DiBetta had no experience in managing a beer wholesaler but had worked as an AB salesman for thirty-one years. (*Id.*). AB then conspired with Mr. DiBettta to control Dichello for AB's benefit. (*Id.* ¶ 56). For example, Mr. DiBetta, "under the direction of AB[,] … changed Dichello's sales force incentives structure" to prohibit higher commissions on any products competing with AB brands. *Id.* Dichello alleges that Mr. DiBetta supplied Dichello's confidential information to AB and that Mr. DiBetta regularly communicated with AB concerning strategies to undermine Dichello's attempts to maintain independence and manage the business for the benefit of all its beer brands. (*Id.* ¶¶ 57–58).

The Equity Agreement also mandates that AB must approve of "any sale, transfer[,] or other disposition of any interest in Dichello, and may attempt to dictate and impose restrictions on trusts and estate planning instruments executed in connection with family ownership transfers." (*Id.* ¶ 44(j)). Dichello cannot transfer or sell an ownership interest to a third party so

that Dichello becomes publicly-owned in any way.  (*Id.* ¶ 44(k)).  AB can terminate Dichello's

distribution rights "in a manner inconsistent with Connecticut law."  (*Id.* ¶ 44(l)).

Using the terms of the Equity Agreement and its market power, "AB has attempted to

wrongfully exert control over its independent wholesalers including Dichello."  (*Id.* ¶ 46).

Dichello alleges that AB has "historically" used independent wholesalers to ensure AB's market

dominance in the following ways:

- AB withheld incentives from wholesalers whose brand portfolios were not adequately aligned with AB brands and pressured wholesalers to dispense with non-aligned brands in exchange for newly acquired AB brands;
- AB "requir[ed] wholesalers to use best efforts to achieve and maintain the highest practicable sales volume and retail placement of AB products to the detriment of competing brands in the geographic area";
- AB "condition[ed] wholesaler incentives on sales volume for AB products, the retail placement of AB products[,] and/or on AB's percentage of beer sales in a geographic area, thereby disincentivizing a wholesaler from promoting competing brands";
- AB required wholesalers to allocate marketing spending for AB products in proportion to the wholesaler's revenues from AB products in the prior year;
- AB prohibited wholesalers from requesting that a retailer replace AB taps or shelf space with competing brands' products;
- AB also required wholesalers to report sales of AB and competitor products on a regular basis; and
- AB also "prohibit[ed] wholesalers from compensating its salespeople for the sale of competing brands unless it provides the same incentive for the sale of (typically less profitable) AB products."

(*Id.* ¶ 47).

Dichello alleges that the anticompetitive effects of the Equity Agreement and AB's

conduct are intended to harm consumers of high-end beers as well as small and local brewers

that impose "an important constraint on AB's ability to raise prices of premium and sub-

premium beers."  (*Id.* ¶ 48).  According to Dichello, the result of AB's conduct deters or prevents

independent distributors "from selling more profitable competing brands," and forces them to

"spend more on the promotion and distribution of less profitable AB brands than they otherwise

would." (*Id.*).  Dichello asserts that the anticompetitive effects of the Equity Agreement and AB's conduct "pose more acute harm to competition in states, such as Connecticut, where AB's competitors distribute a beer brand through one wholesaler in a given territory and that one wholesaler is illegally controlled by AB and its Equity Agreements." (*Id.* ¶ 50).

### E.  Modified Final Judgement

Some of the conduct by AB described in the Complaint has already been "curtailed" by a "Modified Final Judgment" ("MFJ") entered in litigation between AB and the Department of Justice ("DOJ").  (*Id.* ¶ 51).  DOJ filed suit against AB's parent company and SABMiller plc. in response to the parent company's proposed acquisition of SABMiller.  (*Id.*).  As a result, in 2018, AB's parent company agreed to the MFJ, which prohibited certain anticompetitive practices under the Equity Agreement.  (*Id.*).  Among other things, the MFJ prohibits AB (as a subsidiary of the parent company) from "provid[ing] any reward or penalty to, or in any other way condition[ing] its relationship with an Independent Distributor … based upon the amount of sales the Independent Distributor makes of a Third-Party Brewer's Beer or the marketing, advertising, promotion, or retail placement of such Beer." *United States v. Anheuser-Busch InBev SA/NV*, No. 16-1483, 2018 WL 6684721, at *8 (D.D.C. Oct. 22, 2018).   This prohibition applies to actions such as requiring the distributor to offer incentives to sell AB's beer if the distributor offers incentives to sell a third-party brewer's beer and preventing the distributor from using best efforts to sell or advertise a third-party brewer's beer.  *Id.* at *8.  The MFJ prevents AB from disapproving the Equity Manager or Successor Manager based on the distributor's dealings with a third-party brewer.  *Id*. at *9.  The MFJ also prohibits AB from requesting or requiring a distributor to report any financial information associated with the purchase, sale, or distribution of a third-party brewer's beer.  *Id*.

