UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DICHELLO DISTRIBUTORS, INC.
     *Plaintiff*,

v.

ANHEUSER-BUSCH, LLC
     *Defendants*.

No. 3:20-cv-01003-MPS

## RULING ON MOTION FOR SUMMARY JUDGMENT

At the end of Prohibition, Connecticut adopted a three-tier system for alcohol distribution, in which out-of-state shippers and manufacturers sell to wholesalers, wholesalers to retailers, and retailers to consumers. To maintain this system, Connecticut's Liquor Control Act and its implementing regulations prohibit businesses in any tier from controlling businesses in any other tier. In this case, Dichello Distributors, Inc. ("Dichello"), a licensed beverage wholesaler, contends that its beer supplier, out-of-state shipper Anheuser-Busch, LLC ("AB"), has violated Connecticut law and public policy by exercising excessive control over it. Dichello alleges that AB violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-11a et. seq., and tortiously interfered with its business relationships with two of its employees. AB has filed counterclaims for breach of the distribution contract between Dichello and AB, fraudulent misrepresentation, breach of the duty of good faith and fair dealing, and declaratory judgment. The parties have cross-moved for summary judgment. For the reasons set forth herein, I grant AB's Motion for Summary Judgment on the Plaintiff's CUTPA and tortious interference claims. I also grant in part AB's Motion for Summary Judgment on its counterclaims, awarding summary judgment as to liability on counterclaim Counts I and II

1

(breach of contract), but denying summary judgment as to Count V (declaratory judgment). I deny Dichello's Motion for Summary Judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise indicated.

### A.  The Parties

Dichello is a beverage wholesaler based in Orange, Connecticut. ECF No. 171-1 ¶ 1. Dichello has distributed AB products since the 1940s. *Id.* ¶ 5. Today, Dichello is the exclusive wholesaler for AB products in all or parts of Fairfield, Litchfield, New Haven, and Middlesex Counties. *Id.* ¶ 6. John Hall, Dichello's President, testified that AB products make up "roughly … 80 percent" of Dichello's business. ECF No. 147-10 at 107. AB does not have an ownership interest in Dichello. ECF No. 165-1 ¶ 13. Since at least 1982, Dichello and AB have been parties to a Wholesaler Equity Agreement. ECF No. 165-1 ¶ 7.

### B.  The Equity Agreement

Dichello and AB entered into the Amended and Restated Anheuser-Busch, Inc. Wholesaler Equity Agreement (the "Agreement"), which became effective on July 17, 1997. ECF No. 171-1 ¶ 3. The Agreement details the arrangements by which Dichello distributes AB products in the parts of Connecticut identified above. In this lawsuit, the parties dispute the enforceability of three provisions of the Agreement: Paragraph 1(b)(iv), Paragraph 2, and Paragraph 3. The Agreement states that its provisions are subject to and governed by Connecticut law, and that applicable provisions of state law are incorporated by reference and supersede any conflicting provisions of the Agreement. ECF No. 136-2 at 24.

(i)    <u>Paragraph 1(b)(iv)</u>

Paragraph 1(b)(iv) of the Agreement states that Dichello "agrees to comply at all times" with the "operating, sales, and merchandizing standards" set out in Exhibit 9 of the Agreement. ECF No. 136-2 at 4, 36-44. The Exhibit 9 standards include a requirement that Dichello participate in AB's "national cents per case ('CPC') media and sales promotion program." *Id.* at 42; ECF No. 153-29 ¶¶ 1, 5. The parties have not submitted a current copy of the CPC program, but they agree that it obligates Dichello to spend a minimum amount on promoting and marketing AB products, based on the amount of AB products Dichello sold in its territory in the previous year. ECF No. 154 ¶ 4; ECF No. 153-29 ¶ 6. AB claims that Dichello "decides how the money is spent within CPC guidelines," and "numerous areas qualify for credit under the CPC program."[1] ECF No. 153-29 ¶¶ 9-10. AB also claims that Dichello can spend "as much as it wants on advertising … any other brands." *Id.* ¶ 11. Exhibit 9 requires Dichello to utilize "best efforts … designed to achieve and maintain the highest practical retail placement …. of [AB] Products in the Territory," ECF No. 136-2 at 40.[2]

---

[1] In addition to the cents per case program, Dichello claims that it "participated in AB's Brand Ambassador ('BAM') program," which "AB funded." ECF No. 165 at 11; ECF No. 167 at 37, 39. Andrew Porter, a Senior Sales Director at AB, testified that BAMs would "go out to bars and clubs, establish relationships with the owners, bartenders, servers, work with them to … teach them … about our products." ECF No. 167 at 140-41. They would also "go to bars, buy people … Anheuser-Busch brands, to sample them, to, you know, create an atmosphere in the bar where folks were enjoying our Anheuser-Busch brands." *Id.* at 141. Dichello admits it was not required to participate in this program. ECF No. 216 at 34.

[2] After the Department of Justice (DOJ) filed suit against AB's parent company related to a proposed merger, AB's parent company agreed to a Modified Final Judgment (the "MFJ") that limits certain anti-competitive behavior. The MFJ permits AB to "enter[] into or enforc[e] an agreement" that requires a wholesaler "to use best efforts to sell, market, advertise, or promote [AB] beer," and to "condition incentives, programs or contractual terms based on an Independent Distributor's volume of sales of [AB's] Beer, the retail placement of [AB] Beer, or on [AB's] percentage of Beer industry sales in a geographic area." *United States v. Anheuser-Busch InBev SA/NV*, No. 16-CV-01483, 2018 WL 6684721, at *8 (D.D.C. Oct. 23, 2018). But the MFJ prohibits AB from, among other things, "conditioning the availability" of AB beer or "terms and conditions of sale" of AB beer on a wholesaler's "sales, marketing, advertising, promotion, or retail placement of a Third-Party Brewer's Beer." *Id.* The MFJ also bars AB from "[p]reventing an Independent Distributor from using best efforts to sell, market, advertise, or promote any Third-Party Brewer's Beer." *Id.*

Exhibit 9 also includes other "sales and marketing processes requirements," ECF No. 136-2 at 38-43, "quality control" requirements (e.g., a "freshest before/code date policy"), *id.* at 36-37, "operations management" requirements (e.g., "truck painting and decaling"), *id.* at 37-39, and "leadership/management processes" requirements (e.g., "employee training and development"), *id.* at 43-44. According to Dichello, AB conducts "recurring and comprehensive audits of Dichello's operations" in which it "determines and reports 'compliance' or 'non-compliance' with AB's Exhibit 9 standards." ECF No. 165-1 ¶ 81.

    (ii)    <u>Paragraph 2</u>

Paragraph 2 of the Agreement is titled "Manager of Wholesaler's Business." *Id.* at 5. Under its terms, Dichello must select a person who will serve as manager of its business (the "Manager"). *Id.* at 10. The Manager is subject to AB's approval. When AB signed the Agreement, it approved Dichello's Manager at the time. *Id.* at 5. The Agreement requires Dichello to submit any subsequent managers to AB for approval, *id.* at 30, which AB cannot unreasonably withhold, so that AB can "pass upon [their] qualifications and competence," *id.* at 10. Subparagraph 2(e) empowers AB to "withdraw its approval of the Manager" for "good cause," *id.* at 9, but AB's right to withdraw approval is, like its right to approve a Manager candidate, "given solely to enable [AB] to pass upon the qualifications and competence of the individuals … chosen by [Dichello] to be the Manager … and who will therefore be responsible for promoting and selling [AB's] products," *id.* at 10. To withdraw its approval of a Manager, AB must "notif[y] [Dichello] of deficiencies in [the] Manager's performance." *Id.* at 7. If those deficiencies are not cured after 90 days, "approval … shall be deemed to be withdrawn." *Id.* Dichello has the right "at any time in its sole discretion (without obtaining the approval of Anheuser-Busch) to terminate the employment of [the] Manager …." *Id.* But

"if individual turnover in the position of Manager is excessive in Anheuser-Busch's reasonable judgment," that turnover may constitute a "deficiency" of Dichello's compliance with the Agreement, *id.* at 8, and AB has the right to terminate the Agreement, *id.* at 17.

Subparagraph 2(b) lays out the powers that the Manager must have over Dichello's business to "ensure" the Manager has "the incentives and authorities necessary" to "aggressively promote, sell, and service [AB] Products." *Id.* at 5. The Manager must have:

> day-to-day operating control over the business of Wholesaler, which shall include, without limitation, control by Manager of promoting, marketing, pricing, selling, advertising, merchandising, delivering, and servicing [AB malt beverage products]; hiring and termination of all other employees of Wholesaler with any responsibilities for any of the foregoing activities; managing the business on a day to day basis; and making capital expenditures by the Wholesaler, subject to reasonable annual budget limits established by Wholesaler.

*Id.* at 3, 5. The parties disagree about whether subparagraph 2(b) requires the Manager to exercise control over Dichello's entire business, including non-AB products. Dichello argues that the contract requires the Manager to control "all aspects of Dichello's business with respect to both AB Products and Non-AB Products." ECF No. 134 at 28. AB argues that "[n]othing in Paragraph 2 requires [Dichello] to grant to the [Manager] control over the sale of competing products." ECF No. 153 at 30.

Paragraph 2 also requires the Manager to have an ownership interest in Dichello, because "[t]he business of selling malt beverages at wholesale has generally proved to be more successful when the manager of such business has an ownership interest." ECF No. 136-2 at 5. Subparagraph 2(b) states that the manager must "own at all times at least twenty-five percent (25%) of [Dichello]" unless AB agrees to a "lesser percentage." *Id*. If the Manager does not own twenty-five percent of Dichello when he or she becomes Manager, then Dichello must "sell[] or assign[] to the Manager a minimum of ten percent (10%) of the

equity of [Dichello], and grant[] to the Manager an option to acquire additional equity, so that within eight (8) years … [the] Manager owns at least twenty-five percent (25%) of the equity of [Dichello] ….”[3] *Id.* at 6. Subparagraph 2(f)(i) expresses AB's preference — but not a requirement — that the Manager be Dichello's owner, or a person with voting control over Dichello. *Id.* at 7.

(iii)    Paragraph 3

Paragraph 3 states the parties' agreement that "[i]t is important … that at such time as Manager becomes unable to or ceases to manage Wholesaler's business, there be a person available to assume the management of Wholesaler's business." *Id.* at 8. Accordingly, Paragraph 3 requires Dichello to designate a person (the "Successor-Manager") who will automatically become Manager if the prior Manager can no longer serve. *Id.* at 8-10.

Exhibit 3 lays out procedures that Dichello must follow in appointing a new Successor-Manager. *Id.* at 9. Dichello must submit its Successor-Manager candidate to AB for approval, and AB has the right to interview the candidate. *Id.* at 30. AB can withdraw approval "for good cause … by giving notice to [Dichello]" after a Successor-Manager is approved. *Id.* at 9.

As with the Manager, AB may not unreasonably withhold its approval of Dichello's designated Successor-Manager. *Id.* Subparagraph 3(h) specifies that "the rights given to Anheuser-Busch to approve the designation of a Successor-Manager and to withdraw its approval of either the Manager or Successor-Manager are given solely to enable Anheuser-Busch to pass upon the qualifications and competence of individuals who are chosen by

---

[3] The Agreement provides exceptions where (1) the wholesaler "provides for a transfer to Manager on the death of [an] owner or owners of sufficient equity so that Manager would then own at least twenty five percent (25%) of Wholesaler," (Subparagraph 2(b)(ii)), or (2) if the wholesaler's owners "have a family member who is not currently qualified to be Manager, but Wholesaler and Anheuser-Busch reasonably believe such family member may become qualified within five (5) years" (Subparagraph 2(b)(iii)). *Id.* at 6.

[Dichello] … and who will therefore be responsible for promoting and selling the Products of Anheuser-Busch." ECF No. 136-2 at 10. Further, AB "agrees it will not use" its rights to approve the Manager and to withdraw its approval of the Manager and Successor-Manager "in such a way as to usurp the right of [Dichello] to choose its own Manager." *Id.*

(iv)    <u>Termination of the Agreement</u>

If no Successor-Manager candidate is designated by Dichello and approved by AB within a certain period of time, then AB "shall notify [Dichello that it] has 90 days … to obtain the approval of [AB] of a Successor-Manager or obtain a waiver thereof." *Id.* at 30. After the 90-day period, "if for any reason there shall be no approved Manager of Wholesaler or a Successor-Manager shall not have been designated and approved," Dichello "shall … be given an additional 90 days (commencing with the expiration of the 90-day period specified in paragraph 2 of Exhibit 3), to sell its business …." *Id.* at 9. Finally, if Dichello's owners do not sell the business "within the time allotted, [the] Agreement shall automatically terminate and [AB] shall pay [Dichello]" a termination fee in the amount of twice Dichello's "pre-tax net income attributable to the sale of [AB] products for [Dichello's] most recently completed fiscal year …." *Id.* Similarly, if Dichello "breach[es] the Agreement," or fails "to use or observe one or more of the Operating, Sales, and Merchandising Standards set forth in Exhibit 9 in a manner and to the extent consistent with the type of market which is [Dichello's] Territory," Paragraph 5 enables AB to "terminate this Agreement … subject … to the termination procedures set forth in Exhibit 10." *Id.* at 17.

Under Connecticut law, however, the termination of the Agreement does not mean AB can terminate Dichello's distributorship. Connecticut General Statutes § 30-17(a)(2) governs situations where a wholesaler has been distributing an out-of-state shipper's "beer …

for six months or more." To terminate the distributorship or reduce Dichello's territory without Dichello's consent, AB must (a) send a notice to Dichello and the Department of Consumer Protection (the "Department") laying out "just and sufficient cause" for the termination, and (b) persuade the Department, "after hearing, that just and sufficient cause exists." *Id*. § 30-17(a)(2)(A)-(B).

### C. Salvatore DiBetta's Tenure as Manager

Salvatore DiBetta became Dichello's Manager in October of 2013. ECF No. 165-1 ¶ 18. Before serving as Dichello's Manager, DiBetta worked for AB for thirty-one years, where he received "extensive training" on "each element" of the Agreement. ECF No. 167 at 5, 9-10. As Dichello's Manager, DiBetta claims he had "day to day operating control" over Dichello's entire business. *Id.* at 16-17.

### (i)     Dispute Over DiBetta's Ownership Interest

As outlined above, the Agreement requires that the Manager have an ownership interest in Dichello. Dichello claims that AB "forced" it to sell DiBetta an equity interest at below market value. ECF No. 165-1 ¶ 66. AB contests this, maintaining that it was Dichello that "obstructed [DiBetta's] ability to acquire stock." ECF No. 176 at 12 n.10.

On December 2, 2014, Andrew Porter, AB's Senior Sales Director, wrote that the parties "reached an agreement on the ownership transfer at Dichello." ECF No. 167-9 at 2. He wrote, "[t]his is a huge win for [AB] in Region 1, as it will allow for [DiBetta] to remain in his leadership role." *Id.* He asked Kelly Awbrey, who worked on wholesaler succession planning for AB, whether it might be possible to have "some security and stability in the contract so we knew Sal would be there for a while." ECF No. 167-8 at 3. She replied that, "there really isn't a

requirement for Dichello to commit to him long term. It's definitely preferable but not something we can require." *Id.* at 2.

(ii)    AB's Influence Over DiBetta

Dichello claims that AB had "great influence and control" over DiBetta, which led DiBetta to (1) disclose "confidential details" about Dichello to AB, (2) give AB control over its pricing, and (3) change its salesforce incentive structure to favor AB products. ECF No. 165 at 9-11.

First, Dichello claims that "DiBetta disclosed confidential details about Dichello's bank covenants, lobbying efforts, delivery fleet, capital improvements, and governance" during his time as Manager. ECF No. 165-1 ¶ 68 (internal citations omitted). AB does not deny that DiBetta sent AB sensitive information, and there is substantial evidence that he did. *See* ECF Nos. 166-10, 166-15, 166-16, 166-17, 166-18. But AB contends that even if DiBetta sent confidential information, "there is no evidence [AB] solicited any [of that] information." ECF No. 147. When asked if AB "ever solicit[ed] any" of his emails, DiBetta said, "No." ECF No. 147-10 at 69. Only one of the emails Dichello cites includes a response from AB. ECF No. 166-10 at 2-3. In that instance, DiBetta forwarded Porter an email from a lobbyist for the Connecticut Beer Wholesaler Association. The email warned wholesalers that AB's lobbyist was trying to "hold (kill) both our bill[s]," and stated the Association's lobbyist's desire to "forge-ahead." ECF No. 166-10 at 2-4. DiBetta wrote, "FYI and confidential … You did not see this …!!!" *Id.* at 2. Porter replied, "of course I will keep this confidential…appreciate the help here." *Id.*

Next, Dichello claims that "DiBetta changed Dichello's sales force incentive structure, which had provided higher commissions on Dichello's more profitable competing brands, to a structure that prohibited paying higher commissions on any products competing with AB

brands." ECF No. 165-1 ¶ 73. Dichello cites a letter from AB District Manager Chris Delaney to DiBetta, informing him that Exhibit 9 of the Agreement prevents Dichello from having "one cents per case commission for premium AB brands … and another, higher cents per case commission for craft brands." ECF No. 166-23 at 2. It is unclear how DiBetta responded.