8

The MFJ expressly allows AB to require distributors to use best efforts to sell, market, advertise, or promote AB's beer. *Id.* at *8 (describing best efforts as "achiev[ing] and maintain[ing] the highest practicable sales volume and retail placement of [AB's beers] in a geographic area"). AB is also allowed to condition incentives, programs, or contractual terms based on the distributor's sales volume of AB's beers, retail placement of AB's beers, or AB's percentage of beer industry sales in that geographic area as long as the conditions do not encourage the distributor to provide less than best efforts to third-party brewers. *Id.* AB may require a distributor to allocate to AB's beers a portion of the distributor's annual spending on marketing no greater than the portion of revenues generated by AB's beers. *Id.* The MFJ does not otherwise address AB's approval of the Equity Manager because this practice fell outside the scope of the DOJ's complaint. (ECF No. 17 ¶ 51).

### F. Procedural History

Dichello first filed a complaint against AB in the Connecticut Superior Court, Judicial District of New Haven at New Haven on June 16, 2020. Case No. NNH-CV20-6105163-S, ECF No. 1. On July 17, 2020, AB removed the case to federal court on the basis of diversity jurisdiction. (ECF No. 1). AB moved to dismiss the Amended Complaint on September 11, 2020. (ECF Nos. 26, 27).

## II.    DISCUSSION

AB seeks dismissal under Rule 12(b)(6), arguing that Dichello failed to plead adequately (i) any antitrust claims under the Sherman Act and the Connecticut Antitrust Act, (ii) a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), (iii) a claim for tortious interference, and (iv) a claim for declaratory relief. (Mot. to Dismiss, ECF No. 27 at 10–13). I will address each in turn.

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)).  The Court must accept the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014).  The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief."  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  In deciding a Rule 12(b)(6) motion, the Court may consider documents attached to, integral to, or incorporated by reference in the complaint.[1]  Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

### B. Antitrust Claims (Counts Two, Three, Four, Five, Six, and Seven)

Dichello brings six claims under the Sherman Act and the Connecticut Antitrust Act, seeking damages and injunctive relief.  (ECF No. 17).  AB moves to dismiss all of Dichello's antitrust claims, arguing that the Amended Complaint: (1) fails to allege antitrust standing; and (2) fails to allege adverse effects on competition.  (Mot. to Dismiss, ECF No. 27 at 21–35).  AB

---

[1] The Equity Agreement and Modified Final Judgment are incorporated into the Amended Complaint by reference.  (ECF No. 17 ¶¶ 44, 51).  The Court may also take judicial notice of the provisions of the Modified Final Judgment.

also moves to dismiss Counts Three and Seven for failure to allege monopoly power and failure

to allege anticompetitive conduct, specific intent, or a dangerous probability of achieving

monopoly power.  (*Id.* at 30–34).  AB moves to dismiss Count Four for failure to allege a per se

antitrust violation and Count Five for failure to allege a tying agreement.  (*Id.* at 34–36).[2]

Because I agree that the Amended Complaint fails to allege per se antitrust violations, adverse

effects on competition, market power, or an unlawful exclusive dealing relationship, I find that

all of the antitrust claims fail, and I do not address AB's other arguments.

1. **Counts Two, Four, and Six: Conn. Gen. Stat. §§ 35-26, 35-28 and Section 1 of the Sherman Act**

AB argues that Dichello has failed to allege conduct that violates Section 1 of the

Sherman Act and the Conn. Gen. Stat. §§ 35-26, 25-28.  I analyze these claims together because

Connecticut courts follow "federal precedent" when interpreting the Connecticut Antitrust Act

"unless the text of our antitrust statutes or other pertinent state law" requires a different

interpretation, which neither party suggests is the case here.  *Reserve Realty, LLC v. Windmere

Reserve, LLC*, 335 Conn. 174, 185 (2020); *see also id.* (noting that Conn. Gen. Stat. § 35-26 is

"the state analogue of [Section 1 of the Sherman Act]"); *Tremont Pub. Advisors, LLC v.

Connecticut Res. Recovery Auth.*, 333 Conn. 672, 693–94 (2019) (noting that Conn. Gen. Stat. §

35-28 codifies the prohibition against per se violations set forth in Section 1 of the Sherman

Act).  For the reasons below, I grant the Motion to Dismiss as to Counts Two, Four, and Six.

Section 1 of the Sherman Act prohibits "[e]very contract … or conspiracy in restraint of

trade."  15 U.S.C. § 1.  Despite its broad wording, however, Section 1 was "intended to outlaw

only unreasonable restraints."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  "To prove a

---

[2] AB also argues that the Amended Complaint fails to allege any injury and that it seeks an advisory opinion from the Court about conduct that AB has not actually engaged in.  (Mot. to Dismiss, ECF No. 27 at 28–30).

[Section] 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).

Section 1 treats vertical and horizontal restraints differently.  Horizontal restraints are agreements between competitors at the same level of the market structure and are sometimes considered per se violations of Section 1, which means that they are deemed illegal even without any evidence that they have an adverse effect on competition.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608–11 (1972) (explaining that horizontal agreements allocating territories are per se illegal).  The per se treatment of certain horizontal restraints reflects the "longstanding judgment that the prohibited practices by their nature have a 'substantial potential for impact on competition.'" *F.T.C. v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984)).

 Vertical agreements, by contrast, are "combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *Topco Assocs., Inc.*, 405 U.S. at 608). Typically, vertical agreements are subject to rule of reason analysis, *Anderson News, L.L.C.*, 680 F.3d at 183, which involves an assessment of the impact of the agreement on competition.  Rule of reason analysis "requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  In particular, under the rule of reason, the plaintiff must establish that the defendant's conduct "adversely affected

competition in the relevant market." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).