Finally, Dichello alleges that AB "used its power to control the prices that Dichello charged to retailers." ECF No. 134 at 37 n.4. AB responds that it "lawfully discuss[ed] or recommend[ed] product pricing" to Dichello. ECF No. 176 at 9. DiBetta testified that he would meet with AB twice before setting prices: first, to "get recommendations from [AB] for their products" and second, "so they can review our pricing." ECF No. 167 at 26, 28, 29. But DiBetta also stated that Dichello was "independent" and could "make [its] own decisions" on pricing. *Id.* at 29. In one instance, DiBetta emailed Delaney a list comparing Dichello's prices for certain products to another wholesaler's and wrote, "Chris, what are your thoughts on this ? Looks like we can move a few items." ECF No. 166-8 at 2. Delaney wrote back, "I would obviously request that you do not increase your pricing on these," and added that Dichello was "above our recommended" for certain beers. ECF No. 166-9 at 2. DiBetta replied, "OK THANKS I WILL STAY." *Id.*

### (iii)   John Hall's Successor-Manager Candidacy

In January of 2013, John Hall became President of Dichello. ECF No. 165-1 ¶ 8. Hall's resume indicates that he had previously worked in real estate for twelve years. ECF No. 151-6 at 3; ECF No. 166-1 at 2. AB claims that Hall spent those years "flipping houses and racing motorcycles." ECF No. 147-1 at 18 n.5. Before his real estate work, Hall worked several entry level positions at Dichello as part of a "management training program" from 1996 to 2001. ECF No. 151-6 at 3. Hall's mother, Gloria Hall, is Dichello's CEO and Chairman, and Dichello

claims that Hall is a "fourth-generation member of the founding family." ECF No. 147-10 at 170; ECF No. 165 at 11.

By 2014, Dichello did not have a Successor-Manager, although it had received a waiver from AB. ECF No. 167-7 at 4. On December 10, 2014, Gloria Hall wrote to AB asking for a year-long extension of the Successor-Manager waiver, because ownership believed "family member John Hall [would] be approvable within the next four years as he works closely with Sal DiBetta." *Id.* Upon receiving Gloria Hall's letter, Porter wrote to Tallett to recommend a six-month extension "to further evaluate John Hall as the Successor Manager candidate," and to enable AB to "meet with John and … ensure he is aligned with the direction moving forward." *Id.* at 3. But Porter added that "[i]f John does not fulfill the requirements at the end of the six month period, Dichello will need to follow the Successor-Manager submission process." *Id.*

The parties disagree about what happened next. Dichello claims that AB "foisted upon Hall a 6-month [training] plan," then "rejected Hall as Successor Manager for alleged failure to complete the training plan" after four months "even though AB knew such training would take [four] years." ECF No. 165 at 12. AB claims that "Mr. Hall agreed to and signed the six-month development plan," but "[a]fter four months of little progress, Mr. Hall, in a pique, crumpled up the plan and threw it away." ECF No. 176 at 13.

According to a June 19, 2015 letter from Porter, AB and John Hall agreed to a "[t]wenty six checkpoint[]" training plan on February 6, 2015. ECF No. 153-20 at 2. A version of the plan, signed by Hall and dated February 12, 2015, is attached to the letter. *Id.* at 5-6. Hall testified that he agreed to the plan and signed it. ECF No. 153-9 at 76. Porter testified that Hall had "no objections and … no pushback whatsoever in terms of the … different checkpoints, the timing, any of that." *Id.* at 85-86.

AB claims that it made a good faith effort to prepare Hall to be Successor-Manager. *See, e.g.*, ECF No. 153-9 at 85 (Porter testifying that he aimed to "present [John Hall] to be a successor manager at the final kind of presentation to the regional vice president …."); ECF No. 153-20 at 2 (letter from Porter stating that "[f]rom the outset, [AB]'s goal was to build a mutually agreed upon plan to … ensure John Hall would be in a position to be approved for the critically important Successor-Manager position"). Dichello claims that AB "knew the training and milestones they expected would take Hall about [four] years." ECF No. 165-1 ¶ 77. To support this claim, Dichello relies on Gloria Hall's statement that "family member John Hall will be approvable within the next four years." ECF No. 167-7 at 4.

During this period, Dichello alleges, DiBetta forwarded confidential communications to AB. On April 16, 2015, DiBetta forwarded Porter and Delaney an email from John Hall regarding a plan to "patch" areas of Dichello's parking lots "as we see fit." ECF No. 166-17 at 2. DiBetta wrote, "CONFIDENTIAL CALL ME WHEN YOU HAVE A CHANCE." *Id.* In another exchange, DiBetta forwarded Porter and Delaney an email from John Hall, which said "[w]e are only required to have 85% of our fleet to have AB decals. Let's not commit to more than that. I would like to give some of our other suppliers an opportunity to have decals on some of our trucks." ECF No. 166-15 at 2. DiBetta wrote "Joke..FYI." *Id.*

AB claims that John Hall met with Porter, Delaney, and DiBetta on May 5, 2015 so they could assess his progress on the training plan. ECF No. 153-20 at 2. At the meeting, Hall allegedly "acknowledged not having completed the vast majority of the previously agreed upon checkpoints. Instead, [he] argued that his prior experience should be satisfactory. [He] also indicated that if [AB] did not feel he should be successor manager, then he would remove himself from consideration." ECF No. 153-20 at 2. Porter testified that Hall "basically [said] …

something along the lines of I didn't do these. If you are not going to approve me, don't approve me," then "crumpled up the paper [with the checkpoints] and then threw everything out." ECF No. 153-9 at 86-87. DiBetta recalled Hall crumbling up the development plan and throwing it at Porter. *Id.* at 34-35. Delaney testified that, "[b]etween February and [the May meeting], [he] had not seen any change in John's involvement at Dichello, which was relatively minimal to start with." *Id.* at 25. Dichello has not cited evidence rebut this account of the meeting. In his deposition, however, Hall testified that it was "not true" that he "didn't do any of those checkpoints." ECF No. 153-9 at 76.

The next day, Andrew Porter wrote that, "[b]ased on our conversation yesterday, I will not be approving John as Successor Manager for Dichello Distributors." ECF No. 167-1 at 3. Porter told Dichello its deadline to submit a Successor-Manager candidate was May 31, 2015. *Id.* at 2-3. John Hall apparently maintained the support of Dichello's owners. On May 28, 2025, Robert Simon, Dichello's Vice President, wrote that "the ownership group is ready to name [Hall] as Successor Manager." ECF No. 166-20 at 2. The same day, Gloria Hall wrote Porter to demand "a detailed explanation on why John will not be approved as successor manager for Dichello." ECF No. 167-10 at 2. On June 19, 2015, Porter sent DiBetta a "summary of the timeline of the Successor-Manager process that we implemented for John." ECF No. 153-20 at 2. Porter accused Hall of "not put[ting] any effort towards actually completing" the "mutually agreed upon plan." *Id.* Porter added that though Hall "worked for Dichello Distributors in the past," he "left for an extended period" and "the beer business has changed drastically over the past decade." *Id.* Therefore, "such a leave of absence warrants a comprehensive development plan." *Id.* Finally, Porter stated that the Successor-Manager waiver had expired on June 12, 2015,

but AB would "be prepared to look favorably upon [a waiver request] so long as it is submitted with a timeline for a new Successor-Manager candidate by July 6th." *Id.* at 2-3.

Meanwhile, DiBetta continued to forward emails to AB. On May 7, 2015, John Hall emailed DiBetta that, "I 100% do not agree with Andy Porter on not considering moving me to successor manager … It is my belief that all that Andy is looking for is a robot with only an opinion that mirrors [theirs.]" ECF No. 166-18 at 2. DiBetta forwarded the message to Porter and wrote, "[p]lease call me to discuss…" *Id.* The same day, John Hall emailed DiBetta directing that he "not commit to any improvements regarding roof and pavement until I approve of our plan," and asking him to "[p]lease explain the highlighted charges … ASAP. You need to get spending under control." ECF No. 166-16 at 2. DiBetta forwarded the email to Porter and commented, "I believe because his title is President he feels he can tell the [Manager] what to do here. I was hired to report directly to the shareholders and not John Hall. Houston we have a problem." *Id.*

(iv)    Recorded Phone Calls

At this point, Dichello claims that "DiBetta and AB … conspired to have Hall removed from Dichello or to force a sale to another entity." ECF No. 165 at 21. AB responds that this accusation is "a wild conspiracy theory." ECF No. 176 at 11. The primary evidence for Dichello's claim is a recording that captures DiBetta's side of a phone call with AB's Region Vice President Brendan Whitworth, ECF No. 167-12, and a phone call with a person who may have been Porter, ECF No. 167-13. The phone calls allegedly occurred on June 26, 2015. ECF No. 168-4 ¶¶ 14-15.[4] AB claims the recording is inadmissible, because it was illegally "recorded without the consent of either party to the phone call." ECF No. 176 at 6; *see also* note 4, *supra*.

---

[4] The only evidence submitted to show the date of the calls is an affidavit from a paralegal at the law firm of Dichello's counsel. ECF No. 168-4. The affidavit does not set forth facts demonstrating personal knowledge of the call. *See* Fed. R. Civ. P. 56(c)(4).

The origins of the recording are unclear. John Hall testified that a former Dichello employee, Kevin Gaetano, made the recording without his knowledge and without Dichello's authorization. ECF No. 147-10 at 112. Hall claims that Dichello had suspended Gaetano, because Hall "knew from reading emails that [Gaetano and DiBetta] were working together on [Gaetano] becoming a successor manager …." *Id.* Hall maintains that Gaetano "came to me pleading for his job …. And I confronted him and said, I know what you were doing. And he came clean and gave [the recording] to me." *Id.* Gaetano testified that he "did not make that recording," and he has "no idea" who recorded the call. *Id.* at 81-82; *see also id.* at 83 ("Q: So John Hall was lying when he testified that you made this recording? … [Gaetano]: Yes."). When DiBetta was asked if Gaetano was in the room with him when he made the calls, he responded, "I don't believe he was. I don't remember if he was. But I doubt he would be." ECF No. 176-2 at 7-8.

Both DiBetta and Porter testified that they did not know they were being recorded or consent to the recording. ECF No. 147-10 at 72, 76, 163. Whitworth was not deposed. During a deposition, DiBetta listened to portions of the recordings and confirmed that it was his voice and that he made some of the statements in the recording. ECF No. 167 at 47-118. AB claims that the recordings are edited, which is apparent from listening to them. *Id*. at 68. DiBetta also described the recordings as "spliced" or "cut" multiple times during his deposition. *Id.* at 53, 74, 102; ECF No. 176-2 at 7-8.

The recordings capture portions of DiBetta's side of two phone conversations. In the recordings, DiBetta warned that Dichello was planning to submit John Hall as a Successor Management candidate. DiBetta told Whitworth that he "tried to explain to John in countless different ways. John Hall is not going to be the candidate." ECF No. 167 at 54. According to

DiBetta, Dichello believed AB had not "come out and clearly state[d]" that John Hall was not going to get the position. *Id.* at 77-80. And he told Whitworth that Dichello believed Porter "had a vendetta" against Hall. *Id.* at 82. He suggested that Whitworth "communicate to them, look, [Hall's] not the candidate. He needs to get out of the business. Sal needs to run the business, or you need to sell. That's what really needs to happen here." *Id.* at 56; *see also id.* at 77 ("I think he's got to be told, 'You need to get out of the business …. You can be like your mother, sit as a trustee. Meet with … Sal four times a year and then move on.").

Asked if he was telling Whitworth that "Dichello owners and trustees needed to sell the business," DiBetta responded, "that's what I guess I said, yeah." *Id.* at 58. DiBetta also testified that the trustees "forc[ed]" him to submit John Hall as Successor-Manager, even though he "expressed to all of them that … [John Hall] was just disapproved. I've never seen [AB] that quickly go back. If they said no, it's no. They give you time to cure – to work with him, which I encouraged Gloria to do and she agreed with me. But, again, this was forced by John." *Id.* at 54-55.

DiBetta also offered his own account of Hall's behavior in the May 5 meeting. He told Whitworth that he was "in the meeting" and "[t]here was … a mutually agreed upon document …. John signed it knowingly and then clearly didn't do anything." *Id.* at 82; *see also id.* at 100-01 ("[The agreement] was mutually agreed on by John. John signed it knowingly. There's no personal anything here. This is a business decision…."). He complained that "there's no realization that he didn't do anything. I mean, they have the CFO write a letter of recommendation. …. [T]hey're delusional here. You know, people within here saying how good he is and they're delusional. The kid's bad. He's bad." *Id.* at 82-84; *see also id.* at 101 ("[T]his is what happens when you have spoiled rich kids that never worked a day in his life…").

In another portion of the recording, DiBetta discussed Dichello's financial situation. He told Whitworth that "the amount of money [Dichello] owes to buy this other partner out is … hindering their ability to take a dividend. On top of that, the bank is only allowing them to spend so much money in capital improvements." *Id.* at 62. And he added, "[a]s Chris Delaney has identified … we have some serious issues here. I mean, vans need to be done over. Trucks need to be done over. Paving." *Id.* at 64. DiBetta concluded that, "if you guys come back and say, 'You guys got to do this within a year and it will cost us a million and a half, two million bucks' … they won't be able to do it." *Id.* at 66. DiBetta testified that he was probably referencing the fact that the "bank wouldn't let [Dichello] make significant capital improvements." *Id.* at 66. In the next section of the recording, DiBetta told Whitworth that, "I think at that point, you guys can have the conversation, 'Look … are you an [AB] wholesaler for the future? If not, I think it might be time, you know.'" *Id.* at 68. In his deposition, DiBetta denied wanting AB to pressure Dichello to sell. *Id.* at 67, 69.

DiBetta also reminded Whitworth that his "employment deal ends at the end of this year." *Id.* at 69. If AB "plays this right," DiBetta suggested, "without a [Manager] and without a successor, they have 90 days to sell the business." *Id.* at 70-71. Thus, when DiBetta "start[ed] negotiating" in September, it would "behoove[] [Dichello] to keep me until they can figure this thing out … while there's a waiver." *Id.* at 72.

(v)     Proposed Capital Improvements at Dichello

Dichello alleges that "immediately after DiBetta's June [26] call with Whitworth," AB "proceeded to do precisely what DiBetta and Whitworth conspired to do—force massive capital improvements upon Dichello to create economic duress and force a sale." ECF No. 165 at 14. The emails Dichello cites show that, more than six weeks after the supposed date of the calls, AB

sent several emails insisting that Dichello make capital improvements. But AB had also conducted an assessment under Exhibit 9 of the Agreement and found issues with Dichello's facilities on April 15, 2015, two months before the calls. ECF No. 166-21 at 3. More specifically, after the April 2015 assessment, Delaney wrote DiBetta to inform him that "Thirty Seven out of the thirty-seven Exhibit 9 standards are *In-Compliance*," but several of the items marked "in compliance" included an observation about planned or needed improvements. *Id.* at 4-6. For instance, Delaney marked Dichello's truck painting and decaling as in compliance, with the observation that "36 trailers [are] currently out of compliance (decals older than 3 years)." *Id.* at 5. Facilities management was also marked in compliance with the observation that Dichello planned to "repave parking lot in sections as necessary," "repaint backside of warehouse," "replace roof in warehouse," and "repatch sidewalk." *Id.* at 6.

In August of 2015, AB sent several communications informing Dichello that it was out of compliance with various Exhibit 9 standards. On August 13, 2015, Rob George, AB's Senior Sales Director, sent DiBetta an email notifying Dichello that the "parking lot at the facilities … is currently out of compliance" and AB "cannot accept a five year timeline to repave the parking lot and bring the facility back into compliance." ECF No. 167-4 at 2. DiBetta replied, reminding AB to "address the front entrance and walkway cement action plan." *Id.* That month, Delaney sent additional communications informing Dichello that its vans, warehouse exterior, and landscaping were not in compliance, and demanding repairs. ECF No. 167-2 at 3; ECF No. 167-5 at 3-5; ECF No. 167-6 at 3; *see also* ECF No. 136-2 at 38 (Exhibit 9 provision requiring that Dichello "[m]aintain warehouse, administrative areas, and other facilities in a clean, painted, and well lighted condition and in good repair," "[p]rovide adequate paved parking facilities," and "[m]aintain landscaping of grounds consistent with the high quality image of [AB]").

(vi)   <u>Submission of John Hall as Successor-Manager</u>

Dichello formally submitted John Hall as a candidate for Successor-Manager in early July of 2015. ECF No. 151-15 at 3; ECF No. 166-1 at 3. On July 31, 2015, Tallett notified Dichello that AB had "decided to disapprove John Hall as the Successor-Manager of Dichello Distributors." ECF No. 153-15 at 2. Tallett's letter stated that Hall had visited the Region Office on July 20, 2015 "to meet with Region V.P. Brendan Whitworth and the new Sales Director, Rob George." *Id.* at 3. Tallett claimed that interview "confirmed Mr. Hall is not qualified," as he "had completed very few of the 26 checkpoints," had not maintained records of his progress, and "did not demonstrate a thorough understanding of the Equity Agreement." *Id.*; *see also* ECF No. 176-3 at 4 (December 15, 2016 letter from Tallett stating that Hall "was unprepared to answer even basic questions about the business or AB's brands"). The letter notified Dichello that it had 90 days to "obtain [AB's] approval of a Successor-Manager or secure a waiver." *Id.* at 4. Asked about the Region Office meeting, John Hall testified that, "I shouldn't have went there. I shouldn't have been subjected to these questions. I shouldn't have to go through their approval process. I don't agree with their approval process." ECF No. 147-10 at 153.

**D.  Termination of DiBetta and Aftermath**

Dichello terminated DiBetta's employment on August 28, 2015. ECF No. 165-1 ¶ 20. The next week, Tallett wrote to Dichello to express "deep concern" over DiBetta's termination and inform Dichello that it did not intend to waive the Manager or Successor-Manager requirements ahead of the October 5 deadline. ECF No. 166-2 at 2-3.

On September 23, 2015, Dichello's counsel wrote to AB to inform them that it had "hired Peter Deane to manage its operations and has applied for [AB]'s approval of Mr. Deane as Successor Manager." ECF No. 151-14 at 2. The letter requested that "Mr. Deane be approved …

19

at the earliest possible opportunity." *Id.* Deane had previously served as Dichello's Manager from December of 2012 until the summer of 2013, when Dichello terminated his employment and hired DiBetta. ECF No. 165-1 ¶¶ 16-17. AB approved Deane as Successor-Manager on October 30, 2015, and he was immediately elevated to Manager. *Id.* ¶ 22.