### a. Horizontal Restraint

Dichello argues that AB, through the Equity Agreements, is "orchestrating a horizontal restraint of trade," which "justifies per se treatment." (Opp'n, ECF No. 27 at 23). AB argues that the Equity Agreement is a "non-price vertical restraint[]" which must be analyzed under the rule of reason. (Reply, ECF No. 48 at 8).

I agree with AB. The Equity Agreement is a vertical restraint, not a horizontal one requiring per se treatment under Section 1. AB is a beer manufacturer (ECF No. 17 ¶ 4), and Dichello is a wholesale distributor of beers (*id.* ¶ 20). Manufacturers and distributors operate at different levels of the market. *See Anderson News L.L.C..,* 680 F.3d at 182 (noting that agreements between manufacturers and distributors are typically vertical restraints). The Equity Agreement, as alleged, is an agreement between a manufacturer and a distributor, making it a vertical restraint subject to the rule of reason analysis.

Relying on *United States v. Apple*, 791 F.3d 290 (2d Cir. 2015), Dichello argues that even though the Equity Agreement may be a vertical restraint, "AB's role in orchestrating a horizontal restraint of trade justifies per se treatment." (Opp'n, ECF No. 42 at 23). In *Apple*, the Second Circuit found that Apple "orchestrated a horizontal conspiracy among [publishers] to raise ebook prices." *Apple*, 791 F.3d at 297. Apple facilitated this conspiracy by contracting (vertically) with publishers on terms that "were only attractive … to the extent [the publishers] acted collectively." *Id.* at 320. There was "strong evidence that Apple consciously orchestrated a conspiracy among [the publishers]" along with evidence of "express collusion among [the

publishers].*" *Id.* at 316. "Apple consciously played a key role in organizing that collusion" between the publishers. *Id.* The Second Circuit described this arrangement as a "'hub-and-spoke' conspirac[y] in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *Id.* at 314 (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)). To successfully allege a hub-and-spoke conspiracy, "the plaintiff must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors." *Apple*, 791 F.3d at 314 n.15.

Dichello argues that AB, by imposing the Equity Agreement upon all the distributors, has orchestrated a conspiracy similar to the one in *Apple*. (Opp'n, ECF No. 42 at 26). But the facts alleged in the Amended Complaint belie this argument and suggest instead that AB would have little opportunity to orchestrate collusion in the manner Apple did. First, the Amended Complaint alleges that under the Connecticut Liquor Control Act, "any given brand of beer can only be distributed by a single wholesaler within a defined territory" (ECF No. 17 ¶ 14), which means there may be limited competition between distributors to begin with and none between distributors in the same territory over which AB would have any influence (because there can only be one distributor per territory that sells AB brands). Second, the Amended Complaint fails to allege that the Equity Agreement gives AB any direct control over prices or that it creates incentives for distributors to collude with each other as to price. Third, even if the Amended Complaint is construed as alleging that AB imposes uniform practices on all its distributors, there is still a key missing ingredient: the "rim." Nowhere does the Amended Complaint suggest that Dichello is colluding with its fellow distributors as to price, other terms or conditions of sale, or anything else. "At the pleading stage, a complaint claiming conspiracy, to be plausible, must

plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.,* it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News, L.L.C.*, 680 F.3d at 184 (quoting *Bell Atlantic Corp.*, 550 U.S. at 556).  None of Dichello's allegations provide any facts suggesting that the distributors agreed or conspired with each other for anticompetitive ends.

Dichello fails to allege a horizontal conspiracy or any other agreement that warrants per se treatment under Section 1 of the Sherman Act.

### b.  *Vertical Restraint*

As noted, the Equity Agreement is a vertical restraint that must be judged under the rule of reason.  Under the rule of reason, the plaintiff bears the burden of showing that the defendant's conduct "had an actual adverse effect on competition as a whole in the relevant market." *Geneva Pharms.*, 386 F.3d at 506–07.  The plaintiff may satisfy the adverse effect requirement in one of two ways: (1) show an actual adverse effect on competition, or (2) establish that defendant had sufficient market power to cause harm to competition.  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993).

Plaintiffs can show actual adverse effects on competition by demonstrating reduced output, increased prices, or decreased quality.  *Virgin Atl. Airways Ltd. V. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).  Dichello fails to plausibly allege that AB's conduct has caused actual adverse effects on the market.  In the Amended Complaint, Dichello states that "AB has used its market power in the relevant market to disadvantage rivals, restrict supply, and reduce price competition."  (ECF No. 17 ¶ 41).  But this statement is conclusory, and Dichello alleges no facts to support it.