Several weeks later, Dichello's trustees wrote to Tallett again to express "concern" about "the issue of management succession at Dichello." ECF No. 151-15 at 3. They suggested that AB "did not approve Mr. Hall based in large measure on perceived concerns about Mr. Hall's lack of complete adherence to a twenty-six point plan …." *Id.* However, the trustees argued, it "should now be apparent" that "Mr. Hall was unable to fully devote his efforts to executing this plan due to his involvement with pressing problems associated with Dichello's management." *Id.* The letter included an attached recommendation from Peter Deane attesting to Hall's "strong leadership abilities." *Id.* at 5.

Tallett responded, again via letter, expressing "surprise[] that Dichello would suggest [Hall] for that position so soon after what transpired earlier this year." ECF No. 166-3 at 2. If the "pressing problems … with Dichello's management" were "its decision to terminate Sal DiBetta," then "Dichello [had] never explained to [AB] the basis for that decision." *Id.* Tallett also disputed that "the events that led to Mr. DiBetta's termination in August somehow prevented [Hall] from adhering to the training plan to which he had agreed six months earlier." *Id.* He added, "[a]ll that aside, [AB] is certainly willing to meet with Dichello to discuss management succession issues." *Id.* Hall testified that he believed Tallett was saying that Hall "would never be successor manager." ECF No. 176-2 at 14.

Dichello also claims that it interpreted AB's communications, beginning with the July letter denying John Hall's Successor-Manager application, as "threats to terminate it or compel a

20

forced sale of its business absent compliance with the Equity Agreement." ECF No. 166 ¶ 14. According to Dichello, these communications "specifically and repeatedly warned Dichello about the 90-day period set forth in Paragraph 2 of Exhibit 3." *Id.* ¶ 13. AB claims that the "letters referenced only the 90-day deadline to submit a new Successor-Manager candidate in Exhibit 3 … not the [90-day] timetable for selling a business set forth in Paragraph 3(d) of the Equity Agreement." ECF No. 176 n.7. A review of the letters confirms that AB insisted Dichello comply with the 90-day Successor-Manager deadline and Paragraph 2's equity ownership requirement but did not explicitly threaten to invoke Paragraph 3(d)'s 90-day sale provision. ECF Nos. 166-1 (July 31, 2015), 166-2 (September 3, 2015); 166-3 at 2 (November 25, 2015), 166-4 at 2 (October 6, 2016), 166-5 (November 7, 2016); ECF No. 176-3 (December 15, 2016).

### E. Dichello's Compliance with the Agreement After 2015

After Deane's elevation to Manager, Dichello did not have a Successor-Manager. Over the next several months, AB extended Dichello's Successor-Manager waiver several times. ECF Nos. 166-3; 166-5. AB's final waiver of the Successor-Manager requirement expired on September 24, 2016. ECF No. 165-1 ¶ 32. On October 6, 2016, Tallett informed Dichello that the waiver had expired and Dichello had not filled the Successor-Manager vacancy. ECF No. 166-4 at 2. Tallett also expressed concern that AB "[has] heard nothing from you regarding Dichello's plan to provide Mr. Deane the ownership interest" ahead of an October 23 deadline. *Id.* at 3. On November 7, 2016, Tallett wrote that Dichello had never "submitted the Exhibit 7 to request approval of the transfer [of an ownership interest to Deane], let alone completed the transfer," and Dichello was therefore "in breach of Paragraph 2." ECF No. 166-5 at 3. On December 15, 2016, Tallett wrote again that "Dichello is currently not in compliance with

Paragraphs 2 and 3 of the Equity Agreement …. [I]t now seems clear that Dichello has no present intention to cure its breach."[5] ECF No. 176-3 at 2.

The parties agree that Dichello never submitted a Successor-Manager candidate after Deane was elevated to Manager. ECF No. 171-1 ¶ 18. At present, Dichello does not have a Successor-Manager. *Id.* ¶ 15. Dichello also never sold or assigned an equity interest in Dichello to Deane, and Deane currently has no ownership interest in Dichello. *Id.* ¶¶ 11-12.

Though Deane is Dichello's Manager, John Hall testified that Deane does not have day-to-day operating control over Dichello. *Id.* ¶ 29. Dichello Trustee James Carloni and Dichello CFO Rob Simon agreed that Hall oversees day-to-day operations. ECF No. 165-1 ¶¶ 34-35. AB has not approved John Hall as Manager or Successor-Manager. ECF No. 165-1 ¶ 36. Hall testified that AB "came to [him] in 2017 to suggest that [AB] put [him] back on a development plan so [he] could be approved as [S]uccessor [M]anager." ECF No. 176-2 at 13-14. Hall refused, because he "didn't feel like [he] needed their approval." *Id.* at 14.

John Hall also admitted that Dichello is not in compliance with the Agreement. ECF No. 171-1 ¶¶ 27-28. According to Hall, he decided Dichello would not comply with Paragraphs 2 and 3 of the Agreement in 2013, because he believes that the Agreement is "interference" under the "three tier system." ECF No. 151-1 at 60; ECF No. 165-1 ¶¶ 37, 42-43.

---

[5] This letter also says that Dichello was planning "to ask state regulators for an 'interpretation' of a contract which is clear and unambiguous…." ECF No. 176-3 at 2. Tallett was presumably referring to Dichello's effort to get an opinion from the Connecticut Department of Consumer Protections on the enforceability of the Agreement. On May 20, 2016, one of Dichello's attorneys reached out to John Suchy, a Department employee, seeking "clarification/advice on the enforceability of contract provisions purporting to (1) provide an out of state shipper with authority to approve or disprove of a Connecticut wholesaler's manager and (2) require the wholesaler to have a similarly approved successor manager" under Conn. Gen. Stat. § 30-48(a) and (b) and Regs. Conn. State Agencies § 30-6-A4(b). ECF No. 147-29 at 2. Suchy replied that "The department declines to become involved in an informal discussion on this subject at this time." *Id.* John Hall and Dichello also worked with an attorney to push for enactment of a bill that would have amended Conn. Gen. Stat. § 30-48 to state that "no backer or holder of one alcohol liquor permit class shall control or determine the compensation, benefits, stock, equity or other incentive provided to employees of the backer or holder of another alcoholic liquor permit class." ECF No. 147 at 2; *see* ECF No. 147-10 at 136-38 (Hall testifying about his advocacy for the bill). Dichello was not successful in enacting the bill. ECF No. 147-10 at 138.

Dichello has also fallen out of compliance with AB's national cents per case media and sales promotion program. ECF No. 165-1 ¶ 71. According to Dichello, it "complied with AB's demands to meet the required CPC spend until March 2020," but it "did not comply … from 2020 until 2022." *Id.*; *see also* ECF No 167 at 133 (John Hall testifying that Dichello "spend[s] as a company what we feel we need to spend in our market"); *id.* at 149 (AB's expert testifying that "Dichello did not meet the required CPC spend from 2020 to 2022").

### F.  AB's Enforcement of the Agreement Since 2016

Since AB's November 2016 letter, Dichello claims that AB has continued to "enforce the Equity Agreement by (1) seeking to enforce its terms through its Counterclaim in this lawsuit and (2) compelling Dichello to participate in its Exhibit 9 assessment process and to comply with AB's controlling operating standards under threat of termination." ECF No. 165 at 27.

The record includes only a few communications from the period after 2016: a December 21, 2022 letter from AB to its "wholesaler partners" regarding the Exhibit 9 standards, and a June 3, 2019 message from Tallett to all "Equity Agreement Wholesalers" regarding the Agreement's requirements for changes in ownership. ECF No. 166-6 at 2; ECF No. 166-19 at 3. Much of the deposition testimony focuses on events that occurred from 2013 to 2016. The primary evidence that Dichello presents regarding events after 2015 is a declaration from John Hall, attached as an exhibit to Dichello's Opposition to AB's Motion for Summary Judgment. ECF No. 166.

(i)  Exhibit 9 Assessment Process

John Hall's declaration claims that AB's letters allegedly threatening to "terminate it or compel a forced sale of its business … coerced Dichello into partially adhering to certain requirements of the Equity Agreement from 2015 to the present." ECF No. 166 ¶¶ 14-15. "In

particular," Dichello "complied with [AB's] 'Wholesaler Exhibit 9 Assessments'" of Dichello's operations. *Id.* ¶ 16. The latest assessment allegedly occurred on May 3, 2023. *Id.*

Hall claims that AB changed some of the Exhibit 9 standards in 2018 to comply with a Department of Justice consent decree. *Id.* ¶ 17. Dichello does not provide a copy of the updated version of Exhibit 9. However, Hall attests that—at least prior to the consent decree—the Exhibit 9 standards pressured Dichello to maximize sales of AB products and favor AB products over other brands. *See, e.g.*, *id.* ¶ 18 (attesting Exhibit 9 required Dichello "to use best efforts to achieve and maintain the highest practicable sales volume and retail placement of AB products"); *id.* ¶ 19 (attesting Exhibit 9 "conditioned wholesaler incentives on sales volume for AB products, the retail placement of AB products and/or AB percentage of beer sales in a geographic region"); *id.* ¶ 21 (attesting Exhibit 9 "forbade wholesalers from requesting that a retailer replace AB taps or shelf space with taps or products from competing brands"); *id.* ¶ 22 (attesting Exhibit 9 "required wholesalers to report to AB sales of all AB products and competitor products on a regular basis[] and prohibit[s] wholesalers from compensating its salespeople for the sale of competing brands unless it provides the same incentive for the sale of (typically less profitable) AB products"). Hall's declaration also provides a description of the damages that Dichello allegedly suffered because of AB's enforcement of the Exhibit 9 requirements. *Id.* ¶¶ 23-27.

(ii)     <u>Interference with Dichello's Relationship with Deane</u>

Next, Hall's declaration alleges that "[s]ince Mr. Deane's hiring, AB has continually interfered with the relationship between Dichello and Mr. Deane to advance AB's own economic interests to the detriment of Dichello …." ECF No. 166 ¶ 29. Hall asserts that AB has interfered with Deane's obligations under the Dichello Employee Handbook, *id.* ¶¶ 28, 30, 32, "pressured

[Dean] to maximize sales of AB products at the expense of Dichello's overall profitability," *id.* ¶¶ 31, 34, and forced Deane to "devote unnecessary time and resources to complying with AB's Exhibit 9 assessment process," *id.* ¶ 33.

### G. Procedural History

On August 14, 2020, Dichello filed an amended complaint, alleging that AB violated the Sherman Antitrust Act, 15 U.S.C. ¶ 1 et seq., the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 et seq., the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-11a et. seq., and Connecticut common law. ECF No. 17. On September 14, 2021, I dismissed Dichello's antitrust claims, but allowed Dichello's CUTPA and tortious interference claims to proceed. ECF No. 59. AB filed an Answer to Dichello's Amended Complaint, which asserted five counterclaims: (1) breach of Paragraph 2 of the Equity Agreement, (2) breach of Paragraph 3 of the Equity Agreement, (3) fraudulent misrepresentation, (4) breach of the duty of good faith and fair dealing, and (5) declaratory judgment regarding the legality of Paragraphs 2 and 3 of the Equity Agreement. ECF No. 64 at 22-37.

Dichello has moved for summary judgment on all of AB's counterclaims and partial summary judgment on Dichello's CUTPA claim on the issue of whether Paragraph(1)(b)(iv) of the Equity Agreement is enforceable. ECF No. 134. AB has moved for summary judgment on Dichello's CUTPA and tortious interference claims, ECF No. 147, and, separately, as to liability on its two breach of contract counterclaims and its counterclaim for a declaratory judgment regarding the legality of Paragraphs 2 and 3 of the Equity Agreement, ECF No. 151.

## II.   CONNECTICUT'S LIQUOR CONTROL ACT

Connecticut comprehensively regulates the sale of alcohol within its borders. *See Schieffelin & Co. v. Dep't of Liquor Control*, 194 Conn. 165, 183 (1984). I set forth below an

overview of the statutes and regulations that govern the relationship between out-of-state shippers like AB and wholesalers like Dichello.

## A. Requirements of the Liquor Control Act

### (i)     The Three Tier System

At the end of Prohibition, Connecticut established a three-tier system for alcohol distribution. Duke Chen, Conn. Office of Leg. Rsch., 2020-R-0048, *Three-Tier Alcohol Distribution System* 1 (2020). The tiers are: (1) out-of-state shippers and manufacturers (Conn. Gen. Stat. §§ 30-16, 30-18, 30-19), (2) wholesalers (*id.* § 30-17), and (3) retailers (*id.* § 30-20 – 30-37). *Latrobe Brewing Co. v. State*, No. CV-96-0560189-S, 1996 WL 737466, at *2 (Conn. Super. Ct. Dec. 6, 1996). With some exceptions, out-of-state shippers and manufacturers "must sell their products to wholesalers, who in turn sell to retailers, who sell to consumers." Chen, *Three-Tier Alcohol Distribution System*, *supra*, at 1.

The Connecticut Department of Consumer Protection (the "Department") issues permits to businesses in each tier. ECF No. 154 ¶ 5. AB holds an out-of-state shipper permit, while Dichello holds a wholesaler permit. ECF No. 165-1 ¶¶ 3-4. The permits expire annually, and the Department has the discretion to refuse to renew permits for specified reasons. Conn. Gen. Stat. § 30-14(a); *id.* § 30-47.

### (ii)     Separation of Tiers

To ensure the tiers remain independent, Connecticut law generally prohibits the backers or permittees of businesses in one tier from being the backer or permittee of businesses in any other tier. Conn. Gen. Stat. § 30-48(a).[6] Backers that are corporations must disclose the names and shares assigned to each of their stockholders. Regs. Conn. State Agencies § 30-6-A4(a).

---

[6] If a permittee is "associated" with a business, "whether as an agent, employee, or part owner," then a backer is the "proprietor" of that business, i.e., any "owner" of the business. *See* Conn. Gen. Stat. § 30-1(4) (defining "backer"); *id.* § 30-1(19)(A) (defining "proprietor").

Persons or corporations that "through stock ownership or otherwise, control or have the power to control a permit business of one [tier]" are prohibited from "control[ling] or hav[ing] the power to control a permit business of another [tier]." *Id.* § 30-6-A4(b).

The Department may revoke a permit if a permittee "has any forbidden connection with any other class of permittee," Con. Gen. Stat. § 30-47(a)(2), or if a permittee "has not been delegated full authority and control of the permit premises and of the conduct of all business on such premises," *id.* § 30-47(a)(6). Agreements between out-of-state shippers and wholesalers are permitted, but such agreements must "be maintained and made available to the [D]epartment." Regs. Conn. State Agencies § 30-6-B16.

(iii)   Protections Against Termination

The Liquor Control Act protects each wholesaler against termination of its distributorship or diminishment of its territory. *Id.* § 30-17(a)(2). If a wholesaler has had a "distributorship … for six months or more," an out-of-state shipper may terminate the distributorship or reduce its territory without the wholesaler's consent only if (a) the shipper notifies the wholesaler and the Department, and (b) "the Department … determine[s], after hearing, that just and sufficient cause exists." *Id.* An out-of-state shipper of beer also cannot "appoint one of more additional wholesalers" to distribute its product within the wholesaler's territory unless it has "just and sufficient cause" and it notifies the wholesaler and the Department of its intent to appoint an additional wholesaler. *Id.* The statute defines "just and sufficient cause" as "the existence of circumstances which, in the opinion of a reasonable person considering all of the equities of both the wholesaler and the … out-of-state shipper, warrants a termination or a diminishment of a

27

distributorship." *Id.* The legislature has revised Section 30-17 multiple times to strengthen protections for wholesalers.[7]

(iv)   Limits on Loans, Credit, and Sales Incentives

Other provisions bar manufacturers and out-of-state shippers from giving financial benefits to wholesalers. Out-of-state shippers cannot offer wholesalers "any free goods, gratuities, gifts, prizes, coupons, premiums, combination items, quantity prices, cash returns, loans, discounts, guarantees, special prices or other inducements in connection with the sale of alcoholic beverages or liquors."[8] *Id.* § 30-94. Nor can out-of-state shippers offer wholesalers "any discount, rebate, free goods allowance, or other inducement for the purpose of making sales or purchases." *Id.* § 30-63(b). Out-of-state shippers may, however, provide wholesalers with "funds to be used for product promotion." Regs. Conn. State Agencies § 30-6-A29a(f). To do so, out-of-state shippers must (1) notify the Department, (2) offer the funds without restrictions, other than that they must be used to promote certain products, and (3) give the funds "without discrimination in any manner among wholesalers." *Id.*

---

[7] The law initially allowed out-of-state shippers to terminate distributorships, without just and sufficient cause, after a one-year waiting period. 1971 Conn. Pub. Acts 977-78 (P.A. 71-605). In 1979, the legislature removed out-of-state shippers' option to terminate a distributorship after one year without just and sufficient cause. 1979 Pub. Acts 125-26 (P.A. 79-132). The 1979 version also added a provision requiring out-of-state shippers to provide notice of their intention to appoint an additional wholesaler for the territory and to wait a year for the additional wholesaler's appointment to be effective. *Id.* In 1981, the legislature extended the protection against termination to any wholesaler who had held a distributorship for six months (previously, the period was two years). 1981 Conn. Pub. Acts 593 (P.A. 81-367). In 1984, the legislature replaced the one-year waiting period for appointment of an additional beer wholesaler with a requirement that the out of state shipper have "just and sufficient cause" to appoint an additional beer wholesaler. 1984 Conn. Pub. Acts 722-23 (P.A. 84-432). In the State Senate, a supporter of the 1984 reform argued "requir[ing] that breweries prove just and sufficient cause before adding additional distributors in franchise areas …. will prevent out-of-state shippers from bringing punitive measures against in-state distributors." 27 Conn. S. Proc., Pt. 8, 1984 Sess., p. 3118.

[8] The legislature relaxed the restrictions on sales incentives in a 1998 amendment to Section 30-94, which permitted floor stock allowances and depletion allowances, two common types of sales incentives. *See* Conn. Joint Standing Committee Hearings, General Law Committee 2, 1998 Sess., p. 401.