Dichello alleges that "AB … has used a variety of practices and contractual provisions that limit, impede and restrain the free and independent promotion and distribution of competing beers, generally, and high-end beers, more specifically." *Id.* ¶ 42.  "AB has forced upon its independent wholesalers contractual terms that (i) limit the wholesaler's ability to promote, supply and sell beers that compete with AB's beer brands, and (ii) place control of the wholesaler, its operations, and its business, in the hands of AB." *Id.* ¶ 43.  Taken as true, these statements do not suggest that these restraints on promotion and distribution actually harmed competition by reducing output, increasing prices, or decreasing quality.  Nor is there any suggestion that they actually succeeded in foreclosing competition.  The Amended Complaint also states that AB's requirement for wholesalers to allocate marketing spending for AB products proportionally to the revenues generated by AB products "limit[s] the marketing spending necessary for new products entering the marketplace from competing manufacturers," (ECF No. 17 ¶ 47(e)), but Dichello has not alleged that any competitors either failed to gain entry to the market because of AB's conduct or that any distributors declined to carry other manufacturers' products because of AB's conduct.  At most, the Court can draw an inference that AB makes it more difficult for the wholesalers to spend disproportionately large amounts of their marketing on the promotion and distribution of competing beers.  That is insufficient to plead an actual adverse effect on competition.

The indirect method to establish actual adverse effects is to show that the defendant had sufficient market power to cause an adverse effect on competition.  "Market power is the ability: '(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" *Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.,* 262 F.Supp.2d 50, 73 (S.D.N.Y. 2003) (quoting *AD/SAT, Div. of Skylight,*

*Inc. v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999)).  Plaintiffs may prove market power

"directly by evidence of the control of prices or the exclusion of competition, or it may be

inferred from one firm's large percentage share of the market."  *Tops Mkts., Inc. v. Quality*

*Markets, Inc.*, 142 F.3d 90, 998 (2d Cir. 1998).

The Second Circuit has held "that a market share of over 70 percent is usually 'strong

evidence' of monopoly power," *Tops Mkts., Inc.*, 142 F.3d at 98–99, but "a market share below

50% is rarely evidence of monopoly power," *Broadway Delivery Corp. v. United Parcel Serv. of*

*Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981).  The higher the market share, the stronger the

inference of monopoly power, but there is not a threshold market share to find market power.  *Id.*

at 129–30 (stating that because the evidence presented a "fair jury issue of monopoly power," the

jury should not have been instructed to find monopoly power lacking below a specified market

share).

Dichello argues that the Amended Complaint plausibly alleges market power through

market share, control over prices, and exclusion of competition.  (Opp'n, ECF No. 42 at 33–34).

Dichello identifies the relevant market as beer sold in Connecticut and the United States, and AB

does not contest this market definition for purposes of this motion.  (ECF No. 17 ¶ 36).  Dichello

alleges that AB is the "largest beer brewing company both in the United States and the world"

and "accounts for approximately 40% of all beer sales in the United States."  (*Id.*  ¶¶ 37–38).

Further, AB "account[s] for a large percentage of independent wholesaler's [sic] revenues."  (*Id.*

¶ 39).  These allegations, even when construed in the light most favorable to Dichello, are

insufficient to support a reasonable inference of market power.  A market share of 40% in the

United States, without more, does not support a reasonable inference of market power.  *See*

*PepsiCo, Inc. v. Cocoa-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (finding that "a 64 percent

17

market share is insufficient to infer monopoly power" "[a]bsent additional evidence, such as an ability to control prices or exclude competition"); *Tops Mkts., Inc.*, 142 F.3d at 98–99 (concluding that there was no monopoly power even with 72% market share due to low barriers to entry); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share.").   Further neither AB's alleged status as the "largest beer brewing company" nor the allegation that it accounts for "a large percentage" of each wholesaler's revenues suggests that it has market power.

Dichello also argues that it has alleged that AB has market power through its control over prices and/or exclusion of competition.  (Opp'n, ECF No. 42 at 33).  Specifically, "AB (1) withheld incentives against wholesalers/distributors who did not adequately 'align' their portfolios with AB brands; (2) pressured wholesalers to dispense with non-AB brands in favor of AB brands; (3) conditioned incentives on sales volume of AB products; and (4) forbade wholesalers from even requesting that a retailer replace AB taps or shelf space with competing taps or shelf space."[3]  (Opp'n, ECF No. 42 at 33); (*see* ECF No. 17 ¶ 47).  Dichello also alleges that AB has forced upon distributors contractual terms that limit the wholesaler's ability to promote, supply, and sell competing beers, and place control of the wholesaler in the hands of AB through the approval of the Equity Manager.  (*Id.* ¶¶ 43–44).  But these allegations do not speak to control over pricing at all.  And there are no facts pled anywhere else in the Amended Complaint suggesting that AB can dictate the pricing of its products once they are in the hands of

---

[3] Although some of these practices are no longer allowed under the Modified Final Judgment which prohibits AB from "condition[ing] its relationship with[] an Independent Distributor … upon the amount of sales the Independent Distributor makes of a Third-Party Brewer's Beer or the marketing, advertising, promotion, or retail placement of such beer," *MFJ*, 2018 WL 668472 at *8, I consider them to the extent they could support a claim for damages for AB's past practices.

independent distributors, let alone that it can successfully price above competitive levels for significant periods through control over pricing in the market.  If anything, Dichello's allegations indicate that AB *lacks* the ability to price independently in the premium and sub-premium beer segments.  "[C]ompetition in the high-end beer segment serves as an important constraint on the ability of AB to raise beer prices in the premium and sub-premium segments."  (ECF No. 17 ¶ 27).  Further, while Dichello's allegations suggest that AB has sought to require independent distributors to favor its brands at the expense of competing brands, they do not suggest this strategy has been successful in actually excluding any competing beer manufacturers from the relevant market.  *See Tops Markets, Inc.*, 142 F.3d at 96 (no adverse effect on competition where plaintiff did not allege that other supermarkets were excluded from the market but only that plaintiff was prevented from opening store).