(v)      Pricing Regulations

Connecticut's scheme also regulates the pricing of alcohol. Out-of-state shippers cannot offer price discounts to some wholesalers that they do not offer to others. *Id.* § 30-63(b). And out-of-state shippers and wholesalers must publicly post the prices at which they will sell their products at the beginning of each month. *Id.* § 30-63(c).

**B. Public Policy Goals**

(i)      The "Tied House" Evil

From its inception, the Liquor Control Act was "plainly aimed at an evil long recognized in the history of liquor control legislation, the 'tied house.'" *State v. Zazzaro*, 128 Conn. 160, 162 (1941); *Eder v. Patterson*, 132 Conn. 152, 156 (1945) ("[T]he statute is directed against the 'tied-house.'"). The "[t]ied-house evil" is the "monopolistic control of distributors by manufacturers" of alcohol. *Park Benziger & Co., Inc. v. Southern Wine & Spirits, Inc.*, 391 So. 2d 681, 683 n.3 (Fla. 1980). "Under the tied-house system, an alcohol producer, usually a brewer, would set up saloonkeepers, providing them with premises and equipment, and the saloonkeepers, in exchange, agreed to sell only that producer's products and to meet set sales requirements. To meet those requirements, saloonkeepers often encouraged irresponsible drinking." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2463 n.7 (2019) (citation omitted). Alcohol producers were also "able to exercise tremendous influence over those retailers they did not directly control … by extending credit and other financial incentives." Evan T. Lawson, *The Future of the Three-Tiered System as a Control of Marketing Alcoholic Beverages*, *in* Social and Economic Control of Alcohol 33 (Carole J. Jurkiewicz & Murphy J. Painter eds., 2008) (internal citations omitted); *see also Ted Sharpenter, Inc. v. Illinois Liquor Control Comm'n*, 119 Ill. 2d 169, 175 (1987) ("By the granting of gifts and loaning of money to

retailers, distributors could effectively 'tie' themselves to retailers to the point of excluding all competitors.").

The public blamed tied houses for "such evils as political corruption, intemperance, and irresponsible ownership of taverns." *Ted Sharpenter*, 119 Ill. 2d at 175; *see also Cal. Beer Wholesalers Ass'n, Inc. v. Alcoholic Beverage Control Appeals Bd.*, 5 Cal. 3d 402, 407 (1971) ("These statutes sought to forestall the generation of such evils and excesses as intemperance and disorderly marketing conditions that had plagued the public…."). Most legislatures, including Connecticut's, adopted three-tier systems, under which "[m]anufacturing interests were to be separated from wholesale interests; wholesale interests were to be segregated from retail interests." *Cal. Beer Wholesalers Ass'n, Inc.*, 5 Cal. 3d at 407.

"[P]reventing out-of-state shippers and manufacturers from dominating Connecticut wholesalers" is an "important purpose" of the three-tier system in the Liquor Control Act. *Schieffelin*, 194 Conn. at 183. Many provisions of the Act "make it apparent that Connecticut … control[s] the supplying out-of-state shipper … to make certain that the owner of the brand name out-of-state shipper cannot dominate or control the Connecticut wholesalers." *Latrobe Brewing Co. v. State*, No. CV-96-0560189-S, 1996 WL 737466, at *2 (Conn. Super. Ct. Dec. 6, 1996) (quoting Daniel E. Brennan, *Liquor Control*, 54 Conn. Bar J. 611, 613 (1980)). Among these provisions is the law preventing backers of out-of-state shippers from backing wholesalers, Conn. Gen. Stat. § 30-48, and the regulation prohibiting out-of-state shippers from having "control or … the power to control" wholesalers, Conn. Regs. State Agencies § 30-6-A4(b).

The law also seeks to prevent out-of-state shippers from dominating wholesalers indirectly, using economic pressure. Out-of-state shippers must post their prices, and cannot discriminate between wholesalers by offering different prices, discounts, or rebates. Conn. Gen.

Stat. § 30-63; *see also* 30-94(b) (requiring out-of-state shippers to offer sales incentives "on a nondiscriminatory basis to all such wholesaler permittees"); Regs. Conn. State Agencies § 30-6-A29(f)(2) (requiring out-of-state shippers to offer advertising funds "without discrimination in any manner among wholesalers."). Out-of-state shippers cannot terminate a wholesaler's distributorship without persuading the Department there is "just and sufficient cause" after a hearing. Conn. Gen. Stat. § 30-17(2).

The three-tier system, and its protections for wholesalers, serve several policy goals, including promoting temperance and encouraging an orderly market for liquor. "Many of the alleged evils of the pre-Prohibition era involved excessive promotion of alcoholic indulgence by the suppliers and retailers of alcohol, who were often one and the same entity." Carole L. Kurkiewicz & Murphy J. Painter, *Why We Control Alcohol the Way We Do*, *in Social and Economic Control of Alcohol* 7, (Carole J. Jurkiewicz & Murphy J. Painter eds., 2008) (citations and internal quotation marks omitted). In these "tied-house" arrangements, "suppliers pushed retailers to increase sales whatever the social cost." *Id.* (citation and internal quotation marks omitted). The Liquor Control Act seeks to eliminate "artificial inducements to purchase liquor" that "will result in increased consumption." *Slimp v. Dep't of Liquor Control*, 239 Conn. 599, 611 (1996). For instance, Section 30-63(b) bars wholesalers and out-of-state shippers from offering "in any form any discount, rebate, free goods allowance, or other inducement for the purpose of making sales or purchases.'" Section 30-94, the "quintessential inducement statute," is explicitly intended "to eliminate incentive or inducement programs" like "prize[s]" offered to customers. *Id*.

The Liquor Control Act also aims to "stabilize the [liquor] industry," both to "encourage observance of the Liquor Control Act," *Schwartz*, 140 Conn. at 180, and to prevent unfair

business practices, *Schieffelin*, 194 Conn. at 183-84. The concern is that large out-of-state shippers or manufacturers might use their economic power to pressure wholesalers or retailers to violate the law. *Schieffelin*, 194 Conn. at 183-84 (describing how Adolph Coors Co. "used the explicit or implicit threat [of] speedy termination … to force the acquiescence of its distributors in anticompetitive behavior"). An unstable industry creates economic pressure that might "induce … retailers to commit such infractions of the law as selling to minors and keeping open after hours." *Schwartz*, 140 Conn. at 180. Thus, Connecticut's pricing statutes are designed to prevent "price wars" that might create economic pressure to break the law. *Id.*

Similarly, the Liquor Control Act seeks to stamp out price discrimination, and is designed "to ensure that there be no favoritism, i.e., no discrimination, in the liquor industry in Connecticut." *Slimp*, 239 Conn. at 611. Thus, Section 30-63(b) "prohibits discrimination 'in any manner in price discounts between one permittee and another,'" and Section 30-63(c) "requires manufacturers, wholesalers, and out-of-state sellers to post the price at which they will sell their product for the following month and to sell the product at that price for that month." *Id.*; *see also* Regs. Conn. State Agencies § 30-6-29(f)(2) (prohibiting discrimination in advertising funds). These provisions ensure equal prices for "all … customers, large or small." *Slimp*, 239 Conn. at 611. However, the law regulates the sale and consumption of alcohol for "the protection of the public, not … the economic benefit of a particular wholesaler." *Eder Bros. v. Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 377 (2005).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties bear the burden of demonstrating that no genuine issue exists

as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## IV.    DISCUSSION

### A.  Enforceability of the Agreement

Dichello contends that Paragraphs 1(b)(iv), 2 and 3 of the Agreement are unenforceable because they (1) violate Regulations of Connecticut State Agencies § 30-6-A4(b), and (2) violate the public policy underlying the Liquor Control Act. I address the enforceability of the Agreement first, since this issue is central to each of the parties' motions for summary judgment. For the reasons outlined below, I find the Agreement to be enforceable

Under Connecticut law, illegal contracts are unenforceable. *D'Angelo Dev. & Const. Co. v. Cordovano*, 278 Conn. 237, 242 (2006). Moreover, contracts that are "legal on their face, yet which are designed to evade statutory requirements, are routinely held unenforceable," as against public policy. *Parente v. Pirozzoli*, 87 Conn. App. 235, 246 (2005); *see also 12 Havemeyer Place Co., LLC v. Gordon*, 76 Conn. App. 377, 389 (2003) ("Generally, agreements contrary to public policy, that is those that negate laws enacted for the common good, are illegal and therefore unenforceable."). A contract may be unenforceable if it violates the "public policy underlying [an] entire statutory scheme, including the policy embodied in [implementing

regulations].” *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 266 Conn. 572, 587 (2003). However, “[t]he principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests; and it is the ‘general rule ... that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.” *Williams v. Vista Vestra, Inc*., 178 Conn. 323, 328 (1979) (internal quotation marks omitted). “The impropriety injurious to the interests of society which will relieve a party from the obligation he has assumed must be clear and certain before the contract will be found void and unenforceable.” *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 377 (1973). “[W]hether a contract is enforceable or illegal” and “whether a contract is against public policy” are “question[s] of law for the court, to be determined from all the facts and circumstances of each case.” *Parente*, 87 Conn. App. at 245.

(i)     Section 30-6-A4(b)

Regulations of Connecticut State Agencies Section 30-6-A4(b) provides that “[n]o person, corporation or group of persons or corporations who, through stock ownership or otherwise, control or have the power to control a permit business of one class shall control or have the power to control a permit business of another class, except as permitted by the Connecticut General Statutes.” ECF No. 134 at 17-23. The parties disagree about how the Court should interpret the phrase “power to control” in Section 30-6-A4(b). Dichello argues that “‘power to control’ should be broadly construed to mean ‘the right, ability, or authority’ to ‘exercise a restraining or directing influence over.’” ECF No. 134 at 27 (quoting definitions of “power” and “control” in Black’s Law Dictionary (5th ed. 1979)). AB contends that “power to

control" covers only "exercises of control that are of the 'same general kind or character' as control 'through stock ownership.'" ECF No. 153 at 24-25.

Connecticut courts "construe agency regulations in accordance with accepted rules of statutory construction." *Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 60 (1989). Therefore, courts first ascertain the meaning of a regulation from "the text of the [regulation] itself and its relationship to other [regulations or statutes]." *State v. Lutters*, 270 Conn. 198, 205 (2004) (quoting Conn. Gen. Stat. § 1-2z). If the meaning of the regulation remains ambiguous, courts look "to the [regulatory] history and circumstances surrounding its [promulgation], to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter …." *Id.* (citation and internal quotation marks omitted).

<u>Text of the Regulation</u>

I start with the text of the regulation, which is ambiguous. The regulation prevents AB from having "control or … the power to control" Dichello, a permitted wholesaler of beer.[9] But the regulation does not define "control." And dictionaries from the time the regulation was

---

[9] AB, which is a limited liability company, argues that limited liability companies are excluded from the definition of "person" and "corporation" under Section 30-6-A4(b). ECF No. 153 at 29. As evidence for this position, AB points out that the definition of "person" in the Liquor Control Act, Conn. Gen. Stat. § 30-1(17)(B), "does not include a corporation, joint stock company, limited liability company or other association of individuals." ECF No. 153 at 29. This textual evidence is far from conclusive. The definition of "person" that excludes limited liability companies was added to the Liquor Control Act after Section 30-6-A4(b) was promulgated. Further, allowing LLCs to circumvent state regulations would clearly violate the public policy goals underlying the Liquor Control Act. Indeed, the amendment that excluded LLCs from the definition of "person" in Section 30-1(17)(B) was part of a larger effort to "place[] limited liability companies on the same footing as other forms of business entities created under Connecticut law." 38 Conn. H.R. Proc., Pt. 6, 1995 Sess., p. 1893. Evidently, LLCs were excluded from the definition of "person" under Conn. Gen. Stat. § 30-1(17)(B) so that they would receive the same treatment as corporations and joint stock companies, which were already excluded from that definition. All this suggests that the legislature did not likely intend to exempt LLCs from existing state regulations like Section 30-6-A4(b) that govern other business entities. I read "person" or "corporation" to include LLCs.

promulgated offer several conflicting definitions.[10] The relevant version of Black's Law Dictionary defines control as "[t]o exercise restraining or directing influence over. To regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern." Control, Black's Law Dictionary (4th Ed. 1968). Non-legal dictionaries from the time offer a similar range of definitions. *See, e.g.*, Control, American College Dictionary (C. L. Barnhart & Jess Stein, eds., 1970) ("[T]o exercise restraint or direction over; dominate; command"); Control, Webster's New World Dictionary (2d ed. 1972) ("[T]o exercise authority over; direct; command."). The relevant version of Ballentine's Law Dictionary defines control as "[t]o check, restrain, govern, have under command, and authority." Control, Ballentine's Law Dictionary (3d Ed. 1969). But Ballentine's also offers the following definition of "control of corporation":

> Power to dictate the action of the corporation, not the mere management of a department of the operations. 36 Am. J1st Monop etc. § 132; the ownership or control of the stock of a corporation which has power to dominate the business, together with the voting strength to make that domination effective. Commissioner v. Shillito Realty Co. (CA6) 39 F2d 830, 69 ALR 1226; ultimately, the control exercised by the owners of a majority of the shares of stock. 18 Am J2d Corp § 496. In a legal sense, one corporation cannot be said to "control" another corporation because nearly all of the stock of the latter corporation is owned by the former. Under such circumstances, the corporation owning the shares can elect the board of directors, but there its power of management stops and control is lodged in the board of directors. Pullman's Pallace Car Co. v. Missouri Pacific Railway Co. 115 US 587.

Control of Corporation, Ballentine's Law Dictionary (3d ed. 1969).

These contemporaneous definitions are too varied to provide much guidance in this case, as they span a range that would embrace very different regulatory outcomes. A definition of "control" that means "to exercise [a] restraining … influence over" would bar practically all contracts between out-of-state shippers and wholesalers, since contracts inherently restrain their

---

[10] The Department of Consumer Protection provided the Court with records from Section 30-6-A4's regulatory history. Those records show that 30-6-A4(b) was added to the regulation in 1970, and the Department has not revised the language of 30-6-A4(b) since then. Conn. Liquor Control Comm'n, Rules and Regulations of Liquor Control Commission Regulation 1305 (1970).

signatories. On the other hand, a definition of control that requires majority stock ownership—or possibly even greater domination of a company—would allow all but a narrow set of arrangements.

Still, the text of Section 30-6-A4(b) provides some clue as to the type of "control" it prohibits: the regulation states that control or the power to control can occur "through stock ownership or otherwise." The Connecticut Supreme Court has described the term "otherwise" as "very broad" and defined it to mean "[i]n a different manner; in another way, or in other ways." *Hunnihan v. Mattatuck Mfg. Co.*, 243 Conn. 438, 450 (1997) (quoting Otherwise, Black's Law Dictionary (6th ed. 1990)). Thus, control of another entity is not limited to stock ownership—it may occur "in other ways," not least because the other entity may not be a corporation. Still, the reference to stock ownership places some constraints on the "other ways" that an out-of-shipper might control another permittee. *State v. LaFleur*, 307 Conn. 115, 133 (2012) ("When determining the legislature's intended meaning of a statutory word, it also is appropriate to consider the surrounding words pursuant to the canon of construction *noscitur a sociis*.")[11] The regulation offers stock ownership as the only illustration of control; this suggests that other forms of control proscribed by the regulation should be comparable in degree or scope to the control an out-of-state shipper might have if it was a stock owner, and in particular, a majority stock owner, because ownership of less than a majority of the issued shares of a corporation does not ordinarily convey any legal right—or "power"—to control the corporation, i.e., "power to dictate

---

[11] Dichello claims that "*noscitur a sociis* applies only where there is a listing of a group of related terms that inform the scope of a general but related term of the group." ECF No. 163 at 9. This argument confuses *noscitur a sociis* with *ejusdem generis*. *See Mason Cap., Ltd. v. Kaman Corp.*, No. 3:05-cv-01470 (MRK), 2005 WL 2850083, at *14 (D. Conn. Oct. 31, 2005) ("Noscitur a sociis suggests that a term should be construed in light of its textual neighbors, while ejusdem generis suggests that a general term that follows more specific terms should be read to embrace only objects similar in nature to those enumerated by the preceding specific words."). Indeed, Connecticut courts have applied noscitur a sociis to situations "where a provision contains two or more words grouped together," regardless of whether either of the words is general. *See Cantonbury Heights Condo. Ass'n, Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 740 (2005).

the action of the corporation," Control of Corporation, Ballentine's Law Dictionary (3d ed. 1969). Thus, the text of the regulation suggests that the "power to control" requires more than the capacity merely to exercise "a restraining …. influence."

A similar suggestion emerges from the context in which the word "control" appears in the regulation. The regulation is obviously concerned with the control of one business by another, not with control in general. "Text may not be divorced from context," *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013), and "the same words, placed in different contexts, sometimes mean different things," *Yates v. United States*, 574 U.S. 528, 537 (2015). When Connecticut courts speak of "control" in the business or corporate context, they are generally referring to a right to dictate the goals and policies of the business similar to that held by majority shareholders. *See, e.g.*, *Yanow v. Teal Indus., Inc.*, 178 Conn. 262, 283 (1979) ("The rule of corporation law and of equity invoked is well-settled: the majority has the right to control …."); *Lombardo's Ravioli Kitchen, Inc. v. Ryan*, 47 Conn. Supp. 540, 547 (J.D. New Britain Oct. 17, 2002) ("Persons having a majority of shares of a corporation have been recognized … as having the right to control a corporation."); *Zaist v. Olson*, 154 Conn. 563, 577 (1967) (recognizing that "corporate control" of majority stockholder was "inherent in his stock ownership"); *Achille Gianoni Revocable Trust v. Bristol General Mfg. Holding Co., Inc.*, 2002 WL 31938868, at *4 (Conn. Super. Ct. Dec. 19, 2002) (recognizing "control premium" in stock purchase transaction: "Thomas' interest in the preferred stock was purchased as part of John's purchase of Thomas' 50% ownership of the common stock. John paid a premium for the preferred stock so that he could acquire Thomas' common stock, own 100% of the common stock and thereby control the business"); *Jackson v. Jackson*, 178 Conn. 42, 48 (1979) (noting that "a voting trust is the accumulation in a single hand or in a few hands of shares of corporate

stock, belong to several or many owners, in order, thereby, to control the business of the company" (internal quotation marks omitted)); *see also Tiplady v. Maryles*, 2017 WL 1194318 *2, 5 (Conn. Super. Ct. J.D. Stamford-Norwalk Feb. 22, 2017) (where one LLC had right to "direct, manage and control the business" of another by virtue of operating agreement, it could be vicariously liable for the actions of the latter's employee, because: "[T]he parent entity created a subordinate which then ceded back to the parent, by way of management contract, the right to control all decision-making by the subordinate"). So the context in which appears the prohibition against a person with the "control or the power to control the permit *business* of one class" also "control[ing] or hav[ing] the power to control a permit *business* of another class"—a regulation of the control of a business by another business—likewise suggests that the drafters were worried about more than the mere capacity to exercise a "restraining influence."