Because Dichello fails to allege actual adverse effects or market power, Dichello fails to plead a violation of Section 1 under the rule of reason.  Therefore, I grant the Motion to Dismiss as to Counts Two, Four, and Six.

### 2.  **Counts Three and Seven: Conn. Gen. Stat. § 35-27 and Section 2 of the Sherman Act**

Dichello also makes claims under Section 2 of the Sherman Act and Conn. Gen. Stat. § 35-27.  I analyze these claims together because Section 35-27 "is patterned after [Section] 2 of the Sherman Act."  *Shea v. First Fed. Sav. and Loan Ass'n of New Haven*, 184 Conn. 285, 304 (Conn. 1981); *see also Tremont Pub. Advisors,* 333 Conn. at 691 (stating that the Connecticut state courts "follow federal precedent" when interpreting the act unless state law indicates otherwise).   For the reasons below, I grant the Motion to Dismiss as to Counts Three and Seven.

Section 2 of the Sherman Act prohibits monopolization and attempts to monopolize.  *See* 15 U.S.C. § 2.  Dichello alleges two claims under Section 2: (1) monopolization and (2) attempted monopolization.  (ECF No. 17 ¶ 103).

### a.  *Monopolization*

To establish a monopolization claim, "plaintiffs must prove that defendants possessed monopoly power, and willfully acquired or maintained that power in the relevant market." *Geneva Pharms.*, 386 F.3d at 495 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  Monopoly power, which is a synonym for market power, is the "power to control prices or exclude competition."  *Geneva Pharms.*, 356 F.3d at 500; *see In re Aluminum Warehousing Antitrust Litig.*, 95 F.Supp.3d 419, 453 (S.D.N.Y. 2015) (stating that market power is sometimes referred to as monopoly power).  Plaintiffs may prove monopoly power "directly through evidence of control over prices or the exclusion of competition" or indirectly based on market share.  *Geneva Pharms.*, 389 F.3d at 500.  "[W]illful acquisition or maintenance" is shown if the defendant "use[s] monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor."  *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 482–83 (1992).  "The willful acquisition or maintenance of monopoly power is to be distinguished from growth or development that is the result of superior product, business acumen or historical accident."  *Id.* at 495.

As discussed above in connection with Section 1 of the Sherman Act, Dichello has failed to allege facts suggesting that AB has monopoly or market power.  Therefore, the monopolization claim fails.

### b.  *Attempted Monopolization*

Attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "Attempted monopolization requires some degree of market power," but a "lesser degree of market power" than monopolization claims. *Tops Mkts., Inc.*, 142 F.3d at 100. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc.*, 506 U.S. at 456; *see also Tops Mkts., Inc.*, 142 F.3d at 100 (noting that in determining the likelihood of achieving market power, the Court must look at "the defendant's relevant market share in light of other market characteristics, including barriers to entry").

Dichello argues that it has adequately pled attempted monopolization based on AB's alleged anticompetitive conduct via the Equity Agreement and AB's market share. (Opp'n, ECF No. 42 at 37). As noted, the Amended Complaint alleges that "AB accounts for approximately 40% of all beer sales" in the relevant market. (ECF No. 17 ¶¶ 38, 36). Although an attempted monopolization claim requires a "lesser degree of market power," *Tops Mkts., Inc.*, 142 F.3d at 100, Dichello's allegations still fall short. As discussed above, market share of 40% does not support a reasonable inference of market power. Further, Dichello fails to allege market conditions that make the beer market ripe for monopolization, such as high barriers to entry, or that AB has the ability or is near gaining the ability to insulate its prices from competitive pressure. *See Apotex Corp. v. Hospira Healthcare Indian Priv. Ltd.*, No. 18-4903, 2020 WL 58247, at *7 (S.D.N.Y. Jan. 6, 2020) (finding that the Plaintiff failed to allege a dangerous probability of acquiring market power with market shares of 43.57% and 30.76% and allegations

21

that "make plain that there was never a 'dangerous probability' that [Defendant] could insulate its prices from competition, given that [Defendant] was bound to prices set by" competitors).

Dichello argues that it has pled "high barriers to entry in this business," (Opp'n, ECF No. 42 at 37), but one searches the Amended Complaint in vain for any factual allegations about barriers to entry. Indeed, the Amended Complaint suggests that even local "craft" beers have succeeded in entering the market, thanks in part to the "tiered" market structure and the independence of wholesalers. (ECF No. 17 at ¶¶ 19–21). Although the Amended Complaint alleges that AB has sought to undermine that independence, it has not alleged any facts suggesting that AB has succeeded in erecting barriers to entry. The Amended Complaint alleges no facts about whether it is difficult for new beer manufacturers to enter the market or how long it takes to enter the market. *See United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322, 342 (S.D.N.Y. 2001) (stating that the "longer the lags before new entry, the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints"). And as noted above, Dichello alleges that the "competition in the high-end beer segment serves as an important constraint on the ability of AB to raise beer prices in the premium and sub-premium segments." (ECF No. 17 ¶ 27). As previously discussed, this allegation undermines any argument that AB can insulate or control prices in those segments.