### Other Regulations or Statutes

Connecticut courts also determine the meaning of a regulation by looking at its relationship to "other [regulations or statutes]." *Lutters*, 270 Conn. at 205. Adopting the broad definition of control that Dichello proposes would bring Section 30-6-A4(b) into conflict with other regulations and statutes governing liquor distribution.

Dichello's interpretation of Section 30-6-A4(b) would bar many contracts between out-of-state shippers and wholesalers, including distribution agreements. Dichello claims that Section 30-6-A4(b) bars out-of-state shippers from exercising a "restraining or directing influence" over wholesalers. Most contracts either "restrain" or "direct" the parties to the contract. But Connecticut's liquor regulations recognize that out-of-state shippers and wholesalers may enter into distribution or franchise contracts. *See* Conn. Agencies Regs. § 30-6-B16 (requiring that agreements "be maintained and made available to the [D]epartment"). Although Connecticut's

legislature has acknowledged that some states "specifically prohibit distribution agreements" in the liquor business, it has never adopted such a model. Conn. Gen. Assembly, Legislative Program Review & Investigations Comm., *Sunset Review 1982: Department of Liquor Control* 31 (1982). Instead, Connecticut limits out-of-state shippers' capacity to end distributorships once they have agreed to them, by permitting termination only for "just and sufficient cause." Conn. Gen. Stat. § 30-17. Thus, Dichello's interpretation of Section 30-6-A4(b) is out of step with Connecticut's approach, which permits distribution agreements.[12]

Section 30-6-A4(b) of the liquor control regulations must also be reconciled with Conn. Gen. Stat. § 30-48(a), the statute it implements,[13] which provides that "[n]o backer or permittee of one permit class shall be a backer or permittee of any other permit class." The Connecticut Supreme Court has discussed corporate control in the context of Section 30-48(a) in two cases, *Eder v. Patterson*, 132 Conn. 152 (1945), and *Ruppert v. Liquor Control Commission*, 138 Conn. 669 (1952). In both cases, the court suggested that the degree of inter-tier control over a business

---

[12] Dichello points to the last clause of Section 30-6-A4(b), which states that out-of-state shippers may not have "control or … the power to control" wholesalers, "except as permitted by the Connecticut General Statutes." Dichello argues that this provision creates the only exception to a "broad prohibition that no one in one tier can have an influence, involvement, in the other tier except as permitted by the Connecticut general Statutes." ECF No. 216 at 4; *see also* ECF No. 163 at 8. But as AB responds, if parties could only contract on terms "specifically enunciated and permitted in the Connecticut statutes, there would be no need for contracts between brewers and wholesalers." ECF No. 216 at 76. Further, the exceptions to the inter-permit control prohibition listed in the statutes are so narrow they leave little more room for out-of-state shipper/wholesaler distribution agreements than would exist if the "except" clause were omitted from the regulation. *See, e.g.*, Conn. Gen. Stat. § 30-48(a) (listing exceptions, such as "a backer of a restaurant permit … may be a backer of a coliseum permit," "a backer of a café permit … may be a backer of a nonprofit theater permit," "a holder of an out-of-state shipper's permit for wine … may be a holder of an in-state transporter's permit"). So the existence of the exceptions does not make Dichello's reading of the regulation significantly more convincing.

[13] Section 30-6-A4 is titled "Corporation Backers." When the predecessor regulation was first promulgated in 1948, it provided that "[n]o permittee or backer of one class of permit shall be a permittee or backer of any other class. No permittee or backer, as an individual, member of a partnership or stockholder in a corporation appearing as backer of one type of permit shall be a permittee backer, member of a partnership or stockholder of a corporation appearing as backer of any other type of permit." Conn. Liquor Control Comm'n, Rules and Regulations of Liquor Control Commission Regulation 244, at 12 (1948). In 1970, the Liquor Control Commission removed that regulation and added the current text of Section 30-6-A4(b). Conn. Liquor Control Comm'n, Rules and Regulations of Liquor Control Commission Regulation 1305, at 2 (1970). Section 30-6-A4(a) requires certain corporate backers to provide the Department with information about their stockholders and notify the Department if stock is transferred, among other requirements.

targeted by the Liquor Control Act is that amounting to either (1) majority ownership of a corporation,[14] or (2) powers equivalent to those that a majority owner of a corporation might have.

In *Eder v. Patterson*, the Connecticut Supreme Court considered whether the Liquor Control Commission correctly denied renewal of two wholesaler permits under Section 30-48.[15] For each wholesaler, some of its stock was owned by an employer who held several retail permits, and some of its stock was owned by that employer's employee/permittee. *Id.* at 153-54. While the employer and employee/permittee each owned less than 50 percent of the wholesaler's stock, their collective share added up to more than 50 percent. *Id.* The Commission denied the wholesalers renewal of their permits because the employers had retail permits, and the employer/employee pairs would have "a controlling interest" in each wholesaler. *Id.* at 154. It determined that the proposed arrangement violated Section 30-48 and offended "the spirit of the Liquor Control Act" and its "legislative intent to eliminate the so-called 'tied house' evil." *Id.* at 154-55. The Connecticut Supreme Court disagreed, holding that since "[n]either [the employer nor the employee] owned a majority of the stock in the backer corporations," it "cannot be held as a matter of law that they were in control." *Id.* at 155. However, the court noted that "control

---

[14] This rule is also consistent with Conn. Gen. Stat. § 30-48a, another provision of the Liquor Control Act that uses the term "control" in the corporate context. That provision provides that: "No person … shall … acquire an interest in more than four alcoholic beheverage liquor permits …. [A] person shall be deemed to acquire an interest in a retail permit if an interest is owned by such person … or … [a] corporation controlled by such person …. [T]his subsection appl[ies] to any such interest without regard to whether such interest is a controlling interest." *Id.* The use of the phrase "controlling interest" in this subsection evidently refers to majority stock ownership. Thus, Section 30-48a suggests that a "corporation" is "controlled" by any person who owns a majority of its shares.

[15] While *Eder* was decided before the Department promulgated Section 30-6-A4(b), the Court presumes that the agency was aware of longstanding judicial opinions interpreting Section 30-48 when it drafted regulations related to that provision. *Cf. Warner v. Lancia*, 46 Conn. App. 150, 155 (1997) ("[W]hen the legislature amends a statute, it is presumed that it was aware of long standing judicial decisions interpreting former versions of the statute."). Indeed, when the Liquor Control Commission amended 30-6-A4 by adding 30-6-A4(b), among other changes, the Commission's Statement of Purpose noted its intent "to amend 30-6-A4 to conform with a decision of the Supreme Court," although it did not specify the decision. Conn. Liquor Control Comm'n, Rules and Regulations of Liquor Control Commission Regulation 1305 at 2, 7 (1970).

might be found to exist as a matter of fact," if there was "further evidence of the relationship" between the two minority shareholders. *Id.* at 155-56.

*Eder* establishes a demanding standard for "control" of a wholesaler. The Court concluded that minority shareholders—including one shareholder who owned 49 percent of a wholesaler—did not "control" the wholesaler as a matter of law. *Id.* at 155. This holding suggests that control requires more than the ability to exercise a restraining or directing influence over a wholesaler, as a large minority shareholder might. However, *Eder* does not stand for the proposition that "control" requires majority stock ownership. The court acknowledged that a minority shareholder could control a corporation if there were evidence that it had a particular relationship with another minority shareholder and where the shares held by both together amounted to a majority.

In *Ruppert v. Liquor Control Commission*, a New York corporation was the proposed backer for an out-of-state shipper permit. 138 Conn. at 671-72. But the New York corporation "own[ed] and control[led]" a Connecticut corporation that was the backer of four wholesaler permits. *Id.* at 672. And the plaintiff "concede[d] that to all intents and purposes the [two corporations were] one and the same, in spite of their separate corporate identities." *Id.* Therefore, the Court held that Section 30-48 prohibited the New York Corporation from backing an out-of-state shipper permit. *Id.* at 672, 676. However, the Court suggested that the bar for control is high, as it relied on the fact that the two corporations were "to all intents and purposes … one and the same." *Id.*

*Eder* and *Ruppert* suggest that the level of "control" of one business by another prohibited by the Liquor Control Act is much more pervasive and complete than the mere

"restraining … influence" Dichello's proposed definition contemplates; they suggest that the statute envisions a level of control like that held by the majority shareholder of a corporation.[16]

<u>Policy Goals and Common Law</u>

Because the meaning of Section 30-6-A4(b) is ambiguous, I also look to the "policy it was designed to implement, and to its relationship to … common law principles governing the same subject matter." *Lutters*, 270 Conn. at 205.

As I have explained, the Liquor Control Act—and Section 30-6-A4(b) in particular— aims to prevent out-of-state shippers from "dominating" wholesalers. *See Schieffelin*, 194 Conn. at 183 (holding that Section § 30-17, which prohibits out-of-state shippers from terminating a wholesaler's distributorship absent "just and sufficient cause" as determined by the Department following a hearing, "serves the equally important purpose of preventing out-of-state shippers from dominating Connecticut wholesalers"); *Latrobe Brewing Co.*, 1996 WL 737466, at *2 ("Connecticut … control[s] the supplying out-of state shipper … to make certain that the owner of the brand name out-of-state shipper cannot dominate or control the Connecticut wholesalers." (citation and internal quotations omitted)). Thus, the Liquor Control Act is concerned with the

---

[16] Dichello also points to Section 30-47(a)(6), which gives the Department discretion to suspend, revoke, or refuse a permit where, among other things, "the applicant or permittee has not been delegated full authority and control of the permit premises and of the conduct of all business on such premises." Dichello argues that the use of the terms "full authority" and "all business" suggests that the Liquor Control Act ponders a broad meaning of the term control. ECF No. 216 at 40-41.

The Connecticut Supreme Court interpreted this provision *Biancardi v. Liquor Control Comm'n*, 142 Conn. 569 (1955). In that case, the Liquor Control Commission denied a wholesaler permit based on the unsuitability of one of the wholesaler's backers. *Id.* at 569. The Commission had determined that the "president and treasurer" of the backer, who also owned "a substantial number of shares of stock in the backer," was barred from voting because of a felony conviction and was therefore unsuitable to receive a permit "[a]s an individual." *Id.* The applicant for the wholesaler permit had testified that "As far as I am concerned [the president of the backer] is top boss." *Id.* at 573. The court affirmed the Commission's decision to deny the permit, holding that the Commission had not abused its discretion by determining that the wholesaler had not "been delegated full authority and control of the premises and the business." *Id.* The court added that "[a] person suitable per se to receive a permit may be rendered an unsuitable person if, in operating under it, he would be completely subject to the domination of another who is himself an unsuitable person." *Id.* at 571. As in *Eder* and *Ruppert*, the Court's opinion suggests that control of a corporation does not require majority ownership, but it requires a degree of "complete[] … domination" that is comparable to the power a majority owner might have. *Id.*

possibility that out-of-state shippers might "dominate" wholesalers, not the possibility that out-of-state shippers might "restrain" them. But the Liquor Control Act also recognizes that there are multiple ways out-of-state shippers might overpower wholesalers, including through price discrimination or threats to terminate a distributorship. *See* discussion *supra* pages 30-31. Stock ownership is only one mechanism. To fulfill the policy goals of the Liquor Control Act, then, I must take account of all of the ways an out-of-state shipper might dominate a wholesaler when interpreting Section 30-6-A4(b).[17]

No single formula for determining control emerges from the sources I have considered, including the text of the regulation, Connecticut's regulatory scheme, the larger policy goals of the Liquor Control Act, and other areas of the law. At minimum, however, these sources establish that majority stock ownership is sufficient for control. And the text of the regulation, its context, and *Eder* and *Ruppert* suggest that control of a corporation requires the same or a similar level of power as that held by a majority stock owner, even though majority stock ownership is not required under the regulation. To determine control, the focus must be on the policies of the Liquor Control Act. I therefore read the regulation to prohibit out-of-state shippers

---

[17] I also note that courts and regulators in other areas of the law have recognized that corporate control does not always require stock ownership. In the antitrust context, the Department of Justice and Federal Trade Commission examines partial mergers to determine whether one corporation's "less-than-full control" of another corporation might "influence decision-making at the [firms] in ways that may substantially lessen competition." Dep't of Justice & Federal Trade Comm'n, Merger Guideline 11 (December 18, 2023). Merger Guideline 11 notes that "specific governance rights, such as the right to appoint members to the board of directors, influence capital budgets, determine investment thresholds, or select particular managers" can give a partial owner "the ability to influence the competitive conduct of the target firm." *Id.* Other federal laws also require agencies to determine whether businesses control each other. For instance, to determine which firms are affiliates of other firms, the Federal Communications Commission considers both "*de jure*" control which requires "holdings of greater than 50 percent of the voting stock of a corporation," and "*de facto*" control, which is "determined on a case-by-case basis." *U.S.* ex rel. *Taylor v. Gabelli*, 345 F. Supp. 2d 340, 348-49 (S.D.N.Y. 2004). In that context, the factors courts consider to determine *de facto* control include "[w]ho controls daily operations," "[w]ho is in charge of employment, supervision, and dismissal of personnel," and "[w]ho determines and carries out the policy decisions." *Id.* at 349.

from having the power to dictate a wholesaler's policies in areas the Liquor Control Act is particularly concerned with, including pricing and promotion.

(ii)    Enforceability of Paragraphs 2 and 3

With this concept of "control" in mind, I now consider whether Paragraphs 2 and 3 of the Agreement violate Section 30-6-A4(b) or the public policy underlying the Liquor Control Act. The parties disagree as to (1) the correct interpretation of Paragraph 2 of the Agreement, and (2) whether Paragraphs 2 and 3 are enforceable under any interpretation. I address the parties' competing interpretations of Paragraph 2 first.

Interpretation of Paragraph 2

Dichello contends that subparagraph 2(b) requires the Manager to control both AB and non-AB products, ECF No. 134 at 28, while AB argues that it gives the Manager control only of AB products. ECF No. 153 at 30. When construing a contract, Connecticut courts "determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Isham v. Isham*, 292 Conn. 170, 180 (2009) (citation and internal quotation marks omitted). "When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract"; however, "[e]xtrinsic evidence is always admissible … to explain an ambiguity appearing in the instrument." *Id.* (citation and internal quotation marks omitted).

The contested language of Subparagraph 2(b) states that Dichello must provide the Manager with:

> day-to-day operating control over the business of [Dichello], which shall include, without limitation, control by Manager of promoting, marketing, pricing, selling, advertising, merchandising, delivering, and servicing [AB products]; hiring and termination of all other employees of [Dichello] with any responsibilities for any of the foregoing activities; managing the business on a day to day basis; and

making capital expenditures by [Dichello], subject to reasonable annual budget limits established by [Dichello].

I find this provision ambiguous. The listed powers of the Manager are broad; the Manager must have "day-to-day operating control" over Dichello's business, which "shall include, without limitation" control over AB's products, "managing the business on a day to day basis," and "making capital expenditures." *Id.* at 5. Other language in Paragraphs 2 and 3 of the Agreement, however, suggests that the purpose of this provision is limited to ensuring AB's products are handled correctly. *See id.* (Subparagraph 2(a) stating that AB "relies upon … the manager of [Dichello's] operation to aggressively promote, sell and service [AB's] Products"); *id.* (Subparagraph 2(b) stating that the Manager's powers are given "to ensure [Dichello's Manager] has the incentives and authority" to promote, sell and service AB's Products); *id.* at 10 (Subparagraph 3(h) stating that AB's power to approve the Manager exists "solely to enable [AB] to pass upon the qualifications and competence of the individuals … who will … be responsible for promoting and selling the products of [AB]"). Because the language of the contract is ambiguous, and because extrinsic evidence of the parties' course of dealing does not definitively resolve this question,[18] there is a genuine dispute of material fact as to the meaning of the Agreement.

---

[18] Some extrinsic course of dealing evidence supports the conclusion that the Agreement gives the Manager power over the wholesaler's entire business. *See, e.g.*, ECF No. 167 at 124 (Rob George testifying that "every [Manager]" that he worked with over fifteen years at AB "has had control over the entire business"); *Id.* at 11 (Salvatore DiBetta agreeing when asked if AB trainings taught that "the equity agreement requires the distributor to give total control of the distributor's business, including AB and non AB products, to the [Manager]"). Other evidence supports AB's argument that the Manager's powers are intended to cover only AB products. *See, e.g.*, ECF No. 153-9 at 21-22, 88 (Christopher Delaney and Andrew Porter testifying that the Agreement only requires the Manager to have operating control over AB's products); ECF No. 176-3 at 2 (December 15, 2016 letter from Tallett stating that "[t]he Equity Agreement does not require that the Manager have control over Dichello's sale of competing brands"); ECF No. 153-16 at 3 (letter from Dichello's trustees recognizing AB's "interest in having a qualified and accountable individual responsible for Dichello's day to day business of selling [AB] products"). Where "the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." *Metro. Life Ins. Co.*, 255 Conn. 295, 306 (2001). Therefore, the Court cannot resolve this issue at the summary judgment stage.