Dichello has failed to allege a dangerous probability of achieving market power. Because Dichello failed to plead adequately a claim of monopolization or attempt to monopolize under Section 2 of the Sherman Act, I grant the Motion to Dismiss as to Counts Three and Six.

### 3.  Count Five: Conn. Gen. Stat. § 35-29

Dichello also sets forth a claim under Conn. Gen. Stat. § 35-29, which provides that "[e]very lease, sale or contract for the furnishing of services or for sale of commodities … shall be unlawful where the effect of such lease or sale or contract for sale or such condition or understanding may be to substantially lessen competition or tend to create a monopoly in any part of trade or commerce."  Conn. Gen. Stat. § 35-29 is "the Connecticut analogue of [Section] 3 of the Clayton Act."  *Reserve Realty, LLC*, 335 Conn. at 199.  "Section 3 provides a cause of action for anti-competitive 'product tying' and 'exclusive dealing' arrangements."  *Campbell v. Austin Air Systems, Ltd.*, 423 F.Supp.2d 61, 70 (W.D.N.Y. 2005).  To prove an illegal tying arrangement, the plaintiff "must demonstrate … that a defendant tied the sale of two distinct products; in other words, that it sold one product on the condition that another be purchased as well."  *Id.*

An exclusive dealing agreement is a contract between a seller and a buyer that prohibits the buyer from purchasing the goods from another seller.  *Conn. Ironworkers Employers' Ass'n v. New England Reg'l Council of Carpenters*, 324 F.Supp.3d 293, 306 (D. Conn. 2018).  The agreement does not need to contain an "express exclusivity requirement … because *de facto* exclusive dealing may be unlawful."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012); *see also Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-2680, 2014 WL 4988268, at *11 (S.D.N.Y. Sept. 29, 2014) ("The concept of *de facto* exclusivity is based on the premise that some agreements, though they do not require a contracting party not to deal in its counterparty's competitor's goods in so many words, still have the effect of being exclusive.").  Section 3 of the Clayton Act only prohibits exclusive dealing agreements that "substantially lessen competition or tend to create a monopoly in a line of commerce." *Anheuser-Busch, Inc. v. G.T. Britts Distrib., Inc.*, 44 F.Supp.2d 172, 176 (N.D.N.Y. 1999); *see Tampa Elec. Co. v. Nashville Coal Co.*, 365

U.S. 320, 327 (1961) (stating that there is no violation of the Clayton Act unless the agreement "will foreclose competition in a substantial share of the line of commerce affected"). In determining whether the agreement is illegal, courts examine if competitors can reach the market through other ways and if there are high barriers to entry. *See CDC Technologies, Inc. v. IDEXX Laboratories, Inc.* 186 F.3d 74, 80–81 (2d Cir. 1999) (concluding that there was no evidence that the exclusive dealing contract impeded a competitor's ability to reach customers or that there were "significant barriers to entry"). In addition, courts evaluate whether the agreements are imposed on distributors rather than end-users, because the former are "generally less cause of anticompetitive concern [since] there may be other avenues available to competing manufacturers to distribute their product." *Anheuser-Busch, Inc.*, 44 F.Supp.2d at 176.

In its opposition brief, Dichello asserts that it did not allege a "tying arrangement," but, instead, an exclusive dealing arrangement in violation of Conn. Gen. Stat. § 35-29. (Opp'n, ECF No. 42 at 38–39). Specifically, Dichello argues that it pled an exclusive dealing arrangement based on AB's coercion of distributors to sign the Equity Agreement, which "forced Dichello to devote greater efforts" to AB products. (*Id.* at 39). I disagree. The Amended Complaint does not plead an unlawful exclusive dealing agreement. First, Dichello admits being the "wholesale distributor of numerous beer brands" including AB. (ECF No. 17 ¶ 2). While AB contracts only with Dichello to distribute AB beers in New Haven, Fairfield, and Middlesex—as required by state law—Dichello is free to distribute other beer manufacturers' products. (*Id.* ¶ 2); *see also* (*id.* ¶ 14 (alleging that the Connecticut Liquor Control Act prohibits a single brand from being distributed by more than one distributor in the same territory, but not that distributor may not carry competing brands)). Nor does Dichello allege that the effect of the Equity Agreement is to impose *de facto* exclusivity. The Amended Complaint does not contain allegations suggesting

that, as a result of the Equity Agreement and the "best efforts" clause, Dichello cannot distribute

other products or that Dichello has, in fact, stopped distributing other brands.

Even if the Equity Agreement were an exclusive dealing arrangement, Dichello has not

pled that it forecloses competition in a substantial share of the beer market either in Connecticut

or the United States.  As discussed above, Dichello has not alleged that the requirements

imposed on it under the Equity Agreement have actually succeeded in foreclosing any

competition.  The allegations that the Equity Agreement requires Dichello to favor AB's brands

do not suggest that the Agreement has had the effect of foreclosing competition from other

brands.  Indeed, competing beer manufacturers may, according to the allegations, sell their

brands through other distributors, even in Dichello's territory.  (ECF No. 17 ¶ 14); *see Anheuser-*

*Busch, Inc.*, 44 F.Supp.2d at 176 (dismissing the distributor's counterclaim under Section 3 of

the Clayton Act because "[t]he Complaint does not allege that [the manufacturer's] competitors

are precluded from reaching retailers because of the [manufacturer's handling of its distributor

arrangements]").