<u>Enforceability</u>

For purposes of deciding the summary judgment motions, I assume that Dichello's interpretation of the Agreement is correct and that it requires the Manager to supervise the handling not only of AB but also of all other products distributed by Dichello. Because I find that the Agreement—even in its broadest reading—is enforceable, I need not consider whether a narrower version would be permissible.

Dichello points to several provisions that, it claims, collectively give AB the power to control it. First, as already discussed, Dichello's Manager must oversee all of its operations, including those related to non-AB products. ECF No. 165 at 28 (citing Paragraph 2 of the Agreement). Second, Dichello cannot appoint a Manager or Successor-Manager without the approval of AB, which may "pass upon" that individual's "qualifications and competence." *Id.* at 29 (citing Paragraph 3(h)). Third, the Agreement gives AB the power to withdraw its approval of a Manager or Successor-Manager for "good cause" by notifying Dichello of "deficiencies in the Manager's performance." *Id.* (citing Paragraph 2(e)). Fourth, Dichello must assign or sell the Manager a 25 percent ownership interest in Dichello, unless AB agrees to an exemption. *Id.* at 30 (citing Paragraph 2(b)(i)). Finally, if there is no AB-approved Manager for a specified period, Dichello has "an additional 90 days … to sell its business as a going concern according to the procedures and limitations set forth in paragraph 4" of the Agreement. *Id.* at 31 (citing Paragraph 3(d)). If Dichello is "unwilling or unable to effect a sale of its business," the "Agreement shall automatically terminate," and AB must make a termination payment to Dichello. *Id.* (citing Paragraph 3(d)).

These provisions do give AB significant influence over Dichello, but they do not give it control of Dichello within the meaning of the regulation. AB has no ownership interest in

Dichello. Dichello's Manager, whom Dichello alleges is controlled by AB, is required to have only a 25 percent ownership stake in Dichello, is hired by Dichello, can be fired by Dichello at any time and "in its sole discretion," ECF No. 136-2 at 7, and reports to Dichello's owners. And the Agreement places significant limitations on AB's powers over the Manager. AB cannot "unreasonably withhold" its approval of the Manager, *id.* at 30, and if AB uses its rights to approve and withhold approval of the Manager or Successor-Manager "in such a way as to usurp the right of [Dichello] to choose its own Manager," it is in breach of the contract, *id.* at 10. Second, AB cannot withdraw its approval from a Manager without "good cause," *id.* at 9, and its withdrawal right is further limited by the purpose of that right, which is "solely to enable [AB] to pass upon the qualifications and competence" of the Manager and Successor-Manager, *id.* at 10. Further, to exercise that right, it must "notif[y] [Dichello] of deficiencies in [the] Manager's performance," and give Dichello "ninety (90) days to cure such deficiencies." *Id.* at 7. Because Dichello can appoint or remove a Manager for any reason, it ultimately retains the superior power to control the Manager. And Connecticut law provides further protections that limit AB's ability to terminate Dichello's rights if there is no approved Manager or for any other reason: AB cannot terminate Dichello's distributorship or reduce its territory unless the Department concludes, after hearing, that AB has "just and sufficient cause." Conn. Gen. Stat. § 30-17(a)(2). As a practical power, this statute sharply limits AB's ability to enforce the Agreement, which expressly notes that its provisions are "subject to and … governed by" Connecticut law, which "supercede[s] any conflicting provision of this Agreement," ECF No. 136-2 at 24. The "just and sufficient cause" requirement of Section 30-17 means, among other things, that if Dichello refuses to appoint an AB-approved Manager, and then, after the expiration of periods specified in the Agreement, refuses to sell its business, AB can do nothing about it, and must still sell all of

its products in Southern and Southeastern Connecticut through Dichello unless AB proves, at a hearing before the Department of Consumer Protection, that it has "just and sufficient cause" to sell through another wholesaler. Taken together, these provisions of the Agreement and Connecticut law fall far short of conferring on AB the power to control the Manager or Dichello.

Nor do Paragraphs 2 and 3 "violate[] the public policy underlying" the Liquor Control Act and its implementing regulations. *Dow & Condon, Inc.*, 266 Conn. at 587. As outlined above, Act is designed to prevent "tied-houses," where out-of-state shippers "dominate" wholesalers. *Schieffelin*, 194 Conn. at 183. For the same reasons that Paragraphs 2 and 3 of the Agreement do not violate Section 30-6-A4(b), then, they do not offend the public policy underlying the Liquor Control Act. *See Williams*, 178 Conn. at 328 ("The principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests …." (internal quotation marks omitted)). While AB has significant influence over Dichello, Dichello maintains control of its Manager and its business. Because Paragraphs 2 and 3 of the Agreement are not "clear[ly] and certain[ly] illegal," *Collins*, 164 Conn. at 377, they are enforceable.

### (iii)     Enforceability of Paragraph 1(b)(iv)

Dichello also argues that Paragraph 1(b)(iv) violates Section 30-6-A4(b) and the public policy underlying the Liquor Control Act, because it requires Dichello to adhere to "AB's national [cents per case] sales and promotion program." ECF No. 134 at 41. Dichello claims the cents per case program gives AB the "'power to control' an important aspect of Dichello's business … Dichello's advertising expenditures." *Id.* Dichello also claims that the cents per case program violates the public policy behind the Act by enabling AB to "'artificially' induce consumer demand for its products." *Id.*

Based on the evidence in the record regarding the cents per case program, no reasonable jury could conclude that it violates Section 30-6-A4(b) or Connecticut public policy. The parties agree that the program obligates Dichello to spend a minimum amount on promoting and marketing AB products each year that is proportionate to the amount of AB products it sold in the preceding year. ECF No. 154 ¶ 4; ECF No. 153-29 ¶¶ 6, 8. But AB cites evidence that Dichello "decides how the money is spent," and can choose how much it spends on advertising other brands. ECF No. 153-29 ¶ 6. Thus, "AB's national [cents per case] sales and promotion program" does not give AB the "power to control" Dichello's advertising. Nor is there evidence that the cents per case program "artificially induces" demand for liquor in violation of the public policy underlying the Liquor Control Act. To the contrary, the amount Dichello is required to spend is tied to existing demand for AB products, i.e., the amount must be proportional to Dichello's sales of such products in the preceding year. The Liquor Control Act does not ban advertising or place a cap on the dollars wholesalers can spend—or out of state shippers can require them to spend—on promotion. And Dichello's distributorship contracts with other out-of-state shippers likewise include requirements that it participate in advertising and promotional activities, and yet Dichello does not suggest that these companies control its business. *See, e.g.* ECF No. 153-12 at 4-5 (requiring Dichello to "carry out Heineken USA's sales advertising, and marketing policies and programs"); ECF No. 153-22 at 3 (requiring Dichello to "join in certain advertising and promotional activities on a cooperative basis" with Nighthawk Brewing); ECF No. 153-25 at 3, 8-9 (requiring Dichello to "apply best effort in adherence to [Outer Light Brewing Company's] marketing plan," which includes "cost sharing" requirements). Because such arrangements are aimed merely at informing consumers about the different brands of beer

Dichello carries and, at least in AB's case, tied to existing demand, they do not undermine the Liquor Control Act.

### B. AB's Counterclaims

AB claims that Dichello has breached (1) Subparagraph 2(b)(i)'s requirement that Dichello's Manager have an ownership interest in Dichello, (2) Subparagraph 2(b)'s requirement that the Manager "control … Dichello's sale and service of [AB] Products," and (3) Paragraph 3's requirement that Dichello have a Successor-Manager. ECF No. 151-1 at 13-14. Dichello admits that it does not comply with these provisions.[19] But Dichello argues that there is a genuine dispute of material fact about whether AB materially breached the contract, thereby excusing Dichello's failure to perform. ECF No. 171 at 7-8.

Under Connecticut law, "it is well settled that a material breach by one party discharges the other party's subsequent duty to perform on the contract." *Weiss v. Smulders*, 313 Conn. 227, 263 (2014). Dichello argues that AB breached Subparagraph 3(h) of the Agreement, which prohibits AB from "usurp[ing]" Dichello's "right … to choose its own Manager." ECF No. 136-2 at 10. Specifically, Dichello claims AB violated Subparagraph 3(h) by (1) denying John Hall's Successor-Manager application, (2) attempting to force Dichello's owners to sell the company, and (3) "compromis[ing] Dichello's independence" during DiBetta's tenure. ECF No. 171 at 8-9.

### (i)   Admissibility of Recordings

To support its argument that AB materially breached the Agreement, Dichello relies, in part, on recordings of DiBetta's phone conversations made by an unknown person without

---

[19] Dichello admits that it did not sell or assign Peter Deane, who is currently serving as Manager, an equity interest in Dichello. ECF No. 171-1 ¶ 11. Dichello also admits that Deane does not have day-to-day operating control over AB's products. *Id.* ¶ 29. John Hall, Dichello Trustee James Carloni, and Dichello CFO Rob Simon testified that John Hall oversees day-to-day operations at Dichello. ECF No. 165-1 ¶¶ 33-36. Finally, Dichello admits that it has no Successor-Manager and has not had one since AB's last waiver of the Successor-Manager requirement expired on September 24, 2016. ECF No. 171-1 ¶¶ 15, 18, 27; ECF No. 165-1 ¶¶ 31-32.

DiBetta's knowledge, ECF Nos. 167-12; 167-13. As a threshold issue, I must determine whether the recordings of DiBetta are admissible to support Dichello's claims. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment). AB argues that the recordings are inadmissible because (1) they were not properly authenticated, and (2) they were recorded in violation of federal law. ECF No 176 at 11. Rule 56 permits AB to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Based on the evidence in the record, I find that the recordings were heavily edited by an unknown person and therefore have not been properly authenticated, and that any probative value they might have would be substantially outweighed by the dangers of unfair prejudice and misleading the jury. I also agree with AB that the recordings were created in violation of, and are inadmissible under, the federal wiretap statute.

<u>Authenticity and Probative Value of Recordings</u>

AB argues that the recordings were not properly authenticated, because the recordings were edited, Dichello has not established "who made the recording," and Dichello has provided "no information about the recording device, how the recording was preserved, or its accuracy." ECF No. 176 at 6-7 & n.9. Dichello claims the recordings were "authenticated at the Deposition of Sal DiBetta." ECF No. 168-4 ¶¶ 14-15. DiBetta testified that the voice on the recording was his and admitted to saying many of the words captured in the recording. *See, e.g.*, ECF No. 167 at 75-77, 79-90. But DiBetta also testified that the recordings sounded like they had been edited. *See, e.g.* ECF No. 147-10 at 78 (DiBetta testifying that he felt the recording was "spliced" because it "wasn't a fluid conversation. It would be cut off…."); ECF No. 167 at 53 ("It sounds like this tape's been sliced, by the way…."). And it is evident that the recordings are edited from

listening to them: DiBetta's voice jumps between topics, sometimes mid-sentence, and the recording skips over any sections where DiBetta is silent because the person on the other side of the phone call is speaking. Further, Dichello has submitted no admissible evidence showing who made the recordings or when the calls took place. *See* note 4, *supra*.

Federal Rule of Evidence 901 requires that Dichello authenticate the recordings by "produc[ing] evidence sufficient to support a finding that the item is what [Dichello] claims it is." In general, evidence "is properly authenticated if a reasonable juror could find in favor of authenticity." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). Among other methods of authentication, a recording can be authenticated by "[a]n opinion identifying a person's voice …. [b]ased on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5). Thus, DiBetta's testimony that the recording captures his voice and that he made the statements in the recording would ordinarily be sufficient to authenticate the recordings. *See United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) (holding that tape was properly authenticated by testimony of witnesses who "had firsthand knowledge of the conversations and each identified the voices on the tape," although the government had not established chain of custody for the tapes); *Nunn v. Massachusetts Cas. Ins. Co.*, No. 3:10-CV-01350 (JBA), 2012 WL 3985162, at *4 (D. Conn. Sept. 10, 2012), *vacated on other grounds*, 758 F.3d 109 (2d. Cir. 2014) ("Because Mr. Lucas has identified his own voice and confirmed that it was a recording of the presentation he made to the NBRA on September 29, 1996, the Plaintiffs have satisfied the requirements of Federal Rule 901.").

But the Second Circuit has held that trial courts have "wide discretion" to include or exclude a recording "when there is a serious question of its audibility," because "when a recording is substantially unintelligible the part that can be heard may leave a misleading

impression of the entire conversation." *United States v. Frazier*, 479 F.2d 983, 985 (2d Cir.

1973); *see also* Fed. R. Evid. 403. By extension, trial courts must have discretion to exclude

recordings that are so heavily edited that the remaining portions are likely to mislead the jury.

*See Leo v. Long Island R. Co.*, 307 F.R.D. 314, 322 (S.D.N.Y. 2015) (denying motion for new

trial and reaffirming exclusion of surveillance videotape that had been edited in unspecified ways

and was blurry in parts: "Under the circumstances, we properly concluded that defendant had

failed to justify introduction of the tape. Indeed, to do otherwise would have been grossly unfair

to plaintiff and potentially highly misleading to the jury.").

     I find that because the recordings were plainly edited—by an unknown person for

unknown reasons—they are inadmissible. There is no admissible evidence showing when, or

how, or by whom the recordings were made or edited, because Hall's testimony that Gaetano did

so is hearsay, and no witness has admitted creating or editing the recordings. So I cannot

determine whether the missing segments of the recording are brief or lengthy, whether recorded

clips are in the correct order, or whether they come from the same telephone call. Indeed, it is

impossible to rule out the possibility that the editor(s) might have rearranged the clips in a

misleading way, or combined clips from multiple different conversations in each recording. *Cf.*

*United States v. Sovie*, 122 F.3d 122, 127 (2d Cir. 1997) (affirming district court's decision to

admit recording, despite allegations of tampering, where trial court "found that the taped

conversations contained no breaks in meaning to indicate" tampering (citation and internal

quotations omitted)). DiBetta's testimony does not establish that the recordings accurately

capture the conversation, because he stated that the recordings were "spliced," ECF No. 167 at

74; *see Snyder v. Tiller*, No. 3:08-CV-00470, 2010 WL 3522580, at *7 (N.D. Ind. Aug. 30, 2010)

(holding that portion of video that was "altered by an unknown television station employee"

could not be authenticated by testimony of witness present at the recorded meeting who had no knowledge of alterations). Further, since DiBetta testified that he "[did not] remember having [the] conversation" beyond listening to the recording, his testimony does not preclude the possibility that the clips were rearranged in misleading ways. ECF No. 167 at 51. Finally, all available evidence suggests that the person who made the recordings did so with an agenda: either Gaetano made the recordings in a desperate attempt to save his job, as Hall claims, or Hall lied about Gaetano's role and was likely responsible for creating the recordings. Under these circumstances, the recordings are likely to "leave a misleading impression of the entire conversation." *Frazier*, 479 F.2d at 985. So I find the recordings inadmissible.

        Wiretapping Statute

        Under the federal wiretapping statute's exclusionary rule, "no part of the contents of [an intercepted wire or oral communication] and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court … if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. Among other things, the chapter prohibits the "intentional[] use[] [of] ... any electronic, mechanical, or other device to intercept any oral communication when … such use ... obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate commerce." *Id.* § 2511(1)(b)(iv)(B). To be protected, the "oral communication" recorded must be "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." *Id.* § 2510(2); *See Tancredi v. Malfitano*, 567 F. Supp. 2d 506, 512-513 (S.D.N.Y. 2008) (noting that this "inquiry is … the same as that for a Fourth Amendment claim, 'whether the subjective expectation of privacy … is one society is prepared to recognize as justifiable.'" (quoting *United*

*States v. Pui Kan Lam,* 483 F.2d 1202, 1206 (2d Cir. 1973)). A recording does not violate the statute if one party to the communication "has given prior consent" or the person who records the conversation is a "party to the communication." *Id.* § 2511(2)(d).

The evidence in the record suggests that the recordings were created in violation of Section 2511(b), because they were made without the participants' consent and in violation of their reasonable expectation of privacy. DiBetta and Porter both testified that they did not consent to be recorded. ECF No. 147-10 at 72, 76, 163. There is no evidence that the person who made the recording was a party to the conversation. *See Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010) ("In the context of the [Wiretap Act], a party to the conversation is one who takes part in the conversation.").

Dichello claims that DiBetta consented to be recorded because of a provision in the 2014 Employee Handbook on "workplace monitoring," which states:

> Workplace monitoring may be conducted by Dichello Distributors, Inc. to ensure quality control, employee safety, security, and customer satisfaction. Employees who regularly communicate with customers may have their telephone conversations monitored or recorded. Telephone monitoring is used to identify and correct performance problems through targeted training …. Because Dichello Distributors, Inc. is sensitive to the legitimate privacy rights of employees, every effort will be made to guarantee that workplace monitoring is done in an ethical and respectful manner.

ECF No. 147-19 at 12-13. Under Section 2511(b), a party can "express[ly]" consent to recording, or consent can be "implied" from "surrounding circumstances indicating that the [recorded party] knowingly agreed to the surveillance." *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987). But there is no evidence in the summary judgment record that DiBetta knew about the workplace monitoring provision or agreed to it.[20] Even if he did, the Handbook permits monitoring only if it

---

[20] Dichello's counsel claimed that "in November of 2013," DiBetta "sign[ed], acknowledge[d] and agree[d] to the terms of the then in effect employee handbook, which is a 2005 handbook." ECF No. 216 at 69. No version of the 2005 employee handbook—signed or unsigned—is in the summary judgment record. During oral argument,

is (1) "conducted by Dichello," (2) for certain specified purposes, i.e., "to ensure quality control, employee safety, security and customer satisfaction" and "to identify and correct performance problems through targeted training." *Id.* at 12. The record does not suggest the recording was "conducted by Dichello": John Hall testified that Kevin Gaetano told him Gaetano made the recording without his authorization, ECF No. 147-10 at 112-14, and Gaetano testified that Hall was lying and that he did not make the recordings, *id.* at 81-84. Even if Hall's testimony that Gaetano made the recordings was not hearsay and could be considered on this motion, the Handbook does not give employees like Gaetano a blank check to monitor their co-workers without signoff from superiors. *See Hay v. Burns Cascade* Co., No. 5:06-CV-00137, 2009 WL 414117, at *9 (N.D.N.Y. Feb. 18, 2009) ("Consent may not be inferred if an employee is not informed … of the manner in which the monitoring is conducted."). In any event, Dichello has pointed to no evidence that the monitoring was done for any legitimate business purpose, let alone for one of the specific purposes listed in the Handbook. *See* ECF no. 147-10 at 114 ("Q: Did you ask [Gaetano] why he was [recording phone calls]? [Hall]: He just said he did it because he was working with [DiBetta] and he wanted to record the conversation because that is what they were doing. You would have to ask him that.").