Dichello fails to plead a claim under Conn. Gen. Stat. § 35-29.  I grant the Motion to

Dismiss as to Count Five.

### C.  Count One: CUTPA

CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 41-110b.  A CUTPA

claim must allege that "(1) the defendant committed an unfair or deceptive act or practice; (2) the

act complained of was performed in the conduct of trade or commerce; and (3) the prohibited act

was the proximate cause of harm to the plaintiff."  *Pellet v. Keller Williams Realty Corp.*, 177

Conn.App. 42, 62 (2017).  Courts consider three factors to determine whether an act or practice is unfair: 1) whether it is in violation of public policy as established by common law or statute, 2) whether it is otherwise immoral, and 3) whether it causes substantial harm to consumers. *Tillquist v. Ford Motor Credit Co.*, 714 F. Supp. 607, 616 (D. Conn. 1989).

Dichello's CUTPA claim is based on two theories: (1) AB violates the public policy underlying state and federal antitrust laws, and (2) AB's control of Dichello through the Equity Agreement violates the public policy embodied in the Connecticut Liquor Control Act.  (Opp'n, ECF No. 42 at 15–23); (ECF No. 17 ¶¶ 60–70).  I address only the latter theory and find it sufficient to support the CUTPA claim.

Under the Connecticut Liquor Control Act, the state grants separate permits for beer manufacturers, wholesalers, and retailers.  *See e.g.,* Conn. Gen. Stat. §§ 30-16, 30-17c, 30-20. Regulations issued under the Act prohibit any "person, corporation or group of persons or corporations who, through stock ownership or otherwise, control or have the power to control a permit business of one class" from "control[ing] or hav[ing] the power to control a permit business of another class of permit."  Conn. Agencies Regs. § 30-6-A4(b).  I find that Dichello has alleged a violation of the public policy underlying this provision and, thus, has alleged a CUTPA violation based on the "public policy" prong.

The Connecticut Liquor Control Act was enacted in part to "eliminate[] the so-called 'tied-house evil.'"  *Eder v. Patterson*, 132 Conn. 152, 155 (1945).  "Tied-house evil" is the "monopolistic control of distributors by manufacturers" of alcohol.  *Park Benziger & Co., Inc. v. Southern Wine & Spirits, Inc.*, 391 So.2d 681, 683 n.3 (Fla. 1980).  Here, Dichello alleges that AB is violating the public policy of preventing "tied-house evil" because it has approval rights over the Equity Manager, only the Equity Manager can control the daily operations of the

wholesaler, Dichello must convey the Equity Manager an ownership interest of at least 25%, AB can withdraw its approval of the Equity Manager, and AB must approve the successor to the Equity Manager.  (ECF No. 17 ¶ 44).  Regardless of whether these allegations describe an actual violation of the "control" restrictions in the Liquor Control Act, when construed in Dichello's favor, they amount to a violation of the broader policy underlying the Act.  From the facts pled, it is reasonable to believe that AB asserts substantial influence over the wholesaler.

AB argues that it does not control Dichello and that Dichello is a family-owned business. (Mot. to Dismiss, ECF No. 27 at 19).  AB relies on *Eder v. Patterson*, 132 Conn. 152 (1945), which involved the Connecticut Liquor Control Commission's refusal to renew wholesale liquor permits in two cases.  Both cases involved an employer and employee who held retail permits and also owned stock in an applicant for a wholesale permit.  132 Conn. at 154–55.  Individually, the employer and employee owned less than 50% of the stock, but together they owned 50% or more.  *Id.*  The court found that neither employer-employee pair controlled the corporations that sought the permit because neither owned a majority of the stock.  *Id.* at 155.  The court noted that the decision might have been different had there been evidence about the relationship between the employer and the employee to justify treating their stock ownership as a single bloc.  *Id.* at 155–56.

*Eder* is distinguishable for two reasons.  First, *Eder* involved a violation only of the Liquor Control Act, *Id.* at 153–54, not CUTPA, and CUTPA sweeps more broadly.  "[W]hile a violation of another statute *can* serve as the basis for a CUTPA claim, the defendant in the present case does not necessarily have to be found to have violated the Liquor Control Act in order to be found to have violated CUTPA for conduct controlled by the Liquor Control Act. [The Connecticut Supreme Court] previously has indicated that a plaintiff may bring a CUTPA

27

claim that is predicated upon the public policy embodied in another statute, irrespective of whether the conduct in question expressly is prohibited by the letter of that statute, so long as the claim is consistent with the regulatory principles established by the underlying statute." *Eder Bros., Inc. v. Wine Merchants of Conn., Inc.*, 275 Conn. 363, 381 (2005) (internal quotation marks and citation omitted).  Second, as the decision itself notes, *Eder* does not involve facts relating to control outside of stock ownership and does not foreclose a finding of control based on other facts.  Because of the breadth of CUTPA, I need not decide whether the facts alleged regarding the influence AB has gained through the Equity Agreement actually amount to a prohibited level of control under the Liquor Control Act.  I note only that the *Eder* decision would not foreclose a finding of such control.