The evidence in the record also suggests that DiBetta likely had an expectation of privacy during the call. The evidence on this final point is sparse: no witness testified with reasonable certainty about the location or circumstances of the call. *See* ECF No. 147-10 at 77 (DiBetta wondering whether the recording captured his cell phone or his office phone). But DiBetta was

---

however, Dichello's counsel read a provision in the 2005 Handbook, which states that "[e]mployees have no expectation of privacy concerning e-mail and voice mail communications." *Id.* at 70; *see also* ECF No. 147-19 at 15 (2014 Handbook including this same provision). But that provision gives Dichello permission to monitor emails and voicemails, not phone calls. The 2005 Handbook apparently did not include the "workplace monitoring" provision that was added to the 2014 Handbook. ECF No. 216 at 70-71. And Dichello has pointed to no evidence that DiBetta read, knew about, signed, or otherwise consented to the 2014 Handbook. Finally, as noted above, *see* note 4, *supra*, Dichello has pointed to no competent evidence in the record showing when the call occurred, leaving it unclear whether the 2014 Handbook was in effect at the time.

discussing sensitive information that he likely would not have wanted others to overhear, and only two people participated in each conversation. *Cf. Williams v. United Airlines, Inc.*, No. 19-CV-02988 (WHA), 2021 WL 77932, at *4 (N.D. Cal. Jan. 8, 2021) ("Individuals may reasonably expect that no one is surreptitiously eavesdropping on meetings with limited participants."). There is no evidence that calls were routinely recorded at Dichello. ECF No. 147-10 at 114 ("Q: How many phone calls did Kevin Gaetano secretly record? [Hall]: As far as I know, just these."); *cf. Gray v. Royal*, 181 F. Supp. 3d 1238, 1253-54 (S.D. Ga. 2016) (holding plaintiffs "[did] not have an expectation of privacy in an office where their telephone calls are routinely monitored pursuant to established office policy"). And as I have explained, the Employee Handbook did not warn DiBetta that his calls might be monitored by co-workers without authorization or any legitimate business purpose. *Cf. Mancusi v. DeForte*, 392 U.S. 364, 369 (1968) (finding that union official had reasonable expectation of privacy in his office, as he was "entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors"). The Handbook explicitly acknowledges the "legitimate privacy rights of employees." ECF No. 147-19 at 13. Therefore, I find that the recordings violated the federal wiretapping statute, and they are inadmissible on this alternative ground as well.[21]

---

[21] The Second Circuit has found an exception to the wiretapping statute's exclusionary rule where "illegally obtained wire or oral communications" are used for "impeachment purposes" in criminal cases. *United States v. Simels*, 654 F.3d 161, 169 (2d Cir. 2011). The Second Circuit has not determined whether this exception extends to civil cases, and other circuits have split on this issue. *Compare Forsyth v. Barr*, 19 F.3d 1527, 1541 n.28 (5th Cir. 1994) ("The impeachment exception has not been extended to civil cases."); *Williams v. Poulos*, 11 F.3d 271, 287 (1st Cir. 1993) (same); *and Anthony v. United States*, 667 F.2d 870, 879 (10th Cir. 1981) (same); *with Culbertson v. Culbertson*, 143 F.3d 825, 827 (4th Cir. 1998) (applying impeachment exception in civil case) *and Gillenwater v. Tommy Hilfiger Retail*, LLC, No. 2:16-cv-05903, 2017 WL 11633484, at *4 (C.D. Cal. Aug. 28, 2017) (same). To the extent the recordings in this case might be used for impeachment, I agree with the First, Fifth, and Tenth Circuits that the impeachment exception should not be extended to civil cases. First, "the allowance of an impeachment exception derives from the references in the legislative history to 'search and seizure law' and the Supreme Court's decision" in *Walder v. United States*, 347 U.S. 62 (1954), which held that "evidence obtained in violation of the Fourth Amendment can be used for the limited purpose of attacking a testifying defendant's credibility." *Williams*, 11 F.3d at 287 & n.35; *see Simels, 654* F.3d at 170 (Second Circuit adopting the impeachment exception in criminal

(ii)     <u>Evidence of Material Breach</u>

I now turn to the merits of Dichello's material breach argument, which alleges that AB breached the Agreement when it (1) denied John Hall's Successor-Manager application, and (2) allegedly attempted to force Dichello's owners to sell the company, and (3) "compromised Dichello's independence by wrongly influencing Dichello's posted prices, forcing Dichello to spend advertising dollars, and funding the [Brand Activation Manager] program in Connecticut." ECF No. 171 at 8-9.

Specifically, Dichello alleges that AB violated Paragraph 3(h) of the Agreement, which provides that:

> It is agreed that the choosing of a Manager for [Dichello's] business shall be the responsibility and prerogative of [Dichello] in conducting its independent business and that the rights given to [AB] to approve the designation of a Successor-Manager and to withdraw approval of either the Manager or Successor-Manager are given solely to enable [AB] to pass upon the qualifications and competence of individuals who are chosen by [Dichello] to be the Manager and the future Manager of [Dichello's] business and who will therefore be responsible for promoting and selling the Products of [AB]. [AB] agrees that it will not use these rights in such a way as to usurp the right of [Dichello] to choose its own Manager.

*Id.* AB would breach this provision if it withheld its approval of a Successor-Manager candidate for reasons other than his "qualifications or competence," or if it otherwise used its powers to "usurp" Dichello's "right … to choose its own Manager." *Id.*

<u>Hall's Successor-Manager Candidacy</u>

Dichello first contends that AB violated Paragraph 3(h) when it declined to approve John Hall as Successor-Manager. ECF No. 171 at 7-8. Dichello's primary argument is that AB forced

---

cases based on legislative evidence). This history suggests that the exception is limited to criminal cases. And given "extensive impeachment at depositions" in civil cases, "[a] blanket impeachment exception would swallow up the statutory prohibition." *Wuliger*, 981 F.2d at 1506. Therefore, I find that the recordings are not admissible for impeachment or otherwise.

a six-month development plan on Hall despite knowing that "such training would take [four] years." ECF No. 176 at 8. But the only evidence that the training would take four years or that AB knew this is an email from Gloria Hall stating that "family member John Hall will be approvable within the next four years." ECF No. 167-7 at 4. By contrast, multiple AB employees attested that the six-month plan was offered in good faith and was a standard protocol that had been used to train successful Successor-Manager candidates in the past. *See* ECF No. 153-20 at 2 (June 2015 letter from Porter); ECF No. 153-15 (July 2015 letter from Tallett); ECF No. 153-9 at 85 (deposition testimony from Porter); ECF No. 176-1 at 17 (deposition testimony from Tallett). John Hall agreed to the plan, ECF No. 153-9 at 76, and Dichello provided no evidence that he raised any concerns about the checkpoints. *See* ECF No. 153-9 at 85 (Porter testifying that Hall did not push back on the checkpoints).

Indeed, beyond Gloria Hall's comment about when Hall would be "approvable," Dichello has provided no evidence the checkpoints were unfair or unrealistic. And, if anything, Gloria Hall's apparent belief that John Hall needed four years of preparation vindicates AB's decision to deny his Successor-Manager application: it suggests Hall was not adequately prepared to be a Manager in 2015. If he did require four years of training, nothing in the Agreement requires AB to continually extend waivers of the Successor-Manager requirement or train him to take over as Manager.

Moreover, AB's account of the May 5, 2015 meeting, which formed one basis for denying Hall's Successor-Manager candidacy, is virtually uncontested. AB claims that Hall "acknowledged not having completed the vast majority of the previously agreed upon checkpoints," then crumpled up the paper with the checkpoints and threw it. ECF No. 153-20 at 2; *see also* ECF No. 153-9 at 86-87 (Porter's account of the meeting); *id.* at 33-35 (DiBetta's

account of the meeting); *id.* at 24 (Delaney's testimony regarding Hall's checkpoint progress). Although Hall testified that it is "not true" that he "didn't do any of those checkpoints," ECF No. 153-9 at 76, his testimony does not otherwise contradict AB's account that he fell behind on the checkpoints and lashed out at Porter and Delaney. Indeed, a letter that Dichello's trustees sent AB on November 13, 2015 seems to confirm that Hall did not complete the development plan. ECF No. 151-15 at 5 (arguing "Mr. Hall was unable to fully devote his efforts to executing this plan due to his involvement with pressing problems associated with Dichello's management").

AB's account of Hall's visit to the Region Office on July 20, 2015 is similarly uncontested. In a letter sent after the meeting, Tallett alleged that Hall still had not completed many of the checkpoints, "did not demonstrate a thorough understanding of the Equity Agreement," had "little, if any, substantive experience in sales and marketing," and could not correctly answer questions about the business or AB's products. ECF No. 153-15 at 3-4. Dichello has cited no evidence to contradict these claims. Indeed, when asked about AB's account of the July 20, 2015 meeting, Hall said he "disagreed," because "I shouldn't have went there …. I shouldn't have to go through their approval process … I shouldn't have to answer any questions. We should be allowed to [run] our own business independent of our own suppliers and not be forced to hire only people they approve." ECF No. 147-10 at 153. But the Equity Agreement entitles AB to interview Successor-Manager candidates. ECF No. 136-2 at 30. And the uncontroverted evidence shows that AB's reasons for denying Hall were based on his "qualifications and competence." *Id.* at 10.

The record does include evidence that Dichello viewed John Hall as capable of fulfilling the Successor-Manager role. Hall had the confidence of Dichello's trustees, who wrote to AB multiple times to make the case for Hall. ECF Nos. 167-10, 151-15 at 3-5, 166-20 at 2. In July of

2015, Dichello submitted Hall as a Successor-Manager candidate, despite apparent pushback from AB. ECF No. 151-15 at 3. Dichello's CFO, Peter Deane, also wrote a letter of recommendation attesting to Hall's "strong leadership abilities." ECF No. 151-15 at 5. But AB has the right under the Agreement to independently assess Hall's capabilities, and was not required to take Dichello's word that he was qualified.

Dichello's trustees also argued that Hall "was unable to fully devote his efforts to executing [the twenty-six point development] plan due to his involvement with pressing problems associated with Dichello's management." ECF No. 151-15 at 3. As Tallett responded, however, there is no evidence that "the events …. that led to Mr. DiBetta's termination in August somehow prevented [Hall] from adhering to the training plan to which he had agreed six months earlier." ECF No. 166-3 at 2. In any case, Hall's failure to complete the twenty-six point plan was just one of several reasons AB offered for its decision to deny Hall's application, which also included his lack of experience and his behavior at the May 5, 2015 meeting. And even if there are good reasons Hall may not have been prepared to answer AB's questions on July 20, AB still had the right to "pass upon his qualifications and competence" at that point.

Finally, Dichello has presented some evidence that AB might have opposed Hall for reasons that go beyond his competence or qualifications. By the time AB formally rejected Hall's application, DiBetta had forwarded to AB multiple communications from Hall that might have led AB to conclude Hall would not be as pliant as DiBetta. *See, e.g.*, ECF No. 166-18 ("It is my belief that all that Andy [Porter] is looking for is a robot with only an opinion that mirrors [theirs.]"); ECF No. 166-15 at 2 ("We are only required to have 85% of our fleet to have AB decals. Let's not commit to more than that."). But the possibility that AB had additional reasons to dislike Hall is not a basis for a reasonable jury to conclude that AB "usurp[ed]" Dichello's

right to choose its own Manager. ECF No. 136-2 at 10. Therefore, even when construed in the light most favorable to Dichello, the undisputed evidence in the record shows that AB did not violate Paragraph 3(h) when it denied Hall's application to be Successor-Manager.

Forced Sale Theory

Dichello also alleges that AB violated Paragraph 3(h) when it allegedly "attempt[ed] to use the mechanisms of the Equity Agreement to force a sale of Dichello." ECF No. 171 at 7. In Dichello's view, "DiBetta conspired with AB's Brendan Whitworth" to "force massive capital improvements upon Dichello and force a sale," taking advantage of the fact that "Dichello had bank covenants, which hindered dividends and prevented expenditures on capital improvements." ECF No. 165 at 13-14. This theory suffers from two problems. First, there is little evidence to support it, because the recordings of the telephone conversations between DiBetta and Porter and Whitworth are inadmissible. Beyond the recordings, Dichello points only to a series of letters AB sent, beginning in August 2015, when it notified Dichello that its facilities were not in compliance with the Agreement. ECF Nos. 167-2, 167-3, 167-4, 167-5. The August 2015 letters do not mention Subparagraph 3(d), the contractual provision that requires Dichello's owners to sell the business if there is no approved Manager or Successor-Manager within 90 days *after* expiration of an initial 90-day period for proposing and approving successive Successor-Manager candidates. Dichello has not cited any admissible evidence that AB requested the repairs in bad faith, or in an attempt to force Dichello's owners to sell. AB also sent Dichello several letters between July 31, 2015 and November 7, 2016, which Dichello claims it interpreted as "threats to terminate it or compel a forced sale of its business absent compliance with the Equity Agreement." ECF No. 166 ¶ 14. Several of these letters warn Dichello that failure to comply with the Equity Agreement might trigger Exhibit 3's initial 90-

day window to select a Successor-Manager. ECF Nos. 166-1, 166-2, 166-3, 166-4, 166-5. None of the letters threaten to invoke Paragraph 3(d), or suggest that the 90-day period in that provision is running. *Id.* Even if the letters did reference Paragraph 3(d), AB cannot breach the Agreement by enforcing its provisions using mechanisms provided for in the Agreement.

Second, even if I assume such a plot existed, Dichello does not specify which portions of the Equity Agreement AB's actions would violate. Paragraph 3(h) bars AB from using its right to approve the Manager/Successor-Manager to "usurp [Dichell's right] to choose its own Manager," but says nothing about using Exhibit 9 requirements to pressure Dichello's owners to sell. Dichello does not identify any other "express[]" or "implied obligations" that AB allegedly breached.[22] ECF No. 171 at 8. In any event, given that the "forced sale" plot was unsuccessful, it is doubtful that, even if it breached the contract, it was a material breach. *See Alpha Beta Cap. Partners, L.P. v. Pursuit Inv. Mgmt., LLC*, 193 Conn. App. 381, 410 (2019) ("[W]here a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material.'"). Thus, no reasonable juror could find that AB materially breached the Agreement based on Dichello's "forced sale" theory.

<u>Compromise of Dichello's Independence</u>

Finally, the evidence does not support Dichello's claim that AB materially breached the Agreement by "wrongly influencing Dichello's posted prices, forcing Dichello to spend advertising dollars, and funding the BAM program in Connecticut." ECF No. 171 at 7-8. Neither the Agreement nor the Liquor Control Act prohibits AB from recommending prices to Dichello's

---

[22] While the "forced sale" theory might—if there were evidence to support it—ground a claim of breach of the covenant of good faith and fair dealing, the operative complaint alleges no such claim, ECF No. 17, and Dichello has cited—and I have found—no Connecticut case law supporting the notion that a breach of the covenant amounts to a material breach of contract that would excuse performance.

Manager, requiring Dichello to spend a minimum amount on advertising, or encouraging Dichello to use a certain form of promotion.

Thus, no reasonable jury could concluded that AB materially breached the Agreement. I grant AB's Motion for Summary Judgment as to liability on Count I and II of its counterclaims, and I deny Dichello's Motion for Summary Judgment as to Count I and II of the counterclaims. Because Dichello's Motion for Summary Judgment on Counts III and IV of the counterclaims rests entirely on the argument that Paragraphs 2 and 3 of the Agreement are illegal—an argument I have rejected—I also deny Dichello's Motion for Summary Judgment as to Counts III and IV of AB's counterclaims.

### C.  Dichello's CUTPA Claim

In ruling on AB's motion to dismiss, I allowed Dichello's CUTPA claim to proceed on the theory that AB's "control of Dichello through the Agreement violates the public policy embodied in the Connecticut Liquor Control Act." ECF No. 59 at 26. AB moves for summary judgment on Dichello's CUTPA claim, arguing that (1) portions of the claim are barred by CUTPA's statute of limitations, (2) AB's enforcement of the Agreement is not against public policy, and (3) Dichello has not presented evidence of an ascertainable loss. ECF No. 147. Because no reasonable juror could find that AB committed an unfair trade practice within the statute of limitations, I do not address whether Dichello has provided sufficient evidence of an ascertainable loss.

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). A plaintiff bringing a CUTPA claim must show that "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; ... and (2) [he] has suffered an ascertainable loss of money or property as

a result of the defendant's acts or practices." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217 (2008).

To determine whether a defendant has engaged in an "unfair or deceptive act or practice," Connecticut courts have adopted the criteria known as the "cigarette rule," i.e.,

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, competitors or other businesspersons."