Because Dichello has pled a plausible CUTPA claim, I deny the motion to dismiss Count One.

### D.  Count Eight: Tortious Interference with Contract

Dichello alleges that AB, through the terms of the Equity Agreement and its direct dealings with Dichello's Equity Manager, has interfered with Dichello's contractual relationship with its Equity Manager.  (ECF No. 17 ¶¶ 108–10).  "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Landmark Inv. Grp., LLC v. CALCO Const. and Dev. Co.*, 318 Conn. 847, 864 (Conn. 2015) (quoting *Appleton v. Bd. of Ed. of Town of Stonington*, 254 Conn. 205, 212–13 (2000)).  For a successful tortious interference claim, the plaintiff "must prove that the defendant's conduct was in fact tortious."

*Landmark Inv. Grp., LLC*, 318 Conn. at 868.   "This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation … or that the defendant acted maliciously." *Id.* (quoting *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 805 (1999)).   "The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." *Daley*, 249 Conn. at 806.   "[N]ot every act that disturbs a contract or business expectancy is actionable."   *Id.* Thus, "an action for intentional interference with business relations … requires the plaintiff to plead … at least some improper motive or improper means."   *Blake v. Levy*, 191 Conn. 257, 262 (1983).

AB argues that Dichello's tortious interference claim is limited to its allegations about the dealings with Sal DiBetta, which is time-barred.   (Mot. to Dismiss, ECF No. 27 at 36); *see* Conn. Gen. Stat. § 52-577 (stating that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission").   I disagree that Dichello's allegations are limited to Sal DiBetta.   Even if the claims about Mr. DiBetta are time-barred,[4] Dichello alleges an ongoing interference with its current contractual relationship with the Equity Manager. Dichello asserts that AB is aware of the relationship between Dichello and the Equity Manager, that the Equity Manager owes a duty of loyalty to Dichello, but that AB maintains control over the Equity Manager.   (*See* ECF No. 17 ¶¶ 52–53, 108–09).   There are no allegations suggesting that the Equity Manager position has been terminated or that the Equity Agreement provisions concerning the Equity Manager no longer apply.

---

[4] It is not clear if the claims are time-barred.  Dichello hired Mr. DiBetta in 2013.  (ECF No. 17 ¶ 55).  The Amended Complaint does not mention when Mr. DiBetta terminated his employment with Dichello.

AB also argues that Dichello fails to allege that AB had an improper motive or used improper means.  (Mot. to Dismiss, ECF No. 27 at 37).  I disagree.  Dichello alleges that AB seeks to undermine Dichello's relationship with the Equity Manager "to advance its own economic interests to the detriment of Dichello."  (ECF No. 17 ¶ 110).  Dichello further asserts that AB "has used a variety of practices and contractual provisions that limit, impede and restrain the free and independent promotion and distribution of competing beers, generally, and high-end beers, more specifically."  (*Id.* ¶ 42).  Dichello supports this assertion by pointing to provisions of the Equity Agreement by which AB seeks to limit the wholesaler's promotion of competing beers.  (*See id.* ¶ 47).  When these allegations are construed in Dichello's favor, they are adequate to plead improper motive.

Because Dichello has pled a tortious interference claim, I deny the Motion to Dismiss as to Count Seven.

### E.  Declaratory Relief (Count Nine)

The Declaratory Judgment Act provides that the courts "may declare the rights and other legal relations of any interested party seeking such declaration" in a case of "actual controversy." 28 U.S.C. § 2201(a).  An actual controversy exists when there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

However, the Declaratory Judgment Act "confers a discretion on the courts rather than an absolute right upon the litigant."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995).  Courts

may exercise their discretion to refuse to hear a "declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (per curiam).  In deciding whether to exercise their discretion to issue a declaratory judgment, courts consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; … (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] … [(3)] whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; [(4)] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [(5)] whether there is a better or more effective remedy." *Id.* at 359–60.  Courts reject declaratory judgment claims "'when other claims in the suit will resolve the same issues,' because under such circumstances, a declaratory judgment will not serve any useful purpose." *Optanix v, Alorica Inc.*, No. 20-9660, 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) (quoting *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018)).

Dichello "seeks a declaration that the AB Equity Agreement and/or its provisions are illegal, invalid and/or unenforceable," (ECF No. 17 ¶ 116), because it violates the Connecticut Liquor Control Act, the Connecticut Antitrust Act, and the Sherman Act, (ECF No. 17 ¶ 114). The request for declaratory judgment is thus duplicative of the relief sought under Counts One through Seven.  Dichello also seeks a declaration that the Equity Agreement is invalid because it "lacks consideration." (ECF No. ¶ 115).  But Dichello pleads no facts that support this conclusory allegation and provides little explanation for the notion of lack of consideration in its opposition brief.  Under these circumstances, I decline to grant the requested declaratory judgment and dismiss Count Nine.

**III.**    **CONCLUSION**

Defendant's Motion to Dismiss is GRANTED with respect to Counts Two through Seven and Count Nine and DENIED with respect to Counts One and Eight.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

September 14, 2021