*Am. Car Rental, Inc. v. Comm. of Consumer Prot.*, 273 Conn. 296, 305-06 (2005) (alterations omitted). A practice may violate CUTPA without meeting all three criteria—i.e., a practice "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three...." *Id.* "Although whether a claimed practice is unfair and thus violates CUTPA is ordinarily a question of fact for the trier, summary judgment is appropriate where, as here, the plaintiff would be entitled to a directed verdict," because no reasonable jury could conclude that a practice is unfair or deceptive. *Ulster Sav. Bank v. 28 Brynwood Lane, Ltd.*, 134 Conn. App. 699, 716, 41 A.3d 1077, 1088 (2012)

    (i)    <u>Statute of Limitations</u>

CUTPA claims are governed by a three-year statute of limitations. Conn. Gen. Stat. § 42-110g(f). CUTPA's statute of limitations is an "occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs." *Breiner v. Stone*, 122 F.3d 1055 (2d Cir. 1997) (unpublished)

(alteration and internal quotations omitted). Therefore, the Court may consider only conduct that occurred in the three years before this case was filed on June 23, 2020.[23]

Limiting the analysis to the events that happened on or after June 23, 2017 significantly narrows the scope of Dichello's CUTPA claim. DiBetta's tenure at AB ended in 2015. Almost every communication the parties cite is dated 2016 or earlier. While evidence related to DiBetta's tenure may be admissible as background evidence to demonstrate that AB uses the Agreement to control wholesalers, *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012) (holding that evidence related to a time-barred claim can be used as "background evidence" to "assess liability on [a] timely alleged act"), such evidence cannot support a CUTPA claim on its own.

Dichello contends that it "is suffering ongoing harm from AB's continued enforcement of the Equity Agreement that continues to date." ECF No. 165 at 27. In particular, Dichello points to (1) AB's enforcement of Paragraph 2 and 3 "through its Counterclaims in this lawsuit," and (2) AB's enforcement of Paragraph 1(b)(iv) of the Agreement, which requires Dichello to participate in compliance assessments and comply with certain "operating standards." *Id.* Therefore, I analyze only whether there is a material issue of fact as to whether AB's continued enforcement of the Agreement violated CUTPA.

---

[23] Dichello does not argue that CUTPA's statute of limitations was tolled by a continuing violation of the law. But even if it did, there is no evidence that many of the alleged violations are ongoing. For instance, Dichello alleges that, in 2014, AB forced it to give DiBetta an equity share at below market value, ECF No. 165 at 9, but Dichello has not given an equity share to the current Manager, Deane, ECF No. ECF No. 165-1 ¶ 13. And there is no evidence from 2017 to when Dichello filed this lawsuit that AB has enforced this provision of the Agreement. *See* discussion *supra* pages 23-25. Second, Dichello alleges that DiBetta "breached his fiduciary duties" to Dichello by sharing confidential information with AB, ECF No. 165 at 9-10, but the last communication that allegedly included confidential information occurred in 2015, *see* discussion *supra* pages 9, 12, 14. Third, Dichello claims that AB wrongly influenced Dichello's pricing and advertising, ECF No. 165 at 10-11, but the only evidence it cites are email exchanges between DiBetta and AB from 2015, ECF No. 166-9 at 2; ECF No. 166-23 at 2. Fourth, Dichello alleges that AB refused to approve John Hall as a Successor-Manager candidate. ECF No. 165 at 11. But AB rejected John Hall in 2015, and Hall testified that AB approached him about restarting the Successor-Manager approval process in 2017, and he refused. *See* discussion *supra* pages 10-19, 22. Finally, Dichello claims that AB conspired with DiBetta to force a sale of the company, ECF No. 165 at 14, but all the relevant events occurred in 2015, *see* discussion *supra* pages 14-18.

(ii)    Enforcement of Paragraphs 2 and 3

Dichello claims that AB's enforcement of Paragraphs 2 and 3 of the Agreement violates Connecticut's policy against "tied houses," i.e., the "monopolistic control of distributors by manufacturers" of alcohol. *Park Benziger & Co., Inc.*, 391 So. 2d at 683 n.3. But I have already found those provisions to be enforceable. The question, then, is whether enforcement of an enforceable contract can offend public policy for the purposes of CUTPA.

In *Kent Literary Club of Wesleyan University v. Wesleyan University*, Connecticut's Supreme Court held that "it is possible, under certain limited circumstances, to commit … an unfair trade practice in the context of exercising one's legitimate contractual rights." 338 Conn. 189, 203 (2021). In that case, the defendant appealed the trial court's refusal to instruct the jury that "[w]hen a party acts consistently with its rights under a contract, its conduct cannot violate CUTPA." 338 Conn. 189, 206 (2021). The Connecticut Supreme Court held that "[a]lthough action in accordance with a party's express rights under a contract ordinarily is shielded from CUTPA liability, liability may attach when, for example, the defendant has acted in bad faith with respect to the contract." *Id.* at 213. For instance, a party might violate CUTPA if it "negotiates in bad faith so as to cause the other party reasonably to rely on a false belief that an annual contract will be renewed." *Id.* at 203.

There is no evidence that AB has acted in bad faith in its enforcement of Paragraphs 2 and 3, let alone that it acted in bad faith in the limited manner described in *Kent Literary Club*. Indeed, since 2016, AB has hardly enforced Paragraphs 2 and 3 at all. Dichello relies on AB's filing of counterclaims in this lawsuit to support its claim that AB continues to enforce Paragraphs 2 and 3. This argument would require me to find that filing counterclaims constitutes a CUTPA violation. But "the filing of a single non-sham lawsuit … cannot form the basis of a

claim under CUTPA," because permitting such a claim would risk infringing on the First Amendment right to petition the judiciary for redress. *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983) (applying the *Noerr-Pennington* doctrine); *see also Ancona v. Manafort Bros.*, 56 Conn. App. 701, 715 (2000) (affirming ruling that party who filed breach of contract action with probable cause did not violate CUTPA); *Zeller v. Consolini*, 59 Conn. App. 545, 553-56 (2000) (affirming dismissal of tortious interference claim because of *Noerr-Pennington* doctrine). Because I have already granted summary judgment to AB on its counterclaims, Dichello cannot show they are a "sham." So AB's decision to file those counterclaims does not violate CUTPA.

    (iii)    <u>Enforcement of Paragraph 1(b)(iv)</u>

Dichello also claims that AB violated CUTPA by enforcing Paragraph 1(b)(iv), which requires Dichello to comply with the "operating, sales, and merchandizing standards" set out in Exhibit 9 of the Agreement. Here, there is evidence that AB has enforced the Agreement within the statute of limitations. John Hall's declaration states that Dichello "complied with [AB]'s Exhibit 9 Assessments," and the latest assessment occurred on May 3, 2023. ECF No. 166 ¶ 16. Dichello apparently complied with AB's national cents per case media program until 2020. ECF No. 165-1 ¶ 71; ECF No 167 at 149.

No reasonable jury could conclude that the Exhibit 9 assessments or the cents per case program violate Connecticut's policy against tied houses. Regular audits of Dichello's business do not constitute the type of domination or control of wholesalers that Connecticut's liquor laws are intended to prohibit. And Dichello presents no evidence that these audits harmed the public, the critical consideration for determining whether they violate the public policy behind the Liquor Control Act. *Eder Bros., Inc.*, 285 Conn. at 377 ("[T]he purpose of the [Liquor Control]

[A]ct is to regulate the sale and consumption of alcohol for the protection of the public, not for the economic benefit of a particular wholesaler."). As I have already explained, there is no evidence in the record that the cents per case program gives AB control over Dichello's advertising or leads to excessive intemperance. Therefore, I grant AB's Motion for Summary Judgment as to Dichello's CUTPA claim.

### D. Dichello's Tortious Interference Claim

AB also moves for summary judgment on Dichello's tortious interference claim, arguing that (1) Dichello's claims regarding DiBetta are time-barred, and (2) Dichello's claims regarding Deane are not cognizable, because Deane has no contract with Dichello, and the evidence does not support Dichello's claims. ECF No. 147-1 at 11. I agree that Dichello's claims regarding DiBetta are time-barred, and therefore need not consider the merits of those claims. I also agree that Dichello has not provided sufficient evidence to create a genuine dispute of material fact as to whether AB tortiously interfered with Dichello's relationship with Deane.

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 864 (2015) (citations and internal quotation marks omitted). "[N]ot every act that disturbs a contract or business expectancy is actionable." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805 (1999). To prove the interference was "tortious," the plaintiff must demonstrate "malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." *Id.* "[A]n action for intentional interference with business relations …

requires the plaintiff to plead … at least some improper motive or improper means." *Blake v. Levy*, 191 Conn. 257, 262 (1983).

(i)    Tortious Interference Claims Regarding DiBetta

Dichello alleges that AB "interfere[d] with its relationship with Sal DiBetta by conspiring to force a sale of its business." ECF No. 165 at 25. A tortious interference claim has a three-year statute of limitations. *See* Conn. Gen. Stat. § 52-577 (stating that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission"); *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996) (affirming grant of summary judgment on tortious interference claim based on three-year statute of limitations). Dichello terminated DiBetta's employment on August 28, 2015. ECF No. 165-1 ¶ 20. Therefore, any claim that AB tortiously interfered with Dichello's relationship with DiBetta is time-barred.

(ii)    Tortious Interference Claims Regarding Deane

Dichello also claims that AB has tortiously interfered with its contractual and beneficial relationship with Deane by (1) enforcing the Exhibit 9 requirements in a manner that caused Deane to take time away from his work for Dichello and "maximize sales of AB products at the expense of Dichello's overall profitability," (2) requiring "the regular reporting of Dichello business information to AB" in violation of Dichello's Employee Handbook, and (3) causing Deane to breach the Ethical Standards/Conflict of Interest section of the Handbook. ECF No. 165 at 17, 26.

As a preliminary matter, AB argues that Dichello's tortious interference claim fails because Deane is "an at-will employee with no employment contract." ECF No. 147-1 at 35. I disagree. Connecticut law recognizes a claim not only for tortious interference with a contract, but also for interference with a "business relationship" *Varley v. First Student, Inc.*, 158 Conn.

App. 482, 502 (2015).[24] "The necessary elements of a cause of action in tortious interference with business relations are the existence of a business relationship, an intentional and improper interference with that relationship and a resulting loss of benefits of the relationship." *Blake*, 191 Conn. at 260. Therefore, Dichello need only show that it had a business relationship with Deane, not a contractual one.

A reasonable jury could not conclude that AB "intentional[ly] and improper[ly]" interfered with Dichello's business relationship with Deane. *Blake*, 191 Conn. at 260. Dichello must "prove at least some improper motive or improper means on the part of the defendants." *Id.* Dichello's allegations, supported almost exclusively by John Hall's declaration,[25] show only that AB sought to enforce its contractual rights. *See Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc.*, 64 Conn. App. 417, 431-32, (2001) (holding that evidence "defendant

---

[24] In Dichello's Amended Complaint, it alleges that "Dichello has enjoyed a contractual and beneficial relationship" with Deane, and AB knew of and "intentionally interfered with this relationship to advance its own economic interests to the detriment of Dichello." ECF No. 17 ¶¶ 108-110.

[25] AB argues that John Hall's declaration "directly contradict[s] his own prior testimony," and the Court therefore cannot rely on it in ruling on summary judgment. ECF No. 176 at 15. At his deposition, John Hall was asked, "Has Anheuser-Busch done anything to interfere with Dichello's relationship [with Deane] since you rehired him in 2015?" He replied, "Not that I know of." ECF No. 147-10 at 150. As stated above, his declaration states that "Anheuser-Busch continually interfered with the relationship between Dichello and Mr. Deane…" ECF No. 166 ¶ 29. Under the Second Circuit's "sham affidavit doctrine," a party cannot "create an issue of fact by submitting an affidavit in support or opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Clark v. Quiros*, No. 3:19-cv-00575 (VLB), 2023 WL 6050160, at *15 (D. Conn. Sept. 15, 2023) (alterations, quotation marks, and internal citations omitted). I agree with AB that Paragraph 29 of John Hall's declaration directly contradicts his deposition testimony. I will consider portions of Hall's declaration that do not directly contradict his testimony. *See Wave Studio, LLC v. Gen. Hotel Mgmt. Ltd.*, No. 13-CV-09239, 2017 WL 972115, at *1 (S.D.N.Y. Mar. 10, 2017), aff'd, 712 F. App'x 88 (2d Cir. 2018) ("To the extent [a witness's] affidavit contradicts her prior testimony, I will disregard it, but such contradictions do not make the entire affidavit a nullity.")

Nonetheless, AB's Motion to Strike John Hall's declaration is denied. "Under Fed. R. Civ. P. 12(f), a court may strike 'any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter' from a party's pleading." *Ricci v. Destefano*, No. 3:04-CV-1109 (JBA), 2006 WL 2666081, at *1 (D.Conn. Sept.15, 2006). "[M]otions to strike are disfavored and not routinely granted, and it is the movant's burden to demonstrate prejudice by the inclusion of the alleged offending material." *Holmes v. Fischer*, 764 F.Supp.2d 523, 532 (W.D.N.Y.2011). "Rule 12(f) allows a court to strike pleadings only," and "[t]herefore it is inappropriate to strike material contained in exhibits to motions." *Ricci*, 2006 WL 2666081, at *1. "Parties ... may point out in their summary judgment briefing evidence that they believe should not be considered because it is inadmissible or immaterial, but they may not utilize a motion to strike to make such arguments and thereby evade the page limits for a summary judgment brief." *Id.* at *3.

declined to release a property right that it was under no obligation to release" was insufficient to support tortious interference claim); *Varley*, 158 Conn. App. at 506-07 (granting summary judgment on tortious interference claim where defendant exercised a contractual right to "express dissatisfaction" to plaintiff's employer).

Dichello claims that the Exhibit 9 standards interfere with its business relationship with Deane by "requir[ing]" Deane "to take time away from" his work, and by causing Deane to spend more on "marketing, handling, and delivery" of AB's products than was profitable for Dichello. ECF No. 165 at 26; ECF No. 166 ¶¶ 16-22, 33-34. Neither of these allegations support a tortious interference claim, because Dichello has presented no evidence that AB used an "improper means" or had an "improper motive." *Blake*, 191 Conn. at 260. AB is entitled to enforce Exhibit 9 of the Agreement. Since AB relies on Dichello to distribute AB's products, it is also consistent with the Agreement for AB to take up some of Dichello's time and resources. Dichello points to no evidence that AB's invocation of the Exhibit 9 process during Deane's tenure has been unduly onerous. Nor does Dichello show that AB has used the Exhibit 9 process with an "improper motive" during Deane's tenure.

Second, Dichello claims that AB demanded "regular reporting of Dichello's business information to [AB]," which caused Deane to violate the Confidentiality Section of Dichello's Handbook. ECF No. 166 ¶¶ 28, 32. According to Hall, the Handbook prohibits employees from disclosing "any information about Dichello Distributors, Inc.'s prices, systems, business or marketing plans, methods of operation, contractual agreements, software, customer and clients lists or other proprietary matters concerning [its] business affairs to any person outside of Dichello Distributors, Inc...." *Id.* ¶ 28. The 2014 Revision of the Employee Handbook is in the record, ECF No. 147-19, and Deane testified that that version of the Handbook is "currently in

effect," ECF No. 147-10 at 47. It permits employees to share information if they have authorization from the "President, General Manager, or Vice President of Finance," or if the person they share the information with has a "need to know." ECF No. 147-19 at 12.

Dichello presents no evidence that AB asked Deane to violate the confidentiality provision. Hall and Simon testified that they were not aware of Deane's violating the Handbook. ECF No. 147-10 at 149, 178. Because Dichello has cited no examples of AB's requesting confidential information, I cannot determine if the "business information" AB requested fell into the categories listed in the Handbook. And any information Deane shared may have fallen into the exceptions listed in the Handbook.

Nor is there any evidence that AB knew that the information it requested might violate the Handbook or acted with an improper means or motive in requesting the information. Indeed, since the Agreement predates Dichello's relationship with Deane, Dichello was aware of AB's rights to request information, for instance, about matters related to sales of its products, when it entered into its relationship with Deane. It is difficult to see how AB might have acted with an improper motive or means by continuing to adhere to the Agreement in its dealings with someone Dichello hired to fulfill its own obligations under the Agreement. No reasonable jury could conclude based on this evidence that AB interfered with Dichello's business relationship with Deane.

Finally, Dichello claims that AB interfered with Deane's obligations under the Ethical Standards/Conflict of Interest section of the Handbook. That section states that Employees cannot "accept or seek out any benefit from a vendor … that would even appear to compromise their judgment." ECF No. 166 ¶ 28. Dichello makes the convoluted argument that AB's "contractual right to revoke the eligibility to be employed as Dichello's 'Equity Manager' … is a

74

'benefit' from a vendor which would 'appear to compromise [the] judgment of that manager.'" *Id.* ¶ 30. This interpretation stretches the language of the Handbook to its breaking point: AB's right to withdraw its approval of Deane for good cause is hardly a "benefit" that Deane has "accept[ed] or [sought] out," because, to the extent it is a benefit at all, it was part of the contractually created position to which Deane was appointed. *Id.* Moreover, there is no evidence that AB used an improper means or acted with an improper motive in enforcing this provision. Finally, there is no evidence that this "benefit" changed Deane's behavior in any way that harmed Dichello.

The evidence regarding AB's interactions with Deane do not create an issue of material fact as to whether AB tortiously interfered with Dichello's relationship with Deane. Therefore, AB's Motion for Summary Judgment as Dichello's tortious interference claim is granted.

## V.    CONCLUSION

For the reasons described herein, I grant AB's Motion for Summary Judgment as to liability on Count I and II of its counterclaims. I also grant AB's Motion for Summary Judgment on Counts I (CUTPA) and Count VIII (Tortious Interference) of the Plaintiff's Amended Complaint. I deny AB's Motion to Strike. I also deny Dichello's Motion for Summary Judgment on Count I, II, III and IV of AB's counterclaims.

Finally, I deny AB's Motion for Summary Judgment as to Count V of its counterclaims, which seeks a declaratory judgment that Paragraphs 2 and 3 of the Agreement are enforceable. As I explained in my ruling on AB's Motion to Dismiss, "Courts reject declaratory judgment claims when other claims in the suit will resolve the same issues, because under such circumstances, a declaratory judgment will not serve any useful purpose." ECF No. 59 at 31 (quotations and internal citations omitted). Here, AB's "request for declaratory judgment is …

duplicative of the relief sought through" Counterclaim Counts I and II. *Id.* Indeed, this Court has already held that Paragraphs 2 and 3 of the Agreement are enforceable.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
               February 7, 2